# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-DP-01348-SCT

*CURTIS GIOVANNI FLOWERS a/k/a CURTIS
FLOWERS a/k/a CURTIS G. FLOWERS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/19/2010 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER, JR. |
| TRIAL COURT ATTORNEYS: | ALISON R. STEINER |
| | ANDRE de GRUY |
| | RAY CHARLES CARTER |
| | DOUG EVANS |
| | CLYDE HILL |
| COURT FROM WHICH APPEALED: | MONTGOMERY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | SHERI LYNN JOHNSON |
| | KEIR M. WEYBLE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BRAD A. SMITH |
| | JASON L. DAVIS |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 11/02/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. Curtis Giovanni Flowers was indicted on four counts of capital murder with the underlying felony of armed robbery, stemming from the 1996 murders of four employees of Tardy Furniture Store in Winona, Mississippi. Following his sixth trial, he was convicted

on all four counts of capital murder and sentenced to death. The Court affirmed his convictions and death sentence in *Flowers v. State*, 158 So. 3d 1009 (Miss. 2014) (*Flowers VI*). Flowers filed a petition for a writ of certiorari with the United States Supreme Court. In *Flowers v. Mississippi*, 136 S. Ct. 2157 (2016), the Supreme Court granted Flowers's petition for a writ of certiorari, vacated the Court's judgment in *Flowers VI*, and remanded the case to the Court for further consideration in light of *Foster v. Chatman*, 136 S. Ct. 1737 (2016).

¶2. The Supreme Court decided *Foster* after *Flowers VI* had been decided by the Court.[1] Because the sole issue raised in *Foster* was whether the prosecution's use of peremptory strikes was racially motivated in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court's order pertains to only one issue raised by Flowers in his latest appeal to the Court—the *Batson* issue. Accordingly, the remaining issues addressed by the Court in *Flowers VI* were not disturbed and the Court's opinion as to the remaining issues is reinstated as fully set out herein.

¶3. On remand, the Court afforded the parties an opportunity to submit supplemental briefs in light of *Foster* as directed by the Supreme Court. After review and further consideration in light of *Foster*, we discern no *Batson* violation and reinstate and affirm Flowers's convictions and death sentence.

**Factual Background and Procedural History**

---

[1] On November 13, 2014, the Court issued its opinion in *Flowers VI*, affirming Flowers's capital murder convictions and sentence of death, with mandate issuing on April 2, 2015. On May 23, 2016, the Supreme Court issued its opinion in *Foster*.

¶4. At approximately 9:00 on the morning of July 16, 1996, Bertha Tardy, the owner of Tardy Furniture Store, called Sam Jones and asked him to come to the store to train two new employees. When Jones arrived at the store a short time later, he discovered the bodies of Bertha Tardy, Robert Golden, Carmen Rigby, and Derrick Stewart. All four victims had been shot in the head; Stewart was the only victim still alive when Jones arrived. Jones went to a nearby business and asked an employee to call the police. Johnny Hargrove, the City of Winona Police Chief, was the first law enforcement officer to arrive; he called for backup and ambulance services. Shell casings from 0.380 caliber bullets were recovered from the scene, and a bloody shoeprint was found near one of the victims.

¶5. Shortly after officers arrived at the scene, law enforcement officers received a call about an auto burglary at Angelica Garment Factory in Winona. Deputy Sheriff Bill Thornburg responded, and he learned that someone had burglarized Doyle Simpson's car and had stolen a 0.380 caliber pistol. Katherine Snow, an Angelica employee, placed Curtis Flowers at Simpson's car around 7:15 that morning.

¶6. Police interviewed Flowers around 1:30 that afternoon, and Flowers consented to a gunshot residue test. Police interviewed Flowers again two days later on July 18, 1996. Flowers claimed to have been babysitting his girlfriend's children on the morning of the murders, but he provided inconsistent statements about his schedule. During the July 16 interview, Flowers said that he woke up around 6:30 a.m. on the day of the murders and went to his sister's house around 9:00 a.m., then went to a local store around 10:00 a.m. On July 18, Flowers said that, on the morning of the murders, he woke up around 9:30 a.m., went to

3

his sister's house around noon, and went to the store at approximately 12:45 p.m. Flowers told investigators that he had been employed at Tardy Furniture for a few days earlier that month, but he had been fired on July 6 after he did not show up for a few days. Flowers moved to Texas in September 1996. After further investigation, Flowers was arrested and brought back to Mississippi. He was indicted on four separate counts of capital murder in March 1997.

¶7. Flowers was tried for the murder of Bertha Tardy in October 1997. After a change of venue from Montgomery County to Lee County, Flowers was convicted and sentenced to death. Flowers appealed and we reversed and remanded for a new trial on the ground that Flowers's right to a fair trial had been violated by admission of evidence of the other three murder victims. *Flowers v. State*, 773 So. 2d 309 (Miss. 2000) ("*Flowers I*"). Flowers's second trial was for the murder of Derrick Stewart; it was held in Harrison County in March 1999. The jury returned a guilty verdict and sentenced Flowers to death. On appeal, we again reversed and remanded for a new trial. The Court held that Flowers's right to a fair trial had been violated, again, by admission of evidence of the other victims and by the prosecution arguing facts that were not in evidence. *Flowers v. State*, 842 So. 2d 531 (Miss. 2003) ("*Flowers II*").

¶8. The Montgomery County Circuit Court held Flowers's third trial in 2004 and tried him for all four murders. The jury found Flowers guilty and sentenced him to death. Finding that the State had engaged in racial discrimination during jury selection, the Court once again reversed and remanded the case for a new trial. *Flowers v. State*, 947 So. 2d 910 (Miss.

4

2007) ("*Flowers III*"). Flowers's fourth and fifth trials also were on all four counts of capital murder. Both resulted in mistrials when the jury was unable to reach a unanimous verdict during the culpability phase. The State did not seek the death penalty in the fourth trial but did seek it in the fifth trial.

¶9.     The circuit court conducted Flowers's sixth trial, the subject of the instant appeal, in June 2010 in Montgomery County. The State tried Flowers for all four murders. The State called twenty-one witnesses in its case-in-chief. Police Chief Johnny Hargrove was the State's first witness. Hargrove testified that police had found a bloody shoeprint at the scene. Hargrove had asked the District Attorney's Office and the Highway Patrol to help investigate the murders. Mississippi Highway Patrol Investigator Jack Matthews testified that he saw a bloody shoeprint and shell casings scattered near the bodies. Matthews testified that cash was taken from the store during the murders and that he found Flowers's time sheet and a check made out to him for $82.58 on Bertha Tardy's desk. Matthews said that, according to the documents on Bertha Tardy's desk, the store would have had $300 cash on hand that morning. However, there was only change, no bills, in the cash drawer. During his investigation, Matthews spoke with Roxanne Ballard, Bertha Tardy's daughter, and learned that Flowers recently had been fired from his job at Tardy Furniture. Matthews testified that $235 was found hidden in Flowers's headboard after the murders. He also testified that Flowers wore a size ten-and-a-half shoe.

¶10.     Ballard was the bookkeeper at Tardy Furniture and had worked in the store her whole life. Looking at the books from the morning of the murders, Ballard testified that the store

5

had $400 in the cash drawer that morning. However, she confirmed Matthews's testimony that the books showed $300, but Ballard saw a receipt for a late charge in the amount of $100, so she knew the drawer had contained a total of $400. Ballard testified that $389 was missing from the cash drawer after the murders. Also, looking at pictures from the crime scene, Ballard testified that the photos showed a bank bag lying wide open on a pile of fabric swatches. She testified that the bank bag was always closed and it should have been in a drawer or on Carmen Rigby's desk.

¶11.    Melissa Schoene, a crime scene expert with the Mississippi Crime Laboratory, testified that she took impressions of the bloody shoeprint and collected the 0.380 caliber casings. Sheriff Bill Thornburg testified that he had gone to Angelica Garment Factory on the day of the murders to investigate Doyle Simpson's stolen 0.380 caliber pistol. Thornburg testified that it looked like a screwdriver or tire iron had been used to pry open the glove box of Simpson's car. Thornburg also went to Simpson's mother's home to collect spent 0.380 hulls from Simpson's gun. A few days after the murders, Thornburg searched the home of Connie Moore, Flowers's girlfriend. He found a size ten-and-a-half Fila Grant Hill shoebox in a dresser at Moore's house.

¶12.    David Balash, a firearms identification expert, testified that the bullets collected from Tardy Furniture either matched the bullets or were consistent with the bullets collected from Simpson's mother's house. Joe Andrews, a forensic scientist specializing in trace evidence, testified that Flowers's gunshot residue test revealed one particle of gunshot residue on the back of Flowers's right hand. Andrews also analyzed the shoeprint found at Tardy Furniture,

6

and he determined that the print was consistent with size ten-and-a-half Fila Grant Hill tennis shoes. Patricia Hallmon Odom Sullivan, one of Flowers's neighbors, testified that she saw Flowers wearing Fila Grant Hill tennis shoes at 7:30 a.m. on the day of the murders. Elaine Goldstein, another neighbor, testified that she had seen Flowers wear Fila Grant Hill tennis shoes a couple of months before the murders.

¶13. Multiple witnesses placed Flowers at or around Angelica Garment Factory and Tardy Furniture on the morning of the murders. Katherine Snow, an Angelica Garment Factory employee, testified that she saw Flowers leaning against Simpson's car at 7:15 on the morning of the murders. Snow also identified Flowers in a photographic lineup and in court. James Kennedy testified that he saw Flowers walking toward Angelica Garment Factory at 7:15 a.m. Edward McChristian testified that he saw Flowers walking north, away from Angelica Garment Factory, between 7:30 and 8:00 a.m. Mary Jeanette Fleming testified that she saw Flowers walking toward Tardy Furniture at approximately 9:00 a.m. Beneva Henry testified that she saw Flowers walking toward downtown Winona, in the direction of Tardy Furniture, sometime between 9:00 and 9:30 a.m.[2] Clemmie Fleming testified that she was going to Tardy Furniture to pay a bill a little after 10:00 a.m, and she saw Flowers running away from the back of Tardy Furniture.

---

[2] Beneva Henry's testimony from Flowers's 2004 trial was read to the jury. In the nearly fifteen years between the 1996 murders and Flowers's sixth trial, several witnesses had died, moved out of state, or were otherwise no longer available to testify. Their testimony from prior trials had to be read to the jury. Those witnesses were Beneva Henry, Sam Jones, Porky Collins, Stacey Wright, and Billy Glover.

¶14.    Porky Collins testified that he saw two African-American men, who appeared to be arguing, outside Tardy Furniture at around 10:00 on the morning of the murders. Collins circled the block and returned to where he saw the men arguing; at that point, the men were headed toward Tardy Furniture. Collins identified Flowers as one of the men he saw that morning. Doyle Simpson testified that his 0.380 caliber pistol was in his car's glove compartment when he arrived at Angelica the morning of July 16, 1996. Simpson discovered that his gun was missing at approximately 11:00 a.m. that day. Simpson, who was Flowers's uncle, testified that Flowers knew he had a gun and that Flowers had seen it in his car before. Odell Hallmon, a jailhouse informant who had been in a cell next to Flowers, testified that Flowers had confessed to killing four people at Tardy Furniture.

¶15.    After the State's case-in-chief, the defense moved for a directed verdict, which the trial court denied. The first witness to testify in the defense's case-in-chief was Mike McSparrin, a fingerprint expert. McSparrin testified that the fingerprints found at the crime scene, as well as on the Fila shoebox, did not match Flowers's fingerprints. The defense also called Steve Byrd, a firearms forensic analyst. Byrd testified that he could not definitively determine whether all of the bullets recovered from the crime scene were fired from the same gun. James Williams, a law enforcement investigator, testified that he did not see a bloody footprint when he first arrived at Tardy Furniture. Billy Glover testified that, on the day of the murders, he saw Flowers around 9:00 a.m. at a friend's house and that they talked for fifteen or twenty minutes. Connie Moore, Flowers's girlfriend at the time, testified that she had purchased a pair of size ten-and-a-half Fila Grant Hill tennis shoes for her son.

¶16.    Stacey Wright testified that Clemmie Flemming had admitted to her that she had lied about seeing Flowers running away from Tardy Furniture on the morning of the murders. Wright testified that Clemmie had said she would get money or have her bill paid at Tardy Furniture in return for her statement against Flowers.  Clemmie's sister, Mary Flemming, testified that she was with Clemmie the morning of the murders and that Clemmie did not go to Tardy Furniture to pay her bill that morning.  Latarsha Blissett also testified that Clemmie had told her that if she made a statement against Flowers, she would get money or have her account at Tardy Furniture paid.  Further, Blissett testified that investigators had asked her if she knew Flowers's shoe size and had implied that she would receive reward money for providing a statement.  Kittery Jones, Flowers's cousin, also testified that investigators had implied that he would receive reward money in return for providing a statement linking Flowers to the murders.

¶17.    On June 18, 2010, the jury returned a guilty verdict for all four murders.  Following the sentencing hearing, the jury sentenced Flowers to death.  The jury found the following aggravating circumstances beyond a reasonable doubt: (1) the defendant knowingly created a great risk of death to many persons; (2) the capital offenses were committed while the defendant was engaged in the commission of an armed robbery for pecuniary gain; and (3) the capital offenses were committed for the purpose of avoiding or preventing lawful arrest or effecting an escape from custody.  Flowers filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial, which was denied.  Flowers timely filed a notice of appeal.

9

**Issues**

¶18.   Flowers raises the following thirteen assignments of error on appeal:

1.   The evidence presented at Flowers's trial was constitutionally insufficient to support a finding of guilt beyond a reasonable doubt, as mandated by the Fifth and Fourteenth Amendments to the United States Constitution and Section Fourteen of the Mississippi Constitution.

2.   Flowers's right to a fair trial, as guaranteed by Mississippi law and the Fourteenth Amendment to the United States Constitution, was violated when the prosecution repeatedly argued material facts not in evidence during its culpability phase closing argument.

3.   The in-court and out-of-court eyewitness identifications of Flowers by Porky Collins were constitutionally unreliable and the trial court erred in overruling Flowers's objections to their admission.

4.   The trial court's exclusion of expert testimony explaining the deficiencies in law enforcement's investigation, and the defects in the composition of the photo lineups shown to Porky Collins, violated Mississippi law and Flowers's right to present a defense as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

5.   The trial court erred in refusing to exclude prosecution testimony that a single particle of gunshot residue had been detected on Flowers's hand.

6.   The jury selection process, the composition of the venire and the jury seated, and pervasive racial and other bias surrounding this matter violated Flowers's fundamental constitutional rights protected by the Sixth and Fourteenth Amendments.

    a.   The prosecutor violated the Equal Protection Clause of the Fourteenth Amendment when he struck five African American jurors after utilizing disparate questioning and citing pretextual reasons.

    b.   The jury failed to adequately deliberate because it was influenced by racial bias in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

c. Pervasive racial bias in the venire infected the fairness of the proceedings, and requires reversal and remand for a new trial.

7. The State's six attempts to convict Flowers of the same offense violated the Double Jeopardy Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment.

8. The trial court reversibly erred in refusing Flowers's requested circumstantial evidence instructions at the culpability phase.

9. The trial court reversibly erred in the penalty phase instructions to the jury.

10. The convictions and death sentences in this matter were obtained in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the counterparts in the Mississippi Constitution.

11. This Court should set aside its prior order denying Flowers's Motion for Remand and Leave to File Supplemental Motion for New Trial.

12. The death sentence in this matter is constitutionally and statutorily disproportionate.

13. The cumulative effect of the errors mandates reversal of the verdict of guilt and/or the sentence of death entered pursuant to it.

We address each of Flowers's issues but have summarized and reorganized several issues for the purpose of discussion.

**Discussion**

¶19. Heightened scrutiny is applied to review of capital murder convictions where the death sentence has been imposed. *Fulgham v. State*, 46 So. 3d 315, 322 (¶ 16) (Miss. 2010) (citing *Bishop v. State*, 812 So. 2d 934, 938 (¶ 7) (Miss. 2002)). "What may be harmless error in a case with less at stake [may become] reversible error when the penalty is death." *Id.* The standard of review for each issue will discussed throughout.

11

**I. Whether the in-court and out-of-court identifications of Flowers by Porky Collins were constitutionally unreliable, and whether the trial court erred in overruling Flowers's objections to their admission.**

¶20.    Flowers claims that the trial court erred in admitting evidence of Porky Collins's out-of-court and in-court identifications of Flowers.  Collins died in 2002, so his testimony from the 1999 trial was read to the jury.  Collins's testimony was that, on the morning of the murders, he had seen two African-American men who appeared to be arguing outside Tardy Furniture.  Collins thought the men were about to fight, so he circled the block and returned to see what was going on.  The second time Collins saw the men, they were walking toward Tardy Furniture.  Collins saw only one man's face when he drove past them.

¶21.    After hearing about the murders at Tardy Furniture, Collins went to police the same day, reported what he had seen that morning, and gave a description of the men.  On August 24, 1996, police showed Collins two photo arrays with six photos each – the first group included Doyle Simpson's photograph; the second group included Flowers's photograph.  Collins testified that he was not expected to identify the man whose face he did not see.  According to police department notes, in response to the first photo array, Collins pointed to Simpson and said that he "looked like" the man he had seen, but he was unable to be positive.  The entirety of the officer's handwritten notes were as follows:

> Porky Collins
> Picture Line-up        11:10 a.m.
>
> #1 and #3 resembles, but hairline was further back
> #6 Pointed to Simpson said hairline like this, may have appeared a little darker.
> "But it looks like him."
> "Face was also same shape, round like this."
> "Unable to be positive."

12

Collins then was shown the second photo array, and he identified Flowers as the man he had seen in front of Tardy Furniture. The officer administering the photo array made the following notes:

2nd Line Up

11:16 a.m.
Pointed to Curtis Flowers #4
"I think that's him."
"He was about my height."
"I'm 5'10""
"The complexion is also right."

"I believe that's him, it look[s] like him."

Identified #4

I asked Porky if he knew Curtis Flowers, he said, "No. But I know the person I just identified is the person I saw in front of Tardy's 7-16-96."

During the 1999 trial, Collins identified Flowers in court as the man whose face he had seen outside Tardy Furniture. Flowers filed a pretrial motion to suppress Collins's out-of-court and in-court identifications, which the trial court denied. On appeal, Flowers claims that the trial court erred in admitting Collins's identifications into evidence.

¶22. The standard of review for a trial court's suppression hearing findings regarding pretrial identifications is whether "substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted." **Butler v. State**, 102 So. 3d 260, 264 (¶ 8) (Miss. 2012) (quoting **Gray v. State**, 728 So. 2d 36, 68 (¶ 159) (Miss. 1998)). For an out-of-court or in-court identification to be excluded, "it must be the result of an impermissibly suggestive

13

lineup *and* the identification must be unreliable." ***Butler***, 102 So. 3d at 264 (¶ 8) (citing ***York***

***v. State***, 413 So. 2d 1372, 1383 (Miss. 1982)).  First, the court must "determine whether the

identification process was unduly suggestive." ***Latiker v. State***, 918 So. 2d 68, 74 (¶15)

(Miss. 2005) (citing ***Neil v. Biggers***, 409 U.S. 188, 198 (1972)).  Second, even if the

identification process was unduly suggestive, the identification still can be admitted if "the

out-of-court identification was nevertheless so reliable that no substantial likelihood of

misidentification existed." ***Id.***

### A. Collins's Out-of-Court Identification

¶23.    Flowers claims that the out-of-court photo lineup was unduly suggestive because the

photo array was skewed toward Flowers in several ways.  He claims that his head was larger

than the others and that the other men had lighter complexions, were younger than him, and

had varying hairstyles and facial features.  We have summarized the standard applied to out-

of-court identifications as follows:

> A lineup or series of photographs is impermissibly suggestive if "the accused,
> when compared with the others, is conspicuously singled out in some manner
> from the others, either from appearance or statements by an officer." . . . To be
> excluded, an out-of-court identification must have resulted from an
> identification procedure that was so impermissibly suggestive as to give rise
> to "a very substantial likelihood of misidentification." . . . Where the defendant
> is "the only one depicted with a distinctive feature," courts usually will find the
> lineup to be impermissibly suggestive. . . . On the other hand, "minor
> differences" with the suspects or differences in the photograph backgrounds
> will not render a lineup impermissibly suggestive. . . .

***Butler***, 102 So. 3d at 264-65 (¶¶ 9-11) (citations omitted).  Applying the standard articulated

in ***Butler***, we recently held that a photo lineup was not impermissibly suggestive even though

14

the defendant was the only person in the lineup with facial tattoos. ***Stewart v. State***, 131 So. 3d 569, 574 (¶ 16) (Miss. 2014). In ***Stewart***, we concluded:

> We find that the case *sub judice* is similar to the cases of ***White***, ***Foster***, and ***Jones***, in which this Court upheld similar identifications. In ***White***, the witness noticed the defendant's plaited hair and forehead tattoo during the commission of the crime. ***White v. State***, 507 So. 2d 98, 99 (Miss. 1987). This Court upheld the out-of-court and in-court identifications of the defendant even though the defendant was the only suspect in the lineup with plaited hair. ***Id.*** at 99-101. The defendant also had a forehead tattoo, which the witness identified at trial. BI at 99-100. In ***Foster***, this Court upheld the out-of-court and in-court identifications of the defendant even though he was the only person in the lineup wearing a fishing hat, where the defendant had worn a fishing hat during the robbery. ***Foster v. State***, 493 So. 2d 1304, 1305-06 (Miss. 1986). Likewise, in ***Jones***, this Court upheld the out-of-court and in-court identifications of the defendant even though he was the only suspect in the photo lineup wearing a hat similar to the one worn by the attacker. ***Jones v. State***, 504 So. 2d 1196, 1199-1200 (Miss. 1987). This Court found that, even though the hat may have played a significant part in the identification, it was not impermissibly suggestive, because the witness had given an accurate description and identified the defendant with great conviction at trial. ***Id.*** at 1200.

***Id.*** at 573 (¶ 12).

¶24. In the photo array that included Flowers's photograph, Flowers's head is slightly larger than the others, as it appears his photo was taken from a closer angle than the others. However, the use of a different photographic technique creates only a minor difference, and that is not enough to render the photo lineup impermissibly suggestive. ***Batiste v. State***, 121 So. 3d 808, 856 (¶ 116) (Miss. 2013). The other characteristics Flowers claims caused the array to be suggestive are not present – three other men have complexions similar to Flowers's complexion; Flowers appears to be the same age or only slightly older than the other men; two of the other men have hair styles similar to Flowers's; and three of the other

men have facial hair similar to his. Accordingly, Flowers fails to show that the lineup was unduly suggestive. Further, Collins provided a description to police on the day of the murders, and he was confident in his identification of the man he saw in front of Tardy Furniture. The trial court did not err in admitting Collins's out-of-court identification. Because the lineup was not impermissibly suggestive, we need not consider the **Biggers** factors for reliability.

### B. Collins's In-Court Identification

¶25. Although Flowers's issue statement asserts that Collins's in-court identification was "constitutionally unreliable," he provides no substantive argument or support for that claim. The extent of his argument is a footnote, which provides: "there is no issue of the admissibility of the in-court identification, given that Collins could not positively identify Flowers in the courtroom at the second trial, and was deceased by the time of this, the sixth trial." His assertion is incorrect. Collins unequivocally identified Flowers at the second trial. Flowers also implies that the typical jury consideration of determining Collins's credibility is not applicable in the case *sub judice* because his testimony was read to the jury, as opposed to live testimony. Although the jury did not personally observe Collins testifying, defense counsel's cross-examination of Collins adequately addressed credibility. For example, defense counsel asked Collins about his memory, any medication he was taking that could affect his memory, and whether he wore glasses. The characteristics of trial itself – trial by jury, an impartial judge, representation by counsel, and witnesses subject to an oath and

16

cross-examination – adequately protect against any suggestiveness of in-court identifications at trial. *Galloway v. State*, 122 So. 3d 614, 663 (¶ 164) (Miss. 2013).

¶26.    Although Flowers does not claim that Collins's in-court identification was tainted by the alleged suggestiveness of the out-of-court identification, that is the argument often made by defendants. *See **Butler***, 102 So. 3d at 266-67.  We have held that "an impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure, unless: (1) from the totality of the circumstances surrounding it, (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of *irreparable* misidentification." ***Id.*** at 267 (¶ 17) (quoting ***York***, 413 So. 2d at 1383).  Collins's out-of-court identification was not impermissibly suggestive; therefore, it could not give rise to the likelihood of an irreparable misidentification.  For the reasons given above, the issue is without merit.

>    **II.     Whether the trial court's exclusion of expert testimony violated Mississippi law and Flowers's right to present a defense as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.**

¶27.    Flowers contends that the trial court erred by excluding the testimony of two experts – Robert Johnson and Dr. Jeffrey Neuschatz.  Flowers tendered Johnson as an expert in criminal investigation procedures, but the trial court did not permit Johnson to testify.  In Flowers's fourth trial, he filed a motion to determine the admissibility of Dr. Neuschatz's testimony on the reliability of eyewitness identification evidence.  Flowers renewed the motion in the present case, and the trial court denied the motion.

¶28. We apply an abuse of discretion standard when reviewing the exclusion of expert testimony. *Gillett v. State*, 56 So. 3d 469, 494 (¶ 61) (Miss. 2010). Analysis of the admissibility of expert testimony begins with Mississippi Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702. The expert testimony must be both relevant and reliable to be admissible. *Gillett*, 56 So. 3d at 495 (¶ 63). "Expert testimony is relevant if it will 'assist the trier of fact in understanding or determining a fact at issue.'" *Galloway*, 122 So. 3d at 632 (¶ 27) (quoting *Ross v. State*, 954 So. 2d 968, 996 (¶ 57) (Miss. 2007)). To determine reliability, the following nonexhaustive list of factors may be considered: whether the expert's theory can be or has been tested; whether the theory has been the subject of peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence of standards to control the technique's operation; and the general acceptance the theory has garnered in the relevant expert community. *Gillett*, 56 So. 3d at 495 (¶ 64) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 37 (Miss. 2003); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993)). "The applicability of these factors varies depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Gillett*, 56 So. 3d at 495 (¶ 64) (citing *McLemore*, 863 So. 2d at 37).

**A. Robert Johnson**

¶29.   Flowers attempted to call Robert Johnson as an expert in criminal investigation procedures, and the State objected.   Johnson would have testified that the criminal investigation was flawed in various ways.   After a lengthy voir dire, the trial court held that Johnson could not testify because "there is no valid way of testing the field of police investigatory techniques."   The trial court also found that, even if Johnson's testimony met the reliability prong of *Daubert*, the testimony was cumulative because the law enforcement officers who already had testified at trial were throughly cross-examined and had admitted that there were flaws in the investigation.   Flowers also attempted to have Johnson give an expert opinion relating to the photographic array shown to Collins.   The trial court excluded the testimony because Johnson stated during his voir dire that he did not have sufficient information about the lineup.

### 1. Johnson's Proffered Testimony

¶30.   During the voir dire, Johnson testified at length about his law enforcement experience. Johnson is currently a law enforcement consultant and previously served as police chief in Jackson, Mississippi; Jackson, Michigan; and Lansing, Michigan.   He was Commissioner of the Mississippi Department of Corrections from 2000 to 2002.   Johnson has a master's degree in public administration, and he graduated from the FBI National Academy and the FBI Law Enforcement Executive Development program.   During his career, Johnson performed homicide investigations as a detective and directly supervised homicide investigations.   Johnson also developed protocols for criminal investigations.

19

¶31.     Johnson testified that generally accepted standards for homicide investigations exist, and he opined that the investigation in today's case failed to meet them in various ways. First, Johnson said the investigation lacked management and organization. In support of his contention, Johnson referred to the testimony of law enforcement officers who said the investigation was a "shared responsibility." Johnson also said the investigation lacked an in-depth case file, which should have included all original notes and reports. Johnson testified: "There has to be somebody who is the recipient of all the information coming from a variety of sources and is able to correlate that information and further direct the direction that the investigation needs to develop." He said that the investigation also lacked written reports of events.

¶32.     Johnson next criticized the crime scene integrity. Johnson said that the integrity of the crime scene could have been compromised by law enforcement officers and investigators meeting within the crime scene to discuss and organize the investigation. According to Johnson, a crime scene log should have been maintained listing who came and went from the crime scene to ensure that it was not contaminated. Next, Johnson testified that he was "concerned" about the investigation's early focus on one suspect – Flowers – to the exclusion of any other suspects. Johnson said early focus can result in lost evidence: "It's okay to very quickly focus on one suspect; that happens all the time, you know. But to the exclusion of all else and all others is where it becomes problematic, and you sometimes lose vital evidence that may be had because you haven't included and kept them in as a potential suspect or person of interest."

20

¶33. On cross-examination, Johnson admitted that Mississippi has no minimum standards for criminal investigations. He also admitted that the Justice Department guidelines he mentioned in direct examination were not requirements and that there are no national minimum standards for criminal investigations. Johnson stated that, rather than minimum standards, he based his opinions on generally accepted practices in police work. Further, when asked if he could provide an opinion on whether investigations that lack written reports lead to incorrect results, Johnson said investigations with written reports are "more complete." He did not, however, state that an investigation without a written report would lead to an incorrect result.

### 2. Admissibility of Johnson's Testimony

¶34. The ***Daubert*** factors apply to expert testimony relating to police investigatory techniques. *See **Ross v. State***, 954 So. 2d 968, 996-97 (Miss. 2007) ("***Ross I***"). In ***Ross I***, the defendant proffered an expert who opined that the securing of the crime scene and evidence collection were deficient. *Id.* at 997 (¶ 61). Although the Court held the testimony did not meet the reliability standards of ***Daubert*** and ***McLemore***, the opinion did not discuss why the testimony was unreliable. *Id.* The judgment was reversed and the case remanded for other reasons. *Id.* at 1019-20 (¶¶ 138-41). The defendant was convicted again and appealed, and the case was assigned to the Court of Appeals. ***Ross v. State***, 22 So. 3d 400 (Miss. Ct. App. 2009) ("***Ross II***"). In ***Ross II***, the Court of Appeals addressed the proffered expert testimony and found that the trial court did not err in excluding the testimony. *Id.* at 420-21 (¶¶ 99-104). First, the expert testimony was cumulative because the investigating

21

officers had been cross-examined about their investigative techniques and had admitted that "things could have been handled better." *Id.* at 421 (¶ 102). Second, the trial court did not abuse its discretion by finding that the testimony failed to meet the ***Daubert*** reliability prong because the expert's "memberships and associations were voluntary and fee based, not peer reviewed or tested" and "the trial court was unable to evaluate the value of [the expert's] certifications because the trial court was unaware of the requirements for certification." *Id.* at 421 (¶¶ 103-104).

¶35. Under Rule 702, the first prong of the inquiry for determining whether expert testimony should be admitted is whether the witness is "qualified by virtue of his or her knowledge, skill, experience[,] or education." ***Galloway***, 122 So. 3d at 632 (¶ 28) (quoting ***McLemore***, 863 So. 2d at 35). Johnson certainly is qualified through his knowledge, experience, and training in the field of criminal investigations. Further, there is no question that Johnson's testimony is relevant. Johnson's testimony addressed facts relating to the criminal investigation that eventually led to Flowers's arrest; thus, his testimony had a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401.

¶36. The critical inquiry, however, is whether Johnson's testimony is reliable. The trial court focused on the inability to test Johnson's theories as a basis for excluding the testimony, holding: "Because there is no valid way of testing the field of police investigatory techniques, this Court finds the proposed testimony in the field fails to meet the reliability

22

standards required under Rule 702." Whether the expert's theory can be tested is one factor to be considered under *Daubert*, but it is not conclusive. Johnson's proffered testimony is not the typical expert testimony contemplated by the testing factor – for example, one cannot test what effect the lack of organization and leadership would have on a murder investigation. As such, reliance on the testing factor alone would have been error. However, the trial court cited other reasons for excluding the testimony.

¶37. The trial court also found that, although Johnson testified that the investigation fell below generally accepted standards and practices in law enforcement, Johnson did not sufficiently articulate the standards. *See McGee v. River Region Med. Ctr.*, 59 So. 3d 575, 579 (¶ 13) (Miss. 2011) (An expert testifying about a failure to meet generally accepted standards must "identify and articulate the requisite standard that was not complied with.") A review of the proffered testimony reveals that Johnson did articulate standards relating to some – but not all – of his opinions. Johnson offered four opinions: (1) that the investigation lacked organization and management; (2) that the integrity of the crime scene was compromised; (3) that the investigation focused on one suspect too quickly; and (4) that the photo lineup used during Collins's identification was flawed. Johnson did not articulate a standard for his opinion relating to the investigation's early focus on Flowers as a suspect. And Johnson said that he was not familiar with the procedures used during Collins's identification. Thus, the trial court did not err in excluding his testimony. *See Dedaux Util. Co., Inc. v. City of Gulfport*, 938 So. 2d 838, 841 (Miss. 2006) (expert testimony must be based on sufficient facts and data).

23

¶38.    Johnson did provide applicable standards for his opinions related to the investigation's organization and management and crime scene integrity.  Regarding the investigation's organization and management, Johnson testified that, based on his experience and knowledge, the investigation should have had centralized leadership that collected information, maintained the case file, and directed the investigation.  Johnson said, "There has to be somebody who is the recipient of all the information coming from a variety of sources and is able to correlate that information and further direct the direction that the investigation needs to develop." Regarding crime scene integrity, Johnson said a crime scene log should have been maintained at the crime scene. He explained that the crime scene can be contaminated, evidence can be overlooked, and evidence can be deposited after the crime. He said, "There may be a number of issues related to the presence of people at the crime scene, so you want to have a record of when they were there, how long they stayed and when they left."

¶39.    Although Johnson provided some standards on which he based his opinions, we cannot say the trial judge abused his discretion when he held the standards insufficient. Johnson testified that the standards he applied in forming his theories were "generally accepted practices in police work."  Certainly, expert testimony can be based on experience, and one factor that may be considered in determining reliability is general acceptance in the relevant expert community.  *See **Gillett***, 56 So. 3d at 495 (¶ 64); ***Daubert***, 509 U.S. at 593-94.  But Johnson did not provide support for his statement that the practices he referenced were, in fact, generally accepted.  Allowing an expert simply to state that his opinions are

based on "generally accepted practices," without support for the assertion, could lead to essentially permitting experts to qualify themselves. While Johnson's opinions and standards seem sensible, we cannot say that he presented enough evidence that his opinions were sufficiently reliable such that the trial court abused its discretion by not allowing the testimony.

¶40. Further, the trial court was correct that Johnson's testimony was cumulative. Law enforcement officers who participated in the investigation were thoroughly questioned about the investigation and admitted that there were flaws in the investigation. Specifically, officers admitted that a crime scene log was not maintained, and the police chief testified that one should have been maintained. The officers also admitted that there was not a lead investigator, and the police chief testified that responsibilities should have been assigned, an investigative plan should have been developed, and information should have been shared with investigators and first responders. The trial court did not commit an abuse of discretion in not allowing Johnson's testimony.

### B. Dr. Jeffery Neuschatz

¶41. During Flowers's fourth trial, he filed a motion to determine the admissibility of Dr. Neuschatz's testimony on the reliability of eyewitness identification evidence. Dr. Neuschatz's affidavit and *curriculum vitae* were attached to the motion. Dr. Neuschatz's affidavit essentially provided two opinions: (1) that Collins's identification of Flowers could have been affected by a number of different circumstances; and (2) that the identification procedure was flawed. Before the fourth trial commenced, the State announced that it would

25

not seek the death penalty, and Flowers withdrew his motion regarding Dr. Neuschatz's testimony.[3]

¶42. At Flowers's fifth trial, the State sought the death penalty, and Flowers renewed his motion to determine the admissibility of Dr. Neuschatz's testimony. The court held a hearing on the motion, but Flowers did not provide a proffer of Dr. Neuschatz's testimony other than the affidavit previously submitted. The trial court denied the motion, holding that, because Collins was extensively cross-examined, the expert testimony would not assist the jury:

> And he was extensively cross-examined, even into the most minute detail about issues concerning what path he took driving around town that morning. He stated in his testimony that he had a brief glimpse of who he believed to be Mr. Flowers.
>
> There was – he was cross-examined about his ability to remember things. He was cross-examined about whether he had had difficulty with memory problems in the past. I mean I do not think there could be a more thorough cross-examination of a witness than was done with Mr. Collins.
>
> So I think given the extensive cross-examination of Mr. Collins and because all other witnesses knew Mr. Flowers on sight, I do not believe an expert on witness identification would assist the jury in the least bit in this case.

The court also found that Flowers did not demonstrate that Dr. Neuschatz's testimony was reliable based on the **_Daubert_** factors. In the present case, Flowers renewed his motion on the admissibility of Dr. Neuschatz's testimony. The trial court denied the motion, adopting its ruling from the fifth trial.

¶43. Again, in determining whether expert testimony is reliable, the court may consider the following factors: whether the expert's theory can be or has been tested; whether the theory

---

[3] Flowers's counsel apparently believed that eyewitness identification expert testimony was not admissible in noncapital cases.

has been the subject of peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence of standards to control the technique's operation; and the general acceptance that the theory has garnered in the relevant expert community. *Gillett*, 56 So. 3d at 495 (¶ 64) (citing *McLemore*, 863 So. 2d at 37, and *Daubert*, 509 U.S. at 592-94). The admissibility of Dr. Neuschatz's testimony was addressed recently in *Corrothers v. State*, 148 So. 3d 278 (Miss. 2014), *reh'g denied* (Oct. 23, 2014). In *Corrothers*, the Court applied Rule 702 and *Daubert* to Dr. Neuschatz's testimony concerning the reliability of eyewitness identification procedures and found that Dr. Neuschatz's testimony was unreliable:

> Dr. Neuschatz attempted to apply the principles and methodologies underlying his expertise in eyewitness identification to opine that [the eyewitness's] identification "could" be unreliable. But Dr. Neuschatz's opinions were undermined by his inaccurate and incomplete understanding of the facts on which he based his opinions and his complete lack of expertise on [the eyewitness's] brain injury. These deficiencies rendered his opinions so fundamentally unsupported that they could offer no assistance to the jury and amounted to nothing more than unsupported speculation. His testimony was unreliable, and there was no abuse of discretion in excluding it. We further note that Dr. Neuschatz's testimony was inconclusive and speculative because he did not offer his opinions to a reasonable degree of scientific certainty, but testified only that Josh's lineup identification "could" be unreliable and that in-court identifications "probably" are suggestive. Nor did Dr. Neuschatz submit any peer-reviewed publications supporting his principles and methodologies; the trial court had only the benefit of Dr. Neuschatz's curriculum vitae and his testimony that his studies had been subjected to peer review and publication and were generally accepted in the relevant scientific community. These facts further support the exclusion of Dr. Neuschatz's testimony.

*Corrothers*, 148 So. 3d at 297 (¶ 35).

27

¶44. In the instant case, the trial court applied the *Daubert* factors and held that Dr. Neuschatz's theories were not generally accepted and that he did not provide information about the rate of error or the principles and methods used. As to the first factor, Dr. Neuschatz's affidavit cited several tests that support his theory that exposure time, appearance change/disguise, and post-identification feedback may affect eyewitness identifications. However, he did not submit documentation of the tests. Regarding peer review and publication, Dr. Neuschatz's affidavit stated that he has "published several articles in peer reviewed journals, written peer invited chapters, and presented [his] research findings at regional and national conferences." Again, however, he did not provide the articles. The same was true in *Corrothers*. *Corrothers*, 148 So. 3d at 297 (¶ 35). Dr. Neuschatz's affidavit did not mention anything relevant to the third or fourth factors – the known or potential rate of error of the applied theory and the existence of standards and controls – therefore, the factors were not satisfied. Finally, Dr. Neuschatz cited several articles and studies supporting his theories to show that his theory is accepted in the scientific community but again, the articles were not submitted.

¶45. Because Flowers did not provide an additional proffer of Dr. Neuschatz's testimony, we have no way of knowing whether Dr. Neuschatz could have offered further support for the *Daubert* factors if he had provided live testimony. We do not hold that every expert is required to submit every article or report on which he or she relies. However, here, the trial judge – in exercising his considerable discretion – found that the defense did not present sufficient evidence in support of Dr. Neuschatz's opinions. The trial judge did not abuse his

28

discretion in concluding that the affidavit alone was insufficient to withstand the ***Daubert*** analysis and in denying Dr. Neuschatz's testimony.

¶46.    Dr. Neuschatz's affidavit included two opinions: that Collins's identification could have been affected by several factors and that the photo identification process was flawed. Regarding the photo array, the same issue was addressed in ***Corrothers***, and we held that Dr. Neuschatz's testimony may have been more prejudicial than probative due to the risk of confusion. ***Corrothers***, 148 So. 3d at 297 (¶ 36). Allowing testimony from Dr. Neuschatz that the photo identification process was flawed, while also admitting evidence of the identification because the court determined that it was not impermissibly suggestive, could result in confusing the jury.[4] Thus, the trial court did not err in excluding Dr. Neuschatz's testimony about the photo-identification process.

¶47.    As to Collins's identification, discussed at length *supra*, the judge held: "[G]iven the extensive cross-examination of Mr. Collins and because all other witnesses knew Mr. Flowers on sight, I do not believe an expert on witness identification would assist the jury in the least bit in this case." The quoted finding represents precisely the type of finding the

---

[4] In ***Corrothers***, Presiding Justice Randolph wrote the following about the admission of Dr. Neuschatz's testimony on a photo lineup after the judge determined that the lineup was admissible:

> Neuschatz also proffered a criticism of the photo lineups presented to Josh, previously ruled admissible by the trial judge. Such generalized expert testimony in limited circumstances may be pertinent at a hearing on a motion to suppress, but once the court has ruled photo-lineup evidence is admissible, offering such testimony at trial encroaches upon a legal issue already determined and usurps the trial judge's discretionary authority.

***Corrothers***, 148 So. 3d at 340-41 (¶ 184) (Randolph, P.J., specially concurring).

trial judge is called upon to make. In determining the admissibility of expert testimony, the trial judge must determine whether the testimony will "assist the trier of fact" in understanding the evidence or issues, and the judge must be satisfied that the testimony is "more probative than prejudicial." *Corrothers*, 148 So. 3d at 294 (¶¶ 24, 27) (citations omitted).

¶48. We recognize that many courts admit expert testimony regarding eyewitness identification, and we do not hold that such expert testimony is *per se* inadmissible. Rather, we recognize that the decision of "whether to admit this testimony is squarely within the discretion of the trial judge[.]" *United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986). In *Moore*, the Fifth Circuit explained that "the trial court should exercise its discretion in deciding whether or not to admit it and should balance the reliability of the testimony against the likelihood that the testimony would overwhelm or mislead the jury." *Id.* (discussing *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985)). The *Moore* Court recognized that a trial judge's exclusion of expert eyewitness testimony was not harmful where "there was evidence indicating guilt apart from the eyewitness identification." *Id.* (citing *United States v. Smith*, 736 F.2d 1103, 1108 (6th Cir. 1984)). The *Moore* court wrote:

> [I]n the present case we do not find that the district court abused its discretion in refusing to admit this evidence. We have earlier held and we now affirm that the decision whether to admit this testimony is squarely within the discretion of the trial judge and properly so. . . . Although admission of expert eyewitness testimony is proper, there is no federal authority for the proposition that such testimony *must* be admitted. The district judge has wide discretion in determining the admissibility of this evidence, and we hold that the district judge did not abuse his discretion in this case.
>
> In some cases casual eyewitness testimony may make the entire difference

30

between a finding of guilt or innocence. In such a case expert eyewitness identification testimony may be critical. But this is not at all the situation in the case before us. Even if the eyewitness identifications of Lamberth and Holder are completely disregarded, the other evidence of guilt is overwhelming. . . .

We emphasize that in a case in which the sole testimony is casual eyewitness identification, expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged. In the present case, we find no abuse of discretion in not admitting such evidence. This was not a case where casual eyewitness identifications were at all critical.

*Moore*, 786 F.2d at 1312-13 (internal citations omitted).

¶49. Like the eyewitnesses in *Moore*, Collins's identification was far from the only evidence of guilt in the instant case, and it cannot be labeled "critical." No fewer than seven other witnesses placed Flowers near Angelica Garment Factory, where Simpson's gun was stolen, and near Tardy Furniture on the morning of the murders. Collins's testimony was no different. He identified Flowers as a man he saw outside Tardy Furniture. Out of all of the witnesses, Collins was the only witness placing Flowers near the scene who did not know Flowers. The other witnesses provided even more credible testimony as they recognized Flowers by sight, having known him previously. If the case hinged on Collins's identification of Flowers, expert testimony on eyewitness identification may have been helpful to the jury. However, as in *Moore*, that was not the situation.

¶50. The trial judge made a rational and reasoned decision regarding the admissibility of Dr. Neuschatz's testimony based on the totality of the facts before him. We afford "the widest possible discretion" to a trial judge's determination on the admissibility of expert testimony, and "that decision will only be disturbed when there has been a clear abuse of discretion." *Smith v. State*, 925 So. 2d 825, 834 (¶ 23) (Miss. 2006) (quoting *Logan v. State*,

31

773 So. 2d 338, 346-47 (¶ 31) (Miss. 2000)). The trial judge's ruling on Dr. Neuschatz's testimony was not an abuse of discretion. The issue is without merit.

### III. Whether the trial court erred in not excluding evidence of a single particle of gunshot residue found on Flowers's hand.

¶51. Investigator Jack Matthews interviewed Flowers on the day of the murders and asked him to submit to a gunshot residue test. Flowers agreed to the test. A single particle of gunshot residue was found on the back of Flowers's right hand. Joe Andrews, a forensic scientist who analyzed the gunshot residue test, testified that three scenarios can result in the presence of gunshot residue on a person's hands: (1) the person actually fired a gun; (2) the person was in close proximity to a discharged gun; or (3) the person handled an object that had gunshot residue on it. At trial, Flowers moved to exclude the evidence concerning the gunshot residue, and the trial court denied the motion. Flowers contends that the trial court erred in admitting evidence that a particle of gunshot residue was found on his hand approximately three hours after the murders were reported. Flowers claims that the prejudicial effect of the evidence greatly outweighed the probative value, so it was inadmissible under Mississippi Rule of Evidence 403.

¶52. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Miss. R. Evid. 403. Applying Rule 403, the trial judge must conduct a balancing test to determine if the probative value of the evidence is "*substantially* outweighed by the danger of unfair prejudice[.]" **McGowen v. State**, 859 So.

32

2d 320, 329 (¶ 29) (Miss. 2003). On appeal, we review a trial court's decision for abuse of discretion. *Stone v. State*, 94 So. 3d 1078, 1085 (¶ 20) (Miss. 2012); *Baldwin v. State*, 784 So. 2d 148, 156 (¶ 27) (Miss. 2001). We do not reweigh the evidence and conduct a new balancing test. "The question on review is not whether this Court would have admitted the evidence, but whether the trial court abused its discretion in doing so[.]" *Stone*, 94 So. 3d at 1085 (¶ 20). *See also Baldwin*, 784 So. 2d at 156 (¶ 27) (on appeal we "must simply determine whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence").

¶53. Flowers cites *Foster v. State*, 508 So. 2d 1111 (Miss. 1987), in support of his argument. In *Foster*, the prosecution presented testimony that paint chips found on the victim's clothing were similar to paint chips found in the defendant's car. *Id.* at 1117. A chemist testified that the paint chips were "indistinguishable in color, texture, and inorganic chemical composition; and that they therefore could have had a common origin." *Id.* The State also presented evidence that the victim's stab wound was caused by a knife found in the defendant's car or one similar to it. *Id.* The Court characterized the testimony in *Foster* as "could have" testimony, which easily could mislead a jury, and held that the testimony was too speculative to be admissible. *Id.* at 1118. Thus, the Court held that the probative value of the testimony was substantially outweighed by the danger of misleading the jury. *Id.* at 1117-18.

¶54. We have distinguished *Foster* in other cases when the risks associated with "could have" testimony did not outweigh the probative value. In *McGowen v. State*, the Court held

33

testimony that a victim's physical condition likely was caused by sexual assault did not result in unfair prejudice or jury confusion. *McGowen*, 859 So. 2d at 334 (¶ 46). *McGowen* was distinguishable from *Foster* because the testimony in *McGowen* "did not employ or rely on phrases such as 'could have' or 'possible.' Rather, [the witness] merely testified as to the condition of [the victim's] body." *Id.* at 331 (¶ 36).

¶55.    In the instant case, Andrews testified that the presence of gunshot residue could result from three scenarios, and Andrews's testimony was clear that the residue did not unequivocally prove that Flowers had fired a gun:

> Q:    Now, you are not telling the jury, are you, that finding a single particle of gunshot residue says that any individual actually pulled the trigger on a firearm, are you?
>
> A:    No, ma'am. The conclusions you can draw from finding and identifying the gunshot residue on the hands of the person are one of three conclusions: That person has discharged a weapon. That person has been in close proximity to a discharged weapon or that person has handled an object that has gunshot residue on it. Those are the three conclusions you can draw from a positive gunshot residue identification.
>
> . . .
>
> Q:    The fact that you found that single particle does not bring this jury or us one step closer to knowing [by] which one of these three means that gunshot residue particle got on Mr. Flowers's hand; is that correct?
>
> A:    Yes, ma'am, that's correct.

Andrews's testimony is distinguishable from the testimony contemplated in *Foster*. Andrews set out three events that could result in a person having gunshot residue on his hands. He clearly explained that the gunshot residue did not unequivocally show that Flowers had fired

a gun.  Because Andrews's testimony was clearly explained, there is little risk that the jury was confused or misled by the testimony.  As such, the testimony was admissible under Rule 403, and the trial judge did not abuse his discretion in admitting it.  The issue is without merit.

## IV. Whether the evidence presented at trial was insufficient to support a finding of guilt beyond a reasonable doubt, as mandated by the Fifth and Fourteenth Amendments to the United States Constitution and Section Fourteen of the Mississippi Constitution.

¶56.    Flowers claims that the evidence produced at trial was insufficient to support the verdict.  He attacks the sufficiency of the evidence from multiple angles: (1) lack of motive; (2) lack of evidence that Flowers knew Simpson kept a gun in his car; (3) lack of evidence that one person, acting alone, committed the murders; (4) lack of the eyewitness credibility; and (5) lack of probative value of physical evidence.  Flowers contends that the instant case is one of circumstantial evidence rather than direct evidence; therefore, he argues that the State was required to meet a higher burden of proof.

¶57.    At the end of the State's rebuttal, Flowers moved for judgment notwithstanding the verdict (JNOV).  The trial court denied the motion.  "A motion for JNOV challenges the legal sufficiency of the evidence."  *Taylor v. State*, 110 So. 3d 776, 782 (¶ 19) (Miss. 2013) (citing *Knight v. State*, 72 So. 3d 1056, 1063 (¶ 24) (Miss. 2011)).  We apply the following standard when reviewing the sufficiency of the evidence:

> When ruling on a motion for JNOV, the trial court must view all credible evidence consistent with the defendant's guilt in the light most favorable to the State. The Court will not disturb the trial court's ruling if the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense

existed; and where the evidence fails to meet this test it is insufficient to support a conviction, and reversal is required. Thus, the Court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Taylor*, 110 So. 3d at 782 (¶ 19) (internal citations and quotations omitted). Flowers was charged with four counts of capital murder with the underlying felony of armed robbery. Thus, the State was required to prove that Flowers killed each of the victims "without the authority of law by any means or any manner . . . [w]hen done with or without any design to effect death, [while] engaged in the commission of the crime of . . . robbery . . . ." Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2014).

### A. Burden of Proof

¶58.    Because Flowers claims that the burden of proof – and, consequently, the sufficiency of the evidence analysis – depends on whether the evidence is direct or circumstantial, we address burden of proof first.  Flowers claims that the case is based on circumstantial evidence, not direct evidence.  Therefore, he claims that the State must meet the following burden of proof:

> It is fundamental that convictions of crime cannot be sustained on proof which amounts to no more than a possibility or even when it amounts to a probability, but it must rise to the height which will exclude every reasonable doubt; that when in any essential respect the State relies on circumstantial evidence, it must be such as to exclude every other reasonable hypothesis than that the contention of the State is true, and that throughout the burden of proof is on the State.

*Westbrook v. State*, 32 So. 2d 251, 252 (Miss. 1947).

¶59.    Flowers's case, however, is not a case of circumstantial evidence.  If an eyewitness is produced or a statement from the defendant is admitted, the case is not circumstantial. *Rubenstein v. State*, 941 So. 2d 735, 785 (¶ 225) (Miss. 2006); *Ladner v. State*, 584 So. 2d 743, 750 (Miss. 1991).  Further, a defendant's "admission of culpability . . . to a third party who is not a law enforcement officer constitutes direct evidence of a crime." *Minor v. State*, 831 So. 2d 1116, 1119 (¶ 9) (Miss. 2002) (citing *Ladner*, 584 So. 2d at 750).  In *Ladner*, the Court held that a case is not based only on circumstantial evidence even if the only direct evidence is a "jailhouse confession." *Ladner*, 584 So. 2d at 750.  *See also Foster*, 508 So. 2d at 1115 (Court held that, without the jailhouse confession, the prosecution's case would have been entirely circumstantial), *overruled on other grounds by Powell v. State*, 806 So. 2d 1069 (Miss. 2001).

¶60.    Odell Hallmon, a jailhouse informant, testified that Flowers had told him that he had committed the murders.  According to *Ladner*, a jailhouse informant's testimony is considered direct evidence, and when a jailhouse informant's testimony is present, the case is not circumstantial.  *See Moore v. State*, 787 So. 2d 1282, 1288 (¶ 18) (Miss. 2001) (discussing *Ladner*, 584 So. 2d at 750).  Following the Court's holdings in *Ladner* and *Moore*, the trial judge found that Hallmon's testimony provided direct evidence of the crimes. We hold that the trial judge did not err in applying the Court's precedent. Under *Ladner*, the case *sub judice* is not one of circumstantial evidence, and the *Westbrook* standard suggested by Flowers does not apply.

**B. Sufficiency of the Evidence**

37

¶61.    Flowers claims that the evidence presented at trial was insufficient to support a finding of guilt beyond a reasonable doubt.  Flowers asserts that the State failed to prove motive; that there was a lack of evidence that Flowers knew Simpson kept a gun in his car; that the evidence does not support the State's theory that the murders were committed by a single gunman; that the eyewitnesses were not credible; and that the physical evidence lacked probative value.  First, although Flowers vehemently argues on appeal his theory that the number of victims and the placement of the gunshot wounds demonstrate that the murders were "almost certainly *not* a one-man crime," that theory was not presented at trial.  Therefore, Flowers cannot raise it on appeal.  ***Lyons v. State***, 766 So. 2d 38, 40 (¶ 7) (Miss. Ct. App. 2000) ("Failure to raise this defense waives the right of the appellant to raise it here.").

¶62.    Regarding motive, Flowers claims that the State failed to prove that he was so aggrieved about being firing from Tardy Furniture that the firing resulted in his murdering four people.  To support his contention, Flowers cites his statement given to the police shortly after the murders.  Flowers told investigators that he had worked at Tardy Furniture for about three days at the beginning of July 1996.  On his last day, Flowers improperly loaded large tractor batteries, and they fell off the truck and were damaged.  Bertha Tardy told Flowers that the cost of the damaged batteries would be deducted from his paycheck.  Flowers failed to return to work after the incident.  After not reporting to work for several days, Flowers called Bertha Tardy and asked if he still had a job.  Bertha Tardy told Flowers

that he no longer had a job and that the majority of his paycheck was "covered up with [the] batteries." Flowers never stated that he was angry with Bertha Tardy for losing his job.

¶63.    Flowers is correct that the State did not provide direct evidence of any anger toward the Tardy Furniture employees, but the State did provide evidence that Flowers had lost his job at Tardy Furniture and had his paycheck reduced as a result of the damaged batteries. A reasonable juror could conclude from that evidence – and it is in the jury's province to draw such inferences if reasonable – that Flowers had a motive to rob Tardy Furniture and kill four employees. *See Howell v. State*, 860 So. 2d 704, 739 (¶ 125) (Miss. 2003) ("It is within the jury's province to draw reasonable inferences from facts based on experience and common sense.") (citing *Lewis v. State*, 573 So. 2d 719, 723 (Miss. 1990)). The State's evidence supported the contention that Flowers had a motive.

¶64.    Next, Flowers contends that the State's theory hinged on proving that Flowers knew he would find a gun in Simpson's car the morning of the murders, and he claims the State failed to prove that. He cites Simpson's testimony that Flowers did not know Simpson's gun was in his car on the morning of the murders:

> Q.    Your testimony was you did not recall agreeing and saying there was no way that Curtis Flowers would have known that gun was in the car that particular morning.
>
> A.    No. He, he didn't know it.
>
> Q.    He did not know it.
>
> A.    He did not know it.

Although Simpson stated at that point in his testimony that Flowers did not know the gun was in his car on the morning of the murders, Simpson had first testified that Flowers had seen the gun in Simpson's car previously. In a followup question regarding whether Flowers knew the gun was in his car that morning, Simpson confirmed that Flowers had seen the gun in his car before.

Q. So you had known [Flowers] pretty much forever.

A. Yes, sir. Yes, sir.

Q. Did he know that you had this pistol?

A. Yes, he did.

Q. Had he seen it in your car before?

A. Yes, sir.

. . .

Q. You were asked . . . whether or not there was any way he knew the gun was in there that morning and your answer was that it wasn't; is that right?

A. That's right.

Q. But you were also asked how [Flowers] knew you kept a gun in your car, I believe. How did [Flowers] know you had had a gun in your car? Had he seen it in there before?

A. Yes, sir, he had.

¶65. Because Flowers previously had seen Simpson's gun in his car, the evidence supports the contention that Flowers knew he would find the gun in Simpson's car the morning of the murders. The jury, as "the ultimate finder of fact," is responsible for considering the

40

evidence and weighing the credibility of witnesses, and the Court will not reweigh the evidence on appeal. *Conley v. State*, 790 So. 2d 773, 807 (¶ 13) (Miss. 2001) ("We do not have the task of re-weighing the facts in each case and going behind the verdict of the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible."). Whether the jury believed that Flowers knew Simpson kept a gun in his car was one piece of evidence for the jury to consider.

¶66. Flowers also attacks the credibility of the witnesses who placed him walking between his home, Angelica Garment Factory, and Tardy Furniture the morning of the murder. He asserts that the $30,000 reward for information lured the witnesses to testify. Several witnesses testified that they were aware a reward was being offered for information.[5] Some witnesses were not asked about the reward. Two of Flowers's fact witnesses, Latarsha Blissett and Kittery Jones, testified that investigators had implied that they would receive the reward if they provided statements implicating Flowers. The reward was never given. The jury heard testimony related to the reward, and Flowers's counsel argued during closing argument that investigators allegedly had tried to entice witness statements by offering the reward. The issue was within the jury's province of determining credibility. *See Taylor*, 110 So. 3d at 784 (¶ 29).

¶67. Flowers also claims that testimony from people who saw him on the morning of the murders is not credible because the witnesses' testimony contains "irreconcilable differences." One difference Flowers cites is the witnesses' descriptions of his clothing.

---

[5] The State's witnesses who testified that they knew about the reward were: Patricia Odom, Katherine Snow, James Kennedy, Mary Fleming, and Clemmie Fleming.

41

One witness testified that Flowers was wearing black windsuit pants; another said Flowers had on brown pants; and another thought Flowers wore white shorts. Flowers also points out that the times at which the witnesses claimed to have seen him at various locations in Winona overlap. For example, James Kennedy testified that he saw Flowers in front of his home at 7:15 a.m., but Katherine Snow said that she saw Flowers at Angelica at 7:15. Inconsistency in witness testimony is an issue of credibility for the jury. "It is within the jury's province to determine the weight and credibility to give to the evidence, resolving all conflicts in the evidence." *Taylor*, 110 So. 3d at 784 (¶ 29).

¶68. Finally, Flowers claims that the physical evidence linking him to the murders lacks probative value. First, he argues that the bloody shoeprint found at the scene does not connect him to the crime, because another person could have come into the store after the murders and stepped on the bloody floor. His assertion lacks merit. The shoeprint was from a size ten-and-a-half Fila Grant Hill tennis shoe. Flowers wore a size ten-and-a-half shoe. A shoebox for size ten-and-a-half Fila Grant Hill tennis shoes was found in Flowers's girlfriend's home. Witnesses testified that they had seen Flowers wearing Fila Grant Hill shoes. Second, Flowers contends that the gunshot residue particle found on his hand has no probative value, claiming that it could have come from another source. As discussed above, Joe Andrews, a forensic scientist, testified that the gunshot residue found on Flowers's hand could prove one of three things: (1) he had discharged a weapon; (2) he had been in close proximity to a discharged weapon; or (3) he had handled an object that had gunshot residue on it. Although the gunshot residue could have come from another source (for example,

42

coming in contact with an item at the police station), one alternative was that Flowers actually fired a weapon. Thus, the evidence does have some probative value.

¶69. The State responds to Flowers's claim that the evidence was insufficient by citing the following evidence linking Flowers to the murders: Flowers was fired from Tardy Furniture and was told he would not receive pay for his days worked. Flowers was seen standing next to Simpson's car – where the gun used in the murders was located – on the morning of the murders. Numerous witnesses saw Flowers walking to and from Tardy Furniture on the morning of the murders. The shoeprint found at the crime scene matched Flowers's shoe size and matched a pair of shoes he had been seen wearing. Flowers tested positive for gunshot residue. The only paperwork that had been disturbed at Tardy Furniture was Flowers's paycheck and timecard. Cash was found hidden in Flowers's headboard after the murders. Hallmon testified that Flowers had confessed to committing the murders. When the evidence is viewed as a whole and in the light most favorable to the State, we conclude that any rational trier of fact could have found that the State had proved the essential elements of capital murder beyond a reasonable doubt. Accordingly, the issue is without merit.

**V. Whether Flowers's right to a fair trial, as guaranteed by Mississippi law and the Fourteenth Amendment to the United States Constitution, was violated by the prosecution referencing facts not in evidence during the culpability phase closing argument.**

¶70. Flowers claims that the prosecution improperly argued facts not in evidence during its culpability phase closing argument. During closing arguments, attorneys may "fairly sum up the evidence," comment on facts in evidence, and "draw whatever deductions and inferences" seem proper from the facts. ***Rogers v. State***, 796 So. 2d 1022, 1027 (¶15) (Miss.

43

2001); ***Bell v. State***, 725 So. 2d 836, 851 (¶ 40) (Miss. 1998) (citations omitted). We apply the following standard of review to attorney misconduct during opening statements and closing arguments: "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." ***Sheppard v. State***, 777 So. 2d 659, 661 (¶ 7) (Miss. 2001) (citing ***Ormond v. State***, 599 So. 2d 951, 961 (Miss. 1992)).

¶71.   "Where prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice, reversal must follow." ***Goodin v. State***, 787 So. 2d 639, 645 (¶ 18) (Miss. 2001) (citing ***Acevedo v. State***, 467 So. 2d 220, 226 (Miss. 1985)). However, we have held that, even if a prosecutor's statements during closing arguments are inconsistent with the facts, reversal is not warranted if the statements do not rise to the level necessary to endanger the impartial administration of justice and the fairness of the trial. ***Pitchford v. State***, 45 So. 3d 216, 233 (¶ 62) (Miss. 2010) (quoting ***Goodin***, 787 So. 2d at 645 (¶ 18)). In ***Pitchford***, the prosecutor said that the defendant "went to the sheriff's department the same morning of the murder and he admitted it." ***Pitchford***, 45 So. 3d at 233 (¶ 62). The testimony, however, was that the defendant "talked to" an investigator. ***Id.*** Despite the inconsistency, the Court held that the statement did not result in an unfair trial. ***Id.***

¶72.   Flowers claims that, during closing argument, the prosecution misstated facts about: (1) the time Sam Jones discovered the victims at Tardy Furniture; (2) Flowers's motive; (3) Porky Collins's response to the photo arrays; and (4) the location of the victims at the crime scene. The State correctly asserts that Flowers did not object  contemporaneously to the

44

statements during closing argument. Generally, even in death penalty cases, "the failure to object to the prosecution's statements in closing argument constitutes a procedural bar." *Ross I*, 954 So. 2d at 1001 (¶ 71) (citing *Spicer v. State*, 921 So. 2d 292, 309 (Miss. 2006); *Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996)). However, in some cases, we have considered the merits of the argument even where the defendant failed to object contemporaneously. *See Ross I*, 954 So. 2d at 1002 (¶ 71) (citing cases).

¶73. In *Flowers II*, we recognized plain error for misstatements by the prosecution in closing arguments. *Flowers II*, 842 So. 2d at 550-56 (¶¶ 52-74). Therefore, because we found plain error on a similar issue in *Flowers II*, we proceed under a plain error analysis for the purpose of a thorough analysis. *Foster v. State*, 639 So. 2d 1263, 1289 (Miss. 1994) ("defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal") (citing *Gray v. State*, 487 So. 2d 1304, 1312 (Miss. 1986)). To reverse under the plain error doctrine, an error must have occurred and that error must have "resulted in a manifest miscarriage of justice" or "seriously affect[ed] the fairness, integrity[,] or public reputation of judicial proceedings." *Conners v. State*, 92 So. 3d 676, 682 (¶ 15) (Miss. 2012) (quoting *Brown v. State*, 995 So. 2d 698, 703 (¶ 21) (Miss. 2008)).

### A. Sam Jones's Arrival at Tardy Furniture

¶74. Flowers claims that, during closing argument, the State misrepresented Sam Jones's testimony regarding the timeline of events on the morning of the murders. Jones died prior to Flowers's 2010 trial, so his testimony from the 2007 trial was read into evidence. Jones initially testified that he arrived at Tardy Furniture between 9:15 and 9:30 a.m. When the

State questioned Jones about the timeline, the State's attorney misstated Jones's arrival time as being closer to 10:00 a.m. The State's attorney asked, ". . . when you got to the store, that was going to be closer on up to 10 o'clock, wasn't it?" Flowers's counsel objected to leading, but the judge overruled the objection. However, Jones never responded to the question. During closing argument, the State discussed the timeline and the attorney said: "Mr. Sam Jones came into the store slightly after 10:00 on the morning of the 16th and discovered the bodies." Flowers claims the statement was prejudicial because it skewed the timeline in the State's favor. Both Porky Collins and Clemmie Flemming testified that they had seen Flowers near Tardy Furniture around 10:00 a.m. Flowers claims that, if Jones's testimony that he arrived at the store between 9:15 and 9:30 had been described accurately, it would have raised a question in the jurors' minds about what Flowers was doing near the murder scene thirty to forty-five minutes after the murders could have occurred.

¶75.    The State responds that, although Jones did not testify to arriving at the store at 10:00 a.m., other evidence presented at trial supported that position. For example, the 911 call reporting the murders was placed at 10:20 a.m., and Jones testified that he was in Tardy Furniture for ten to fifteen minutes before going to a nearby business to call for help. So, working backward, the conclusion could be drawn that Jones arrived at Tardy Furniture closer to 10:00 a.m., rather than 9:15 or 9:30. Further, the State claims that any misstatement relating to the time Jones arrived was harmless error, and the error was cured with the following comments by defense counsel in its closing statement:

> [Sam Jones] came in and you know, his testimony, I looked it up as they were saying that. His original testimony was he might have gotten there, started his

voyage to go in to – as early as 9:00. He, he thought maybe he got there closer to 9:30. But we know from the police that the call came in at 10:20. And if you will remember, Mr. Jones also told you he thought it might have been 15 minutes before he recovered himself enough to go and actually make the report. So there is a bunch of time in there.

Sam Jones did not testify that he arrived at Tardy Furniture at 10:00 a.m. However, a reasonable inference could be drawn from the other evidence, including the 911 call, that Jones may have arrived closer to 10:00. Defense counsel's summary of the timeline in closing and the reasonable inference that could be drawn from the evidence as a whole preclude a finding of plain error on the issue.

### B. Flowers's Motive

¶76. Next, Flowers claims that the following statement by the prosecutor about Flowers's alleged motive was not based on facts in evidence:

> The investigators learned pretty quickly when they asked who in the world could have had some reason, some motive, some anything to attack four people like this.

> Have you had anybody that's had beef with the store? Just one. Well, that doesn't mean he did this though, does it? No. But you check that out. You look at him. And in the course of deciding what, if anything, Curtis Flowers had to do with this crime.

In his brief, Flowers claims that no evidence was presented to support the State's theory that Flowers was angry about being fired. To the contrary, the State identified several facts that supported the contention that Flowers "had beef" with Tardy Furniture: Flowers lost his job days before the murders. Bertha Tardy deducted the cost of damaged inventory from Flowers's paycheck. Police Chief John Johnson testified that the Tardy family considered Flowers a threat and that "they were concerned about their safety dealing with him."

47

Investigator Jack Matthews testified Flowers was the only employee who had been fired from Tardy Furniture in the last few years and was the only person with whom they had had any problems. Doyle Simpson testified that he had heard that Flowers had "problems" with Tardy Furniture. A reasonable inference could be drawn from the evidence that Flowers had ill will toward Tardy Furniture. We cannot say that the State's comment during closing rose to the level of plain error.

### C. Porky Collins's Response to the Photo Lineups

¶77. In his third assignment of error, regarding alleged misstatements by the prosecution, Flowers claims that the prosecutor misrepresented Porky Collins's response to the photo lineup that included Doyle Simpson's photograph. The misrepresentation was prejudicial to Flowers's defense, he claims, because his defense was based partially on the theory that Simpson committed the murders. Collins testified that he did not remember if he had identified Simpson as one of the men he had seen arguing outside Tardy Furniture. Notes taken by an investigator during the photo arrays provided that Collins had said that two of the individuals resembled one of the men but that the "hairline was further back." Investigator Wayne Miller testified that Collins had pointed to Simpson during the photo array and said he looked like the person, but he could not be positive. Collins was shown a second array of photos, and he definitively identified Flowers.

¶78. During closing argument, the State's attorney said the following about Collins's identification: "He said the guy ain't there. They took another six photographs and said look at this second set. He said that's him right there. . . . You know, see if he is in there. No, he

48

is not. Is he in the second group? Yeah. That's him right there." The State correctly reiterated that Collins had identified Flowers in the second photo array as one of the men he had seen arguing outside Tardy Furniture. While the State's statement that Collins had said "the guy ain't there" was not an accurate representation of Collins's response to the first photo array, the reality is that Collins did not identify Simpson. He said he could not be sure. He pointed to Simpson's photograph in the first array and said he "looked like" the man he saw but he was "unable to be positive." However, when Collins saw Flowers in the second array, he was positive. The prosecutor's statement was slightly inconsistent with the facts, but we cannot say that the comment rose to the level of plain error.

### D. Location of the Victims at the Crime Scene

¶79. Flowers contends that the prosecutor incorrectly described the location of the victims at the crime scene. The prosecutor stated during closing argument that Sam Jones had discovered "all four victims basically laying in a pile, in a group right at the front counter in Tardy Furniture Store." The evidence presented at trial, however, showed that three of the victims were lying a few feet apart from one another, while the fourth victim was a considerable distance away. Flowers argues that the prosecutor's statement was prejudicial because it aided in undercutting the theory that the murders were committed by more than one person. Essentially, Flowers claims that the idea of four victims "piled together" aligns with a one-person crime, whereas victims spread across a larger area paints the picture of a two-man crime. The State admits that the "lying in a pile" statement was incorrect, but the State points out that three of the four victims were lying close to one another. The State

49

asserts that the statement did not prejudice Flowers. As previously mentioned, Flowers did not present the "two-man crime" theory to the jury. And Flowers does not claim that the prosecutor's statement prejudiced him in any other way. Applying the plain error doctrine, the statement may have been an error, but we cannot say that it resulted in a manifest miscarriage of justice or resulted in an unfair trial. *See Conners*, 92 So. 3d at 682 (¶ 15).

### E. Conclusion

¶80. We recognize that, in *Flowers II*, the prosecution's misstatement of facts during closing argument was one basis for reversal. *Flowers II*, 842 So. 2d at 556 (¶ 74). In that appeal, Flowers cited approximately fourteen alleged misstatements. *Id.* at 555 (¶ 68). Taken together, the cumulative effect of the misstatements, along with several other errors, warranted reversal. *Id.* at 556, 564 (¶¶ 74, 104). In today's case, Flowers cites four statements made during closing argument that he claims were not supported by the evidence. The prosecutor's comments regarding Jones's arrival time, Flowers's having "beef" with the store, and Collins's identification were supported by the evidence and/or were proper "deductions and inferences" drawn from the facts. *Rogers*, 796 So. 2d at 1027 (¶15); *Bell*, 725 So. 2d at 851 (¶ 40). The statement about the bodies being piled up was a misstatement, but it does not satisfy the standard for plain error. We reiterate that Flowers failed to object to the statements during closing, therefore, we apply the plain error doctrine on appeal. Plain error is not present, as we have only one misstatement, which did not result in a manifest miscarriage of justice or adversely affect the fairness of the proceedings. *Conners*, 92 So. 3d at 682 (¶ 15). The issue is without merit.

## VI. Whether the jury selection process violated Flowers's fundamental constitutional rights protected by the Sixth and Fourteenth Amendments, and whether the trial court erred in denying Flowers's *Batson* claims.

¶81. Flowers claims that the State exercised its peremptory strikes in a racially discriminatory way by striking five African-American venire members after employing disparate questioning and citing pretextual reasons for the strikes. As previously mentioned, the Supreme Court issued an order granting Flowers's petition for a writ of certiorari and remanding the case "for further consideration in light of *Foster v. Chatman*, 578 U.S. _____, 136 S. Ct. 1737, _____ L. Ed. 2d _____(2016)." *Flowers*, 136 S. Ct. at 2157.

¶82. An order granting, vacating, and remanding a lower court decision does not amount to a final determination on the merits. *Kenemore v. Roy*, 690 F. 3d 639, 641 (5th Cir. 2012). Such an order "does not bind the lower court to which the case is remanded; that court is free to determine whether its original decision is still correct in light of the changed circumstances or whether a different result is more appropriate." *Id.* at 642. The Supreme Court often vacates a judgment and remands a case when it "believes that the lower court should give further thought to its decision in light of an opinion of [the Supreme] Court that (1) came after the decision under review and (2) changed or clarified the governing legal principles in a way that could possibly alter the decision of the lower court." *Flowers*, 136 S. Ct. at 2157 (Alito, J., dissenting).

¶83. The Court afforded Flowers and the State an opportunity to submit supplemental briefs on remand in accordance with the Supreme Court's order. Rather than point out how the Court should give further thought to its decision in light of *Foster* or explain how *Foster*

changed or clarified the governing legal principles in a way that possibly could alter our decision, Flowers essentially re-urges the arguments he had raised in his most recent appeal.

¶84.  Flowers contends that "[f]rom the beginning," the State's lead prosecutor Doug Evans engaged in a "relentless exclusion of African Americans from the juries[.]"  Flowers's petition for certiorari to the Supreme Court raised the following question: "Whether a prosecutor's history of adjudicated purposeful race discrimination must be considered when assessing the credibility of his proffered explanations for peremptory strikes against minority prospective jurors?"  Flowers argues that "the Supreme Court's remand for reconsideration requires this Court to reevaluate the evidence of pretext in light of the prosecutor's history of discrimination and dishonesty."

¶85.  Flowers points out that, during his second trial, the trial court disallowed one of Evans's strikes because it had found it to be racially motivated.  Flowers also points out that the Court said that Flowers's third trial presented us with as strong a *prima facie* case of racial discrimination as we had ever seen in the context of a **Batson** challenge.  **Flowers III**, 947 So. 2d at 935.

¶86.  In **Flowers III**, the Court held that the prosecutor had violated **Batson** because the peremptory challenge exercised against juror Vickie Curry was clearly pretextual as there was no basis in the record for two of the grounds proffered by the prosecutor.  **Id**. at 936.  Moreover, the third ground was based on a relationship between Curry and Flowers that was "tenuous at best."  **Id**. at 936.  The Court also noted the trial court's erroneous statement that "the State has a right to exercise a challenge based on some of the answers from the other

jurors as far as their peremptory challenge goes." *Id*. The Court also held that the prosecutor's actions in striking juror Connie Pittman were "equally specious, as there [was] absolutely no evidence in the record to support the [the prosecutor's] proffered reason for striking her." *Id.* The Court classified the strikes of three other jurors as "suspect, as an undertone of disparate treatment exist[ed] in the State's voir dire of [the other three] individuals." *Id*. The Court concluded that, "[a]fter carefully reviewing the record before this Court and the applicable law, we find that the State engaged in racially discriminatory practices during the jury selection process and that the trial court committed reversible error in upholding the peremptory strikes exercised against Vickie Curry and Connie Pittman." *Id*. at 939.

¶87. As an initial matter, *Foster* in no way involved a particular prosecutor's history of adjudicated *Batson* violations. Rather, the Supreme Court's decision in *Foster* hinged on several apparent misrepresentations made by the prosecution, evidenced by the record in conjunction with the prosecution's troubling jury selection file, which had a shocking focus on race. Nonetheless, we analyze *Foster* on our own to look for other issues that might place our original opinion in *Flowers IV* in error.

¶88. In *Foster*, petitioner Timothy Foster claimed that the prosecution used peremptory challenges to strike all four black prospective jurors qualified to serve on the jury in his trial for capital murder, in violation of *Batson*. *Foster*, 136 S. Ct. at 1742. The trial court denied his claim, and the Georgia Supreme Court affirmed. *Id*. Foster renewed his *Batson* claim in a state habeas proceeding. *Id*. While the habeas proceeding was pending, Foster obtained

copies of the file used by the prosecution during his trial through the Georgia Open Records Act. *Id.* at 1743-44.

¶89.    The prosecution's jury selection file was replete with documents referencing race, including: (1) copies of the jury venire list on which the names of each black prospective juror were highlighted in green, with a legend indicating that the green highlighting "represents Blacks"; (2) a draft of an affidavit prepared by an investigator at the request of the prosecutor, comparing black prospective jurors and concluding, "If it comes down to having to pick one of the black jurors, [this one] might be okay"; (3) handwritten notes identifying three black prospective jurors as "B# 1," "B# 2," and "B# 3"; (4) a typed list of qualified jurors with "N" (for "no") appearing next to the names of all five black prospective jurors; (5) a handwritten document titled "definite NO's" listing six names, including the names of all five qualified black prospective jurors; (6) handwritten document titled "Church of Christ" with notation that read: "NO.  No Black Church"; and (7) the questionnaires filled out by several of the prospective black jurors, on which each juror's response indicating his or her race had been circled.  *Id*. at 1744.

¶90.    The state habeas court considered the prosecution's jury selection file but denied relief.  *Id*. at 1745.  The Georgia Supreme Court likewise denied relief, concluding that Foster's *Batson* claim was without merit because he had failed to demonstrate purposeful discrimination.  *Id.* at 1745.  The Supreme Court granted certiorari.  *Id*.  The Supreme Court reemphasized the familiar principle that "the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster*, 136 S. Ct. at 1747 (quoting *Snyder*

*v. Louisiana*, 552 U.S. 472, 478 (2008)). The Supreme Court also reaffirmed the well settled, three part process established in **Batson** for determining when a strike is discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Id*. (quoting **Snyder**, 552 U.S. at 476-477).

¶91. The Supreme Court addressed only **Batson**'s third step because it was undisputed that Foster had demonstrated a *prima facie* case and that the prosecutors had offered race-neutral reasons for their strikes. *Id*. at 1747. The third "step turns on factual determinations, and, 'in the absence of exceptional circumstances,' we defer to state court factual findings unless we conclude that they are clearly erroneous." *Id*. (quoting **Snyder**, 552 U.S. at 477).

¶92. Despite uncertainty about the background of particular jury selection notes obtained by Foster, the Supreme Court refused to blind itself to their existence. *Id*. at 1748. The Supreme Court "made it clear that in considering a **Batson** objection, or in reviewing a ruling claimed to be **Batson** error, all of the circumstances that bear upon the issue of racial animosity must be consulted." **Foster**, 136 S. Ct. at 1748 (quoting **Snyder**, 552 U.S. at 478). "As [the Supreme Court has] said in a related context, 'determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial evidence of intent as may be available.'" *Id*. (quoting **Arlington Heights v. Metropolitan Housing Dev. Corp**., 429 U.S. 252, 266 (1977)). "At a minimum, [the

Supreme Court was] comfortable that all documents in the file were authored by someone in the district attorney's office. Any uncertainties concerning the documents [were] pertinent only as potential limits on their probative value." *Foster*, 136 S. Ct. at 1748.

¶93.   Foster focused his *Batson* claim on the strikes of two black prospective jurors, Marilyn Garrett and Eddie Hood.   *Id*. at 1748.   The Supreme Court analyzed the prosecution's justifications for striking Garrett and Hood.

¶94.   The Supreme Court determined that the prosecution's reasoning for striking Garrett was "not grounded in fact." *Id*. at 1748-49.  Furthermore, the Supreme Court also discovered that the prosecution had made misrepresentations because several of the prosecution's reasons for why he struck Garrett were contradicted by the record.  *Id*. at 1749-50.  The Supreme Court also determined that other explanations given by the prosecution, while not explicitly contradicted by the record, were "difficult to credit" because the prosecution had accepted white jurors with the same traits that allegedly rendered Garrett an unattractive juror.  *Id*. at 1750.

¶95.   As for the other juror, Hood, the Supreme Court said that the prosecution's principal reasons for striking him "shifted over time, suggesting that those reasons may be pretextual." Moreover, the Supreme Court concluded that the prosecution's justifications could "only be regarded as pretextual" because the justifications were "implausible" and "fantastic." *Id*. at 1752-53 (citing *Miller–El v. Cockrell*, 537 U.S. 322, 339 (2003) (holding that credibility can be measured by, among other factors, how reasonable, or how probable, the State's explanations are)).   As for an alternative primary justification for striking Hood--his

affiliation with the Church of Christ--the Supreme Court was persuaded by the record demonstrating that Hood's race was the true motivation for the strike, not his religious affiliation. *Foster*, 136 S. Ct. at 1753. The Supreme Court noted the prosecution's multiple mischaracterizations of the record that other prospective jurors, who were members of the Church of Christ, had been struck. *Id*. at 1753. The Supreme Court also said that "[t]he prosecution's file fortifies our conclusion that any reliance on Hood's religion was pretextual." *Id*. The Supreme Court also determined that "[m]any of the State's secondary justifications similarly come undone when subjected to scrutiny." *Id*.

¶96.    The Supreme Court proceeded with its *Batson* analysis: "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Foster*, 136 S. Ct. at 1754 (quoting *Miller–El v. Dretke*, 545 U.S. 231, 241 (2005)). "With respect to both Garrett and Hood, such evidence is compelling." *Id.* at 1754. Not only was the evidence "compelling," there were "also the shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file." *Id.* "Considering all of the circumstantial evidence that 'bear[s] upon the issue of racial animosity,' [the Supreme Court [was] left with the firm conviction that the strikes of Garrett and Hood were 'motivated in substantial part by discriminatory intent.'" *Id.* (quoting *Snyder*, 552 U.S. at 478, 485).

¶97.    The Supreme Court insisted that the contents of the prosecution's file plainly belied the State's claim that it had exercised its strikes in a "color-blind" manner. *Id*. In fact, the

Supreme Court described the number of references to race in the prosecution's file as "arresting." *Id*. The Supreme Court held that "the focus on race in the prosecution's file plainly demonstrat[ed] a concerted effort to keep black prospective jurors off the jury." *Id*. The Supreme Court concluded that the "prosecutors were motivated in substantial part by race when they struck Garrett and Hood from the jury[.]" *Id*. The Supreme Court reversed the judgment and remanded the case for further proceedings because "[t]wo peremptory strikes on the basis of race are two more than the Constitution allows." *Id*.

¶98. After reviewing Flowers's supplemental briefs, the only aspect of *Flowers VI* that Flowers takes issue with as it relates to *Foster* is that the Court did not expressly refer to the prosecutor's past *Batson* violations in our analysis of Flowers's *Batson* claim. Flowers claims that the Court did not follow the "totality-of-the-circumstances approach" used in *Foster*; rather the Court confined itself to evaluating each piece of evidence of pretext in isolation, affording the prosecutor the benefit of the doubt where the evidence was ambiguous. Flowers argues "although [Doug] Evans had distinguished himself as an especially willful and recalcitrant *Batson* violater," the Court "omitted that well-documented history from its assessment of the credibility of his facially neutral reasons."

¶99. "[T]he State's privilege to strike individual jurors through peremptory challenges is subject to the commands of the Equal Protection Clause." *Batson*, 476 U.S. at 89. The Supreme Court in *Foster* reaffirmed the well established, three step process for determining when a strike is discriminatory as set out in *Batson*. *Foster*, 136 S. Ct. at 1747. When a defendant challenges a peremptory strike under *Batson*, the defendant must first "establish

58

a *prima facie* case of discrimination in the selection of jury members." ***Thorson v. State***, 721 So. 2d 590, 593 (¶ 2) (Miss. 1998) (citing ***Berry v. State***, 703 So. 2d 269, 294 (¶¶ 94-96) (Miss. 1997) (citing ***Batson***, 476 U.S. at 96-98)). Then, the burden shifts to the State to demonstrate that the juror was struck for a nondiscriminatory, or race neutral, reason. ***Thorson***, 721 So. 2d at 593 (¶ 2). The defendant then has the opportunity to rebut the State's reason. ***Id.*** Finally, considering all of the evidence, the trial court must determine if the State "engaged in purposeful discrimination" or if the strike was made for a race neutral reason. ***Id.*** In other words, the trial court must determine whether the race neutral reasons given by the State were credible or merely a pretext for discrimination.

¶100. The Court has identified five indicia of pretext that should be considered when analyzing the race neutral reasons for a peremptory strike:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the challenged characteristic cited; (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

***Manning v. State***, 765 So. 2d 516, 519 (¶ 9) (Miss. 2000) (quoting ***Mack v. State***, 650 So. 2d 1289, 1298 (Miss. 1994)).

¶101. ***Foster*** did not alter the great deference given to trial judges. The third step of ***Batson*** "turns on factual determinations, and, 'in the absence of exceptional circumstances,' we defer to state court factual findings unless we conclude that they are clearly erroneous." ***Foster***, 136 S. Ct. at 1747 (quoting ***Snyder***, 552 U.S. at 477). We give great deference to the trial court's determinations under ***Batson*** and will reverse only if the trial court's decision is

59

clearly erroneous or against the overwhelming weight of the evidence. *Berry v. State*, 802

So. 2d 1033, 1037 (¶ 9) (Miss. 2001); *Thorson*, 721 So. 2d at 593 (¶ 4). "The trial court has

a pivotal role in evaluating *Batson* claims. "*Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

We have expounded on the standard of review afforded to trial judges regarding *Batson*

findings as follows:

> When a *Batson* issue arises, the trial judge acts as the finder of fact. *Berry v. State*, 703 So. 2d 269, 295 (Miss. 1997). . . . The race neutral explanations must be viewed in the light most favorable to the trial court's findings. *Id.* Trust is placed in a trial judge to determine whether a discriminatory motive drives the reasons given for striking a potential juror. *See Webster v. State*, 754 So. 2d 1232, 1236 (Miss. 2000). The determination of discriminatory intent will likely turn on a trial judge's evaluation of a presenter's credibility and whether an explanation should be believed. *Batson*, 476 U.S. at 98[.] Thus, trial courts are given great deference in their findings of fact surrounding a *Batson* challenge. *Lockett v. State*, 517 So. 2d 1346, 1350 (Miss. 1987). . . .

*Walker v. State*, 815 So. 2d 1209, 1215 (¶ 12) (Miss. 2002).

¶102. "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's

credibility." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). "[T]he best evidence of

discriminatory intent often will be the demeanor of the attorney who exercises the

challenge[.]" *Id*. Moreover, race neutral reasons for peremptory challenges often invoke a

juror's demeanor, making the trial court's firsthand observations of even greater importance.

*Id*. The trial court must evaluate not only whether the prosecutor's demeanor belies a

discriminatory intent, but also whether the juror's demeanor credibly can be said to have

exhibited the basis for the strike attributed to the juror. *Id*. The trial court's "determinations

of credibility and demeanor lie peculiarly within a trial judge's province[.]" *Id*. (citations and

quotations omitted).

¶103. "[I]n considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Foster*, 136 S. Ct. at 1748 (citing *Snyder*, 552 U.S. at 478). On the same note, "determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial evidence of intent as may be available." *Foster*, 136 S. Ct. 1737, 1748 (citing *Arlington Heights*, 429 U.S. at 266).

¶104. The Montgomery County clerk summoned a special venire of 600 potential jurors for Flowers's sixth trial. The initial venire consisted of forty-two percent African Americans and fifty-five percent whites.[6] After for-cause challenges, the venire consisted of twenty-eight percent African Americans and seventy-two percent whites. During jury selection, the State accepted the first African-American juror, then exercised six peremptory strikes, five of which were against African-American venire members. At the point when five African Americans were struck by the State, the trial court found that a *prima facie* case of discrimination existed. The State then provided race neutral reasons for the five strikes, and Flowers's counsel offered rebuttals for the State's reasons. Ultimately, the trial court found that the State's reasons were credible.

¶105. Essentially, Flowers is asking the Court to reevaluate the credibility of Evans's race neutral explanations for striking African Americans in the sixth trial. However, as we explained in *Flowers VI*, "the determination of discriminatory intent will likely turn on a trial

_____

[6] The remaining venire members did not identify their race on the juror questionnaire.

61

judge's evaluation of a presenter's credibility and whether an explanation should be believed." *Flowers VI*, 158 So. 3d at 1047 (citing *Batson*, 476 U.S. at 98).

¶106. Here, the trial court was asked on several occasions to consider historical evidence of *Batson* violations committed by Evans in previous trials of the case. Flowers's counsel even asked the trial court to preclude Evans from making peremptory strikes entirely based on his history of *Batson* violations in the case. Specifically, Flowers's counsel urged:

> And I would renew the motion with respect to -- and I, I would now re-urge this, when I've not previously urged. We had in the last trial urged that should this jury -- that the prosecutor be, be precluded from making peremptory strikes because so much of this -- because there is the history that has been found by the Mississippi Supreme Court of racial discrimination in jury selection with respect to this case by this prosecution. It's happened actually -- the predecessor in *Flowers II*, in Harrison County, found a *Batson* violation and ruled a strike by the State. So that in two proceedings and on the basis of what has been a persistent pattern of simply, you know, asking things that are clearly, if not flatly race or at least race-based[.]

The trial court responded to Flowers's counsel's request:

> And as far as the motion to prohibit the State from using peremptory challenges, there is no basis for that. Absolutely none. If the State looks at potential jurors and feels that they have right reasons for using peremptory challenges, that is their right. That is each sides [sic] gets to make peremptory challenges. But because *Flowers III* was reversed on *Batson* is certainly no grounds for saying that they should now be denied the right to use peremptory. The Supreme Court of this State has certainly never said that on a retrial you could not use peremptory challenges, nor has the United States Supreme Court ever said that. And so you're pulling that motion totally out of thin air and without any basis in law or in fact for making it. So it's denied.

¶107. Flowers's counsel continued to argue the history of *Batson* violations in support of the *Batson* claim at trial:

> And we think it is, therefore, pretextual specific and particularly in light under -- of the history of race discrimination in jury selection in this district and in

this particular case found by the Mississippi Supreme Court in ***State v. Flowers*** after the third trial, the first one in this district.

Indeed, the trial court was presented with and rejected Flowers's present argument that he had advanced at trial. Flowers argued to the trial court:

> And I think that that is in ***Flowers III***, what the Supreme Court of Mississippi said was that when you are looking at ***Batson***, you look at the totality of the circumstances and you go beyond little excuses. And that the danger, certainly, in ***Flowers III*** is to devolve -- for the ***Batson*** challenging process, to devolve into an effort of uncovering and coming up with facially neutral reasons that are merely a mask for actually racially discriminatory reasons, the desire to bleach or -- I suppose, if it were the other way around darken or make male or make female, the jury and that the Court, considering the totality of the circumstances, cannot simply express this distinction. This is based on the 14th Amendment Equal Protection Clause. And there is a huge body of equal protection civil litigation. It is referred to by the United States Supreme Court in ***Snyder***, the most recent case in which a verdict was reversed on ***Batson*** in the United States Supreme Court. And basically, the situation is that you may go behind the facial neutrality if anything in the record suggests that one or more of the reasons may be either unconnected and related to what is really a material issue in this case and/or appears to have been pursued with more vigor in an attempt to uncover some excuse that is of less than universal relevance.

Again, Flowers's counsel ensured that the trial court consider the totality of the circumstances, including historical evidence of racial discrimination by the district attorney.

> Again, we would cite the totality of the circumstances and the apparent cherry picking of the African-American jurors for scrutiny and attention. And in light of the history of racial discrimination by this district attorney's office in this district, we would say the totality of the circumstances makes this a pretext for discrimination and attempt to look for race-neutral reasons for racially motivated peremptory striking.

¶108. The trial court not only considered Flowers's counsel's argument in its consideration of the totality of the circumstances; the ***Flowers*** Court also considered other circumstances showing that Evans did not have discriminatory intent. The trial court certainly considered

63

circumstances surrounding the previous trials as evidenced by its response to Flowers's *Batson* claim:

> But you know full well from past experiences in this county because of the number of people that know Mr. Flowers, they know his parents, they know his brother, they know his sisters, and he I mean he has got a large number of siblings. And all of those people you know, I mean he is so well-known here that, you know, you've got a number of African-Americans that say I know him. I can't be fair. I know these people. I can't sit in judgment of their son. And there is there is no way to avoid that if this case is tried in this county. Because this is the same type things that, that occurred in the previous trials where he had so many people that knew him. You know, I don't -- I hadn't kept a running count of anything in here but, you know, there is nothing that has -- that has -- no discrimination that's occurred that has caused this, what you call, statistical abnormality now. It is strictly because of the prominence of his family.

¶109. The prior adjudications of the violation of *Batson* do not undermine Evans's race neutral reasons as the despicable jury selection file in *Foster* had undermined the prosecution's race neutral explanations. We cannot say that the exceptional circumstances discussed in *Foster* are present in today's case so as to prevent the Court from deferring to the trial court's factual determinations. Moreover, we cannot conclude that the trial court's factual findings were clearly erroneous.

¶110. Flowers's post-remand briefs spend far more time re-urging the arguments from his original appellate brief than addressing *Foster* itself. Accordingly, Flowers appears to rely on *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*) instead. In *Miller-El II*, the Supreme Court held "the appearance of discrimination [was] confirmed by widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time Miller-El's jury was selected." *Id*. at 253. The

Supreme Court said, "[w]e kn[e]w that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries[.]" *Id*. at 263. The evidence of a specific policy of past discrimination in *Miller-El II* significantly differs from the evidence before the Court. The Court does not find Evans's past two adjudicated *Batson* violations overcome the deference owed to the trial judge's factual findings on which the Court's affirmance relies. The Court does not have evidence before it of a similar policy of the district attorney's office or of a specific prosecutor that was so evident in *Miller-El II*. *Miller-El II*, 545 U.S. at 266 ("If anything more is needed for an undeniable explanation of what was going on, history supplies it. The prosecutors took their cues from a 20-year-old manual of tips on jury selection, as shown by their notes of the race of each potential juror.").

¶111. We turn to address Flowers's arguments raised on appeal. Flowers claims that the State exercised its peremptory strikes in a racially discriminatory way by: (1) disparately questioning African-American jurors as compared to white jurors; (2) responding differently to African-American jurors' voir dire answers as compared to answers of white venire members; and (3) mischaracterizing the voir dire responses of African-American jurors. We do not ignore the historical evidence of racial discrimination in the previous trials in our consideration of Flowers's arguments. However, the historical evidence of past discrimination presented to the trial court does not alter our analysis, as set out in *Flowers VI.*

### A. Disparate Questioning

¶112. Flowers claims that the questioning of African-American and white jurors was so "starkly different" that the questioning led to purposeful discrimination. First, Flowers asserts that the State asked potential African-American jurors more questions during individual voir dire than potential white jurors. Flowers claims that all African Americans who were struck by the State were asked more than ten questions. That statement is not supported by the record. For example, the State asked Carolyn Wright, an African American against whom the State exercised a peremptory strike, only three questions. However, overall, the State did ask more questions of African-American jurors than of potential white jurors. The State responds that more questions were asked only when a potential juror's answers to voir dire questions were unclear or needed further elaboration. Disparate questioning is evidence of purposeful discrimination. *Miller-el v. Cockrell*, 537 U.S. 322, 344 (2003); *Manning*, 765 So. 2d at 520 (¶ 15). However, evidence of disparate questioning alone is not dispositive of racial discrimination. *Hughes v. State*, 90 So. 3d 613, 626 (¶ 37) (Miss. 2012); *Manning*, 765 So. 2d at 520 (¶ 15); *Berry*, 802 So. 2d at 1039 (¶ 20).

¶113. Second, Flowers claims that the State did not question white venire members about their relationships with defense witnesses even though African-American jurors were extensively questioned about similar relationships. To support his argument, Flowers claims that, during voir dire examination by the trial court, four white venire members – Larry Blaylock, Harold Waller, Marcus Fielder, and Bobby Lester – stated that they knew defense witnesses. The record reveals that the potential jurors knew members of law enforcement, the Tardy family, and the victims; but they did not know members of the Flowers family. Of

the white jurors who survived for-cause challenges, five knew members of Flowers's family. Four of them knew only one member of Flowers's family; the State did not follow up with them. Pamela Chesteen knew Flowers's father, mother, sisters, and a cousin. The State did not question Chesteen about the relationships during voir dire; however, the trial court asked Chesteen whether the relationships would affect her ability to serve as a juror, and she said they would not. Several African-American venire members were questioned about their relationships with Flowers's family, as will be discussed in detail in the following section. However, the State did not question all potential African-American jurors about their relationships with persons involved in the case. For example, Alexander Robinson, an African American who was selected to be a juror, stated that he knew Flowers's brother, but the State did not question Robinson about that relationship.

¶114. The State's assertion that elaboration and followup questions were needed with more of the African-American jurors is supported by the record. Most of the followup questions pertained to the potential juror's knowledge of the case, whether they could impose the death penalty, and whether certain relationships would influence their decision or prevent them from being fair and impartial. The jurors who had heard little about the case, who said they would not be influenced by what they had heard, and who said they would not be influenced by relationships were asked the fewest questions. The jurors who knew more about the case, who had personal relationships with Flowers's family members, who said they could not be impartial, or who said they could not impose the death penalty were asked more questions. Those issues are appropriate for followup questions.

¶115. We have held that voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Howell v. State*, 860 So. 2d at 726 (¶ 67) (quoting *Ballenger v. State*, 667 So. 2d 1242, 1250 (Miss. 1995)). "The trial court has broad discretion in passing upon the extent and propriety of questions addressed to prospective jurors." *Howell*, 860 So. 2d at 727 (¶ 70) (quoting *Stevens v. State*, 806 So. 2d 1031, 1062 (¶ 140) (Miss. 2001)). The trial judge participated in voir dire, asking his own questions when necessary. Flowers was given ample opportunity to question jurors, rehabilitate jurors, and make challenges. That he had these opportunities is evidence of a fair and proper jury selection process. *See Howell*, 860 So. 2d at 726 (¶ 69); *Stevens*, 806 So. 2d at 1062 (¶ 139). There is no evidence of discrimination based on the number of questions asked alone.

## B. Disparate Treatment of Individual Venire Members

¶116. Flowers also contends that the State: (1) responded differently to African-American jurors' voir dire answers compared to the answers of white venire members, and (2) mischaracterized the voir dire responses of African-American jurors. For the purpose of our analysis, the two issues are addressed together by discussing the African-American venire members who were struck from the venire by the State's use of peremptory strikes. We address the State's race neutral reasons for striking the jurors, as well as Flowers's arguments regarding each, which includes his contentions that the State mischaracterized the voir dire responses of the jurors and responded differently to them.

### 1. Carolyn Wright

68

¶117. The State gave the following reasons for its peremptory strike of Carolyn Wright: (1) she knew several defense witnesses; (2) she was sued by Tardy Furniture for an overdue account; and (3) she had worked with Archie Flowers Sr. at Walmart. At the ***Batson*** hearing, Flowers offered rebuttals for the State's reasons, but the trial court held that the State's reasons for striking Wright were race neutral. The trial court summed up its finding by stating:

> If the only reason the State offered was that she knows some of these defense witnesses, then there might be something there. But the fact is knowing these defense witnesses that you're intending to call, plus the fact that Tardy Furniture had to sue her, plus the fact that she worked with Archie, in my mind, creates race-neutral reasons for striking her.

¶118. One reason the State gave for striking Wright was that she knew multiple defense witnesses. In fact, Wright knew a total of thirty-four people who were involved with Flowers's case. Flowers argues that striking Wright because she knew several potential witnesses was pretextual because the State did not strike white jurors who were acquainted with multiple people involved in the case. Specifically, Flowers points to Pamela Chesteen, who knew thirty-one people involved in the case; Harold Waller, who knew eighteen people involved in the case; and Bobby Lester, who knew twenty-seven people involved in the case. We recognize that one of the indicia of pretext is "the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge." ***Manning***, 765 So. 2d at 519 (¶ 9). However, the number of acquaintances was not the sole reason given by the State, so the basis is not an automatic showing of pretext. ***Hughes***, 90 So. 3d at 626 (¶ 37) ("Where multiple reasons lead to a peremptory strike, the fact that other jurors

may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual.").

¶119. The second reason the State gave for striking Wright was that she had been sued by Tardy Furniture. As a rebuttal to that reason, Flowers alleged at the *Batson* hearing that the State did not question white jurors about their accounts at Tardy Furniture. However, the court had asked all jurors during group voir dire if they had accounts at Tardy Furniture and if they had been sued by the store. The court found that the basis was race neutral because none of the white jurors had been sued by Tardy Furniture. On appeal, Flowers claims that the State mischaracterized Wright's litigation with Tardy Furniture by claiming that her wages had been garnished as a result of the litigation. Nothing in the record supports the contention that Wright's wages were garnished. However, that does not change the fact that being sued by Tardy Furniture was a race neutral reason for striking Wright. Prior litigation is a race neutral reason for a preemptive strike. *See Webster v. State*, 754 So. 2d 1232, 1236 (¶¶ 9-11) (Miss. 2000) (finding that potential juror's company being sued by defense attorney in previous and unrelated litigation was sufficient race neutral reason for peremptory strike).

¶120. The State's third reason for striking Wright was that she worked with Archie Flowers Sr. at Walmart. At the *Batson* hearing, Flowers rebutted that reason by comparing Wright's working relationship with Archie to Chesteen, a teller at a local bank where members of the Flowers family were customers. The trial court found this to be a race neutral reason and found that Wright's working relationship with Archie was distinguishable from the professional relationship Chesteen had with the Flowers family. Chesteen worked at a local

bank in Winona and stated that she knew Archie Flowers Sr., Lola Flowers, and Flowers's sisters from her work at the bank. We agree with the trial judge that a coworker relationship and bank employee/customer relationship are distinguishable. Further, the trial court stated that the Winona Walmart was the "smallest Wal-Mart . . . in existence" that he knew of, implying that Wright and Archie certainly had known each other. The trial court also stated that no white jurors had reported working at Walmart with Archie. Being acquainted with the defendant's family is a race neutral reason for striking a juror. *Manning v. State*, 735 So. 2d 323, 340 (¶ 32) (Miss. 1999) ("We have condoned a peremptory challenge against a juror who was acquainted with the defendant's family.") (citing *Porter v. State*, 616 So. 2d 899, 907 (Miss. 1993)).

¶121. Flowers's claim that the State provided "no convincing reasons" for striking Wright is simply unfounded. Wright had worked with Flowers's father, she knew thirty-two of the potential witnesses, and she had been sued by Tardy Furniture. We also note that, on her juror questionnaire, Wright wrote that she previously had served as a juror in a criminal case involving the "Tardy Furniture trial." The State had multiple, credible, race neutral reasons for striking Wright, and the trial judge did not err in denying Flowers's *Batson* challenge as to the juror.

### 2. Dianne Copper

¶122. The State cited the following reasons for its exercise of a peremptory strike of Dianne Copper: (1) she had worked with Flowers's father and sister; (2) she knew several members of the Flowers family; (3) she said she "leaned toward" Flowers's side of the case due to her

71

relationships with the Flowers family; and (4) she knew several defense witnesses. Flowers offered rebuttal to the State's reasons by again asserting that the State had not challenged white jurors connected to people involved in the case. He also claimed that the State did not attempt to rehabilitate Copper after she said leaned toward Flowers. The trial court found the State's reasons to be race neutral, concluding that Copper's relationships were distinguishable from those of the white jurors who were not challenged and recognizing that other jurors had not said they favored Flowers as Copper did.

¶123. During voir dire, Copper was questioned about her relationships with members of the Flowers family, and she revealed the following: Copper once lived in the same neighborhood as the Flowers family. She had worked with Flowers's sister, Cora, at Shoe World for "a year or two." She also had worked with Flowers's father for "one or two years." Copper testified that she knew Flowers's mother, Lola, and his brother, Archie Jr. She also knew more than twenty other potential witnesses. Altogether, Copper knew at least thirty people involved in the case. The State asked Copper about her comment that knowing so many people connected to the case would make her lean toward Flowers:

> Q.   And I think it was yesterday and my notes show that you said that the fact that you know all of these people could affect you and you think it could make you lean toward him because of your connection to all of these people. Is that correct?
>
> A.   It – it's possible.
>
> Q.   Okay. That would be something that would be entering into your mind if you were on the jury, wouldn't it?
>
> A.   Yes, sir.

Q.     And it would make it to where you couldn't come in here and, just with an open mind, decide the case, would it?

A.     Correct.

At that point, Flowers's counsel attempted to rehabilitate Copper:

Q.     . . . What I'm trying to find out is just as you could put aside all the information you heard before about this case, could you not also put aside the fact – if you got picked as a juror, put aside the fact that you have met Mr. Flowers, that you know some other people in these cases and be fair to the Tardys, the Stewarts, the Goldens, and Rigbys, and make whatever decision or vote that you're going to make based on the evidence and the evidence only. Could you do that?

A.     I feel like I could.  But, you know, it –

Q.     Is what you're saying –

A.     Of course, it would make me, you know, feel uncomfortable. But if I had to do it, you know, I got to do what I got to do.

Q.     Okay. So you're saying that – thank you. You're saying that you'll be uncomfortable. You'd prefer not to – I get the impression you're saying that you'd rather not be a juror. But if you got picked to be one, you would take the responsibility seriously, and you would follow the law and the rules that the Court give[s] you, and you would put aside anything that you are required to put aside and make your evidence and make your vote based on just the evidence you hear in the courtroom. Is that fair to say?

A.     Yes, sir.  That's correct.

Clearly, Copper knew several members of the Flowers family and she was uncomfortable serving on the jury.  That reason alone is a sufficient race neutral reason to strike her. *Manning*, 735 So. 2d at 340 (¶ 32).  Further, we have recognized "living near the defendant" as a race neutral reason for a peremptory strike.  *Lockett v. State*, 517 So. 2d 1346, 1356 (Miss. 1987) (citing *Taitano v. State*, 358 S.E.2d 590 (Va. App. 1987)).

73

¶124. On appeal, Flowers claims that the State mischaracterized Copper's statement that she "leaned toward" Flowers due to her relationship with the Flowers family, but a reading of the record shows that the State correctly described her voir dire testimony. The State made the following argument during the **Batson** hearing:

> And the reason I point that out, it's not just that she knows those witnesses, but that because of knowing the family and working with those two family members, she stated that that relationship would influence her. She later said that – well, she could have an open mind. And then she was equivocal back and forth. But because of all those relationships, she clearly stated, when I asked her, that they would influence her. She could not have an open mind, and she was leaning toward the Defendant's family.

The State's argument accurately reflected Copper's testimony, including the defense's attempt to rehabilitate her. Even more, defense counsel asked Copper if she would "rather not be a juror," and she agreed. The Court has recognized that reluctance to serve as a juror is a race neutral basis for a peremptory strike. **Hughes**, 90 So. 3d at 626 (¶ 36) (citing **Lynch v. State**, 877 So. 2d 1254, 1274 (¶ 59) (Miss. 2004)).

¶125. Flowers claims that the State's strike of Copper was pretextual because white jurors who knew several defense witnesses were not struck. As mentioned above, one indicium of pretext is "the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge." **Manning**, 765 So. 2d at 519 (¶ 9). However, like Wright, the number of acquaintances was not the sole reason given by the State for striking Copper, so the instant basis is not an automatic showing of pretext. *See* **Hughes**, 90 So. 3d at 626 (¶ 37). Again, Flowers claims that the State did not provide any convincing reasons for striking Copper and, again, Flowers's claim is unfounded. Copper

74

lived in the same neighborhood as the Flowers family, knew multiple members of the family, and had worked with Flowers's father and sister. She admitted that, in light of the relationships, she leaned toward Flowers in the case. Copper also said that she would rather not serve as a juror. All of the given reasons are race neutral reasons for a peremptory strike. The trial court did not err in denying Flowers's ***Batson*** challenge as to Copper.

### 3. Flancie Jones

¶126. The State gave several reasons for the peremptory strike of Flancie Jones: (1) she was related to Flowers; (2) she was late for jury selection twice; (3) she provided inconsistent statements on her view of the death penalty; and (4) she lied on her juror questionnaire in an attempt to get out of jury service. The trial court found that the State had provided sufficient race neutral reasons for the strike.

¶127. In response to the State's first basis – that Jones is related to Flowers – Flowers claims that the State mischaracterized and exaggerated Jones's relationship with Flowers. The State described the relationship between the two as follows: "She is related to the defendant. She admitted that she was related – she was a cousin – or the defendant's sister, Angela Jones, is her niece. So she said she guessed she must be related to him. Well, I guess so. He would be her nephew." During voir dire, Jones said that Flowers was her "sister-in-law's sister's son." She also said that Flowers's sister was her niece. Jones's statements regarding her relationship to Flowers were confusing, but the trial court seemed to understand and concluded that Jones had more than one familial connection to Flowers. The trial court stated:

> She said that Angela Ward Jones was married to Mark Jones, and she said that was her nephew. She's not directly related to Mr. Flowers. She's related by marriage to Mr. Flowers's sister. And then Hazel Jones is her husband's brother's wife and, you know, that's another family connection there.

Although one may not typically describe the child of an in-law's sibling as a niece or nephew, Jones's own statement that Flowers's sister was her niece supported the State's position that Flowers was Jones's nephew. Flowers's contention that the State mischaracterized and exaggerated the relationship is without merit. And, again, being acquainted with the defendant's family is a race neutral reason for striking a juror. *Manning*, 735 So. 2d at 340 (¶ 32).

¶128. The other reasons the State provided for its strike also are race neutral. Jones was late for jury selection on two days. For one of the days, Jones's excuse was that she had difficulty waking up early in the morning because she used to work nights. On the other day, Jones said she was late because she was looking for her jury questionnaire. Jones also provided inconsistent statements on her view of the death penalty, and she admitted that she wrote on her questionnaire that she was against the death penalty in an effort to get out of jury service:

> Q:   . . . And I think on your questionnaire, you said you were strongly against the death penalty.
>
> A:   I guess I'd say anything to get off.
>
> Q:   Okay. Well, are you saying that you didn't tell the truth?
>
> A:   No, that's not that. It's just that if I didn't have to be here, I wouldn't want to be here.
>
> Q:   Well, I want to know when you put down you were strongly against the

76

death penalty –

A:      I was trying to not be – I – really and truly, I don't want to be here. I'll say it like that.

. . .

Q:      When you put down that you strongly didn't believe in the death penalty, were you being truthful?

A:      No . . . .

Being late on two days, lying on her questionnaire, and blatantly saying that she did not want to be there and that she would "say anything to get off" reflect an overall attitude of contempt toward jury service.

¶129.   Jones's late arrival and her attitude toward jury service, evidencing a lack of concern about or commitment to the proceedings, are two race neutral reasons for a peremptory strike. *See Lynch*, 877 So. 2d at 1274 (¶ 59) (reluctance to serve was a race neutral basis for a peremptory strike); *Brewer v. State*, 725 So. 2d 106, 122 (Miss. 1998) (fact that the juror "had attempted to get off jury duty from the start" was a race neutral reason); *Lockett*, 517 So. 2d at 1351-52 (striking of jurors based on attitude toward jury service is race neutral). In *Lockett v. State*, the Court provided a nonexhaustive list of race neutral reasons that had been recognized by other courts. The Court cited a Seventh Circuit case in which the court upheld the peremptory strike of a juror who arrived late and was inattentive, which indicated "a lack of commitment to the importance of the proceedings." *Lockett*, 517 So. 2d at 1356 (citing *U.S. v. Mathews*, 803 F.2d 325, 331 (7th Cir. 1986)). *See also Hicks v. State*, 973 So. 2d 211, 220 (¶ 28) (Miss. 2007) (inattentiveness is a race neutral reason). Unquestionably,

77

Jones's attitude toward jury service was a proper race neutral reason for striking her.

¶130. The State did not misrepresent Jones's relationship with Flowers, and the State provided several race neutral reasons for striking her. Flowers's claims regarding Jones are without merit. The trial court did not err in denying Flowers's ***Batson*** challenge regarding the juror.

### 4. Tashia Cunningham

¶131. The State's reasons for striking Tashia Cunningham included: (1) her working relationship with Flowers's sister, and (2) her wavering statements about the death penalty. At the ***Batson*** hearing, Flowers attempted to rebut by pointing to Cunningham's testimony that she could be a neutral juror and could set aside her relationship with Flowers's sister. Flowers compared Cunningham to Chesteen, who knew Flowers's family from the bank. Finally, Flowers claimed that Cunningham's alleged wavering views on the death penalty were similar to the views of white jurors. The trial court held that the State's reasons were race neutral, concluding: "Ms. Cunningham's all-over-the-map response to the death penalty, plus her situation about working so closely with Mr. Flowers's sister, in my mind, the State has shown race-neutral reasons for that strike."

¶132. During voir dire, Cunningham said she did not have a close relationship with Flowers's sister, Sherita Baskin. She said they had a "working relationship." Cunningham said she and Baskin had worked the same shift for two or three years, but they did not see each other every day at work. Cunningham said she worked at the end of the assembly line, and Baskin worked at the front of the line. The State asked Cunningham further questions

about that relationship:

Q:     And you work with the Defendant's sister, Sherita Baskin?

A:     Yes.

Q:     Now, the other day, I think you said that you do not work close to her?

A:     No, I do not.

Q:     Would you think about that for a minute?

A:     I do not.

Q:     Are you sure that you do not work side by side with her?

A:     No, I do not.

Q:     And you're saying that under oath?

A:     Yes, sir.

The State then called Cunningham's employer, ADP, to confirm her testimony relating to her working relationship with Baskin. An ADP quality control clerk, Crystal Carpenter, testified that Cunningham and Baskin worked on the same assembly line with twenty-five to thirty-five people. Carpenter testified that Cunningham and Baskin worked side-by-side, "nine or ten inches" apart from one another. Carpenter testified that she saw the women working every day and that her testimony was based on her personal observations. Flowers's counsel asked Carpenter if there was documentation supporting the location of Cunningham and Baskin on the assembly line, and Carpenter said she could provide documentation supporting her testimony. Apparently, Carpenter did not provide the documentation. Thus, Flowers claims that the instant basis for the State's peremptory strike is unfounded. Flowers's claim

79

is without merit.

¶133. We hold that the blatantly conflicting testimony of Cunningham and Carpenter was a race neutral basis for the State's challenge, as concern about a juror's honesty constitutes a race neutral reason. *See Collins v. State*, 691 So. 2d 918, 927 (Miss. 1997) (a juror will be disqualified for withholding substantial information or misrepresenting material facts); *Mack*, 650 So. 2d at 1300 (State's challenge upheld where the juror failed to reveal that her husband had pending charges against him); *Foster*, 639 So. 2d at 1280 (as to one juror, the State said "his demeanor was such that I did not feel that he was being perfectly honest with us" and the Court held that the State had provided race neutral reasons). *See also Aguilar v. State*, 847 So. 2d 871, 877 (¶ 14) (Miss. Ct. App. 2002) (concern that juror was being dishonest was a valid reason).

¶134. The State cited Cunningham's wavering views on the death penalty as a second basis for its peremptory strike. On her juror questionnaire, Cunningham marked that she had "no opinion" on the death penalty but, on the very next question, she marked that she would not consider the death penalty under any circumstances. During voir dire by the trial court, Cunningham first said she "would not" consider the death penalty and that she "did not believe in the death penalty." She confirmed for the court three times that she would not consider the death penalty. However, as questioning continued, Cunningham wavered, saying she "might" be able to consider it. During voir dire by the State, Cunningham went back to her initial position that she did not think she could consider the death penalty. Then, when questioned by defense counsel, Cunningham said that she could consider both life in

prison and the death penalty. We have held that "having doubts as to one's ability to follow the law and vote for the death penalty when appropriate is a sufficient race-neutral reason." *Manning*, 735 So. 2d at 340 (¶ 31) (citing *Johnson v. State*, 529 So. 2d 577, 584-85 (Miss. 1988)). Further, providing inconsistent statements is a race neutral basis for striking a juror. *Hicks*, 973 So. 2d at 220 (¶ 27); *Lynch*, 877 So. 2d at 1272 (¶ 51) (verbal responses and juror's card were inconsistent).

¶135. During the *Batson* hearing, Flowers's counsel attempted to compare Cunningham to Jeffery Whitfield, a white juror who had "mixed feelings about the death penalty." Unlike Cunningham, Whitfield never said that he would be unable to impose the death penalty. We have recognized that a juror's views on the death penalty may provide a race neutral basis for a peremptory challenge. *See Batiste*, 121 So. 3d at 848; *Pitchford*, 45 So. 2d at 229 (¶40); *Flowers III*, 947 So. 2d at 920-21. In *Flowers III*, the Court held that striking an African American who had "virtually indistinguishable" views on the death penalty as white jurors who were not struck raised an inference of discrimination, although, standing alone, it did not warrant finding a *Batson* violation. *Flowers III*, 947 So. 2d at 921. In the instant case, no white jurors survived for-cause challenges who had views on the death penalty comparable to Cunningham's views. Thus, this basis was not pretextual. Cunningham's seeming dishonesty about her relationship with Baskin, her doubt about whether she could impose the death penalty, and her inconsistent statements about the death penalty are all race neutral reasons for a peremptory strike. The trial court did not err in denying the *Batson* challenge as to Cunningham.

81

## 5. Edith Burnside

¶136. The State gave the following reasons for striking Edith Burnside: (1) she knew Flowers and members of his family; (2) she was sued by Tardy Furniture; and (3) she had provided inconsistent statements regarding her views on the death penalty. As discussed above, during group voir dire, the trial court asked the entire venire if anyone had been sued by Tardy Furniture. Thus, again, Flowers's claim that only African-American venire members were asked about prior litigation is incorrect. Burnside responded in the affirmative, telling the court that she had been sued by Tardy Furniture. She later explained that she had paid the amount she owed and that the litigation had arisen from a misunderstanding about her account after the murders.

¶137. At the *Batson* hearing, the State incorrectly stated that a garnishment had been issued against Burnside. The prosecutor said: "She also was sued by Tardy Furniture, and a garnishment was issued against her. She tried to deny that and said that she just settled with them when she came back but she was, in fact, sued by them." In response to the trial court's question about being sued by the store, Burnside had said: "I had an account there, but I was not sued by Ms. Bertha. It was later on when it was took over by Mr. Frank and Roxanne." During individual voir dire, Burnside confirmed that she was sued by Bertha Tardy's son-in-law, but that she had paid him and they "never had a falling out about it." She said the lawsuit would not cause her any difficulty in Flowers's case. Like the State's characterization of Wright's litigation with Tardy Furniture, the statement that Burnside's wages had been garnished and that Burnside had denied it was not supported by the record.

However, prior litigation is a race neutral basis for a peremptory strike. *Webster*, 754 So. 2d at 1236 (¶¶ 9-11).

¶138. Another reason the State gave for striking Burnside was her relationships with Flowers and his family. Burnside said that she had once lived near the Flowers family, and Flowers and his sister used to visit her home. Flowers was a friend of Burnside's sons and played football with them. Burnside said that the relationships would not affect her ability to serve as a juror. No white venire members had relationships remotely comparable to the relationships Burnside had with Flowers and his family. A juror's relationships with the defendant's family is a race neutral reason for a peremptory challenge. *Manning*, 735 So. 2d at 340 (¶ 32). And, again, "living near the defendant" is a race neutral reason for a peremptory strike. *Lockett*, 517 So. 2d at 1356. If simply living near the defendant is a valid reason, then certainly the defendant having visited the juror's home and having been a friend to her children is a valid, race neutral reason. Although Burnside said her connections to the Flowers family would not affect her jury service, the basis is not pretextual.

¶139. Finally, the State cited Burnside's statements regarding whether she could judge another person and whether she could impose the death penalty as bases for its peremptory strike. During voir dire, Burnside testified as follows:

> Q:   . . . And so I want to know if the facts justified it and the law allowed it, could you consider the death penalty as a sentencing possibility?
>
> A:   That I don't think I could do. I don't know if I could do that. . . . I don't – I don't know if I could consider it, sending anybody to death. I don't know if I could do that.
>
> Q:   And can you explain further your views on that?

A:     I've just never been put in that predicament. I've always just don't know if I could do that. It's just the best way I can explain it. I just don't think I could do that.

Q:     Again, let me explain. You're not committing to do it or not to do it. You're just – we just need to know if that's something that would be in your mind where you could think about it and you could consider the possibility of it.

A:     I could think about it and consider it. That's all I could say.

Q:     And would you consider the imposition of the death penalty, if you were on the jury and it got to the second phase?

A:     If I was on there, yeah, I guess I'd have to.

Q:     So if the facts justified it and the law allowed it, you would consider it?

A:     Yes.

Q:     Also, if he did not receive that death sentence – if he was convicted and the jury did not impose the death sentence, . . . [he] would receive the sentence of life without parole. So is that a sentencing option that you could consider, also?

A:     Yes, I could consider that.

Q:     And so you would consider and have an open mind as to both sentencing options then; is that correct?

A:     Yes, sir.

Burnside eventually said she could consider both sentencing options, but later she said again that her reservations about judging another person would affect her ability to serve as a juror:

Q:     When I was asking the questions the other day about jurors that could judge other people, you stated at that time that you could not judge anyone. Why did you state that?

A:     Well, because I – you know, I prefer not to judge anyone. But then when they come back and say could I be fair. My thing is I prefer not

84

to judge anyone. But no, I will be fair.

Q: All right. Who will you be fair to?

A: I will be fair to whoever evidence is presented. I will be fair. Because I would want somebody to be fair to me or my children or my family. That the only way I can explain it.

. . .

Q: So you have changed your mind, and you say now that you could judge someone; is that correct?

A: Well, basically, I haven't changed my mind. I just prefer not to be in a predicament where I have to judge somebody.

Q: So you still have a problem with judging someone?

A: I still have a problem with that.

Q: Would that problem be such that you would think about it if you were picked on a jury?

A: Well, I'd have to say yes.

Q: It would? So that might affect your judgment in the case; is that right?

A: It could, possibly, yes, sir.

Flowers's counsel attempted to rehabilitate Burnside:

Q: Ms. Burnside, if you got picked on the jury, you would be fair to both sides, wouldn't you?

A: Yes, sir.

Q: And despite the fact that you don't like to judge, if you got picked you would, in fact, judge and be fair to both sides; is that correct?

A: Yes, sir, that is correct.

¶140. A juror's views on the death penalty and hesitation about serving as a juror are race

85

neutral reasons for peremptory challenges. *See **Batiste***, 121 So. 3d at 848; ***Hughes***, 90 So. 3d at 626; ***Flowers III***, 947 So. 2d at 920-21. Further, there were no white jurors in the venire whose views and hesitation regarding judgment were comparable to Burnside's views. Although Flowers's counsel did rehabilitate Burnside, her remarks unquestionably were a race neutral basis for the challenge. The trial court did not err in denying the ***Batson*** challenge as to Burnside, as the State provided multiple race neutral reasons for striking her.

### C. *Batson* Conclusion

¶141. We hold Flowers's claim that the trial court erred in denying his ***Batson*** challenges to be without merit. While the State did ask more questions of potential African-American jurors than white jurors, disparate questioning alone is not dispositive of purposeful discrimination. ***Hughes***, 90 So. 3d at 626 (¶ 37); ***Manning***, 765 So. 2d at 520 (¶ 15); ***Berry***, 802 So. 2d at 1039 (¶ 20). Further, the State's contention that the additional questions were asked to clarify and follow up on certain issues is supported by the record. The State provided multiple race neutral reasons for the peremptory strikes against each of the five African Americans. The evidence indicates that the race neutral reasons were valid and not merely pretextual.

¶142. The "exceptional circumstances" present in ***Foster*** and *Miller-El II*, which prevented the appellate courts' deference from being given to the trial court's factual determinations, are not present in the case *sub judice*. In ***Foster*** and ***Miller-El II***, the record demonstrated a policy to exclude prospective African-American jurors, which completely undermined the race neutral explanations urged by the prosecution for exercising their strikes. *See **Foster***,

136 S. Ct. 1737; *Miller-El II*, 545 U.S. 231. Similar evidence undermining the prosecution's explanations simply is not present in the case *sub judice*. Taking into account the "historical evidence" of past discrimination, *i.e.*, Evans's past *Batson* violations, the Court remains unpersuaded that the trial court erred in finding that the State did not violate *Batson*. Accordingly, the trial court did not err in denying Flowers's *Batson* challenges.

**VII. Whether the venire was biased, resulting in an unfair trial, such that reversal and remand for a new trial is warranted.**

¶143. Flowers raises two subissues related to alleged bias in the venire and empaneled jury: (1) whether the jury did not adequately deliberate because it was influenced by racial bias in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment; and (2) whether the pervasive bias in the venire infected the fairness of the proceedings, requiring reversal and remand for a new trial. Flowers implies that African-American jurors either were afraid to serve as jurors or were afraid to find Flowers not guilty as a result of the alleged pervasive racial bias in Montgomery County.

**A. Adequate Deliberations**

¶144. The jury deliberated for twenty-nine minutes during the guilt-or-innocence phase and for an hour and a half during the sentencing phase. Our cases support that the time spent deliberating was adequate. In a capital murder case, we have held that a ten-minute guilt-or-innocence deliberation and a one-hour sentencing deliberation were adequate. *Gray*, 728 So. 2d at 62-63. The well-settled rule is that "there is no formula to determine how long a jury should deliberate." *Id.* at 62 (¶ 125) (quoting *Smith v. State*, 569 So. 2d 1203, 1205 (Miss. 1990)). In *Smith v. State*, we explained:

87

Because the jury's time of considering their verdict did not exceed seven minutes, it does not follow that the jurors did not carefully consider the testimony and the exhibits. It is not only possible but probable that when the state and the defendant had rested and the summations had been made each juror had decided in his mind the issue of innocence or guilt. After the brief deliberation with each other, the jurors found that they were of a single mind as to the guilt or innocence of the appellant and found him to be guilty.

Under the facts of this case this Court is unwilling to lend its authority to the establishment of any formula or guideline relating to the time a jury must deliberate before delivering its verdict. This Court is cognizant of the fact that in the past in occasional cases, as in the case at bar, rather brief deliberations have taken place in the jury room and verdicts have been returned with unusual rapidity. There is no yardstick of time which a jury should use before reaching a verdict. No two cases are similar as to facts and therefore the law varies in its application thereto. Therefore, we cannot hold that in the time utilized by the jury it could not reach a proper verdict of guilty.

*Smith*, 569 So. 2d at 1205 (quoting *Johnson v. State*, 252 So. 2d 221, 224 (Miss. 1971)).

Based on length of the deliberations alone, Flowers's argument that the jury's deliberation was inadequate has no merit. However, Flowers's argument is not based solely on the length of time. He contends that the short amount of time spent deliberating is indicative of racial bias in the jury and venire.

**B. Biased Venire**

¶145. Flowers claims that he was denied the right to a fair trial because the jury was biased. "The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and state constitutions." *Johnson v. State*, 476 So. 2d 1195, 1209 (Miss. 1985). The United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]" U.S.

88

Const. amend. VI. Likewise, the Mississippi Constitution provides: "In all criminal prosecutions the accused shall have a right to . . . a speedy and public trial by an impartial jury of the county where the offense was committed." Miss. Const. art. 3, § 26. We have recognized that the right to a trial by an impartial jury and the right to a trial in the location where the offense occurred can be at odds with one another. *See Johnson*, 476 So. 2d at 1210.

¶146. Flowers takes several approaches to support his contention that he was denied the right to a fair trial because the jury was biased. He asserts that: (1) racial bias in the community is evident by the Court's opinion in *Flowers III*; (2) racial bias and tension was demonstrated by the arrest of two African Americans for perjury during one of Flowers's previous trials; (3) excessive law enforcement personnel were present at the trial; (4) a majority of the jurors empaneled were acquainted with either Flowers or the victims or had formed opinions related to the case prior to trial; (5) the trial court erroneously denied several of Flowers's challenges for cause; (6) the trial court erred by failing to quash the entire venire; and (7) the jury interrupted an important mitigation witness. To cure the alleged biases, Flowers claims that the trial court should have quashed the venire or, in the alternative, provided for a "cooling-off period" until an unbiased jury from Montgomery County could be empaneled.

¶147. First, Flowers asserts that bias is evident from the Court's holding in *Flowers III*. Flowers's claim comes from the Court's statement in *Flowers III* that the case presented "as strong a prima facie case of racial discrimination as we have ever seen in the context of a

89

*Batson* challenge." *Flowers III*, 947 So. 2d at 935 (¶ 66). The problems surrounding jury selection in *Flowers III* are not present in today's case. In that case, the State exercised all twelve of its peremptory strikes on African Americans and its three peremptory strikes for alternate jurors on African Americans. *Id.* at 917-18. The Court found that the following facts resulted in a *Batson* violation: the State exercised peremptory strikes against African-American veniremen who shared characteristics with tendered white jurors; the State's proffered race neutral reasons for striking African Americans were not supported by the record; and the State failed to voir dire other jurors as to a characteristic cited as a race neutral basis. *Id.* at 935-39. However, the facts were particular to the third trial, and *Flowers III* does not stand for the proposition that the community as a whole – and any future venire – would be biased. The claim is without merit.

¶148. Second, Flowers claims that racial tension was escalated by the arrests of two African-American jurors for perjury during Flowers's fourth trial. During that trial, Mary Annette Purnell, an African American who was selected to serve as alternate juror, said during voir dire that she did not know Flowers or his family, but after the jury was selected, another juror reported to the prosecution that Purnell knew Flowers and his family. Purnell admitted to meeting with Flowers prior to the trial but after the jury summons. Apparently, during jury selection, Flowers gave his attorney a note that said they needed to "fight for" Purnell to be on the jury. Flowers's counsel denied having read the note prior to the perjury accusations. Purnell pleaded guilty to perjury and received two ten-year sentences.

¶149. At the end of the fourth trial, after the jury was unable to reach a unanimous decision,

jurors reported to the trial court that James Bibbs, an African-American juror, had told other jurors that the police did not adequately investigate the murders and that evidence had been planted. After the jury was released, the trial court questioned Bibbs about the reports. Bibbs denied making the exact statements, but he admitted that he had told other jurors that he had been in an alley close to Tardy Furniture on the day of the murders and that investigators did not inspect that area. Bibbs claimed that he did not report the information during voir dire because he misunderstood questions relating to whether he had knowledge of the crimes. Although the reason is unclear from the record, the perjury charges against Bibbs eventually were *nolle prossed*.

¶150. Flowers claims that Bibbs was possibly the only juror at the fourth trial who did not vote to convict Flowers. He further contends that the perjury arrests "escalated" racial tension and that the arrests were reported in the press and "pervaded the jury venire" in today's case. To support his contentions, Flowers cites local media articles discussing the perjury arrests. Nothing in the record, however, discusses whether members of the venire in today's case were aware of the arrests. Further, nothing in the record suggests that the arrests were anything less than legitimate. Clearly, Purnell admitted to perjury, and Bibbs admitted to having knowledge that he did not disclose during voir dire. The contention is not supported by the record and is without merit.

¶151. Next, Flowers's claim that excessive law enforcement presence caused bias in the venire also is without merit. When Flowers's counsel raised concerns that venire members were standing close to a law enforcement officer during voir dire, the trial court responded

by reminding counsel that the potential jurors could be questioned about any contact with law enforcement during voir dire. Considering the notoriety of the crimes in the case, a large number of law enforcement personnel would be expected.

¶152. Further, Flowers's claim that the jury interrupted a mitigation witness is not supported by the record. During the mitigation phase, pizza was ordered for the jury. Apparently, the pizza arrived while Archie Flowers Sr., Flowers's father, was providing mitigation testimony. In response to the food arriving, Flowers's counsel stated: "Your honor, if the jurors' food is here, I don't want to stand in the way of that." There is no indication that the jury interrupted the witness, and Flowers's counsel encouraged the recess.

¶153. Flowers asserts that a majority of the jurors empaneled were acquainted with Flowers, acquainted with the victims, or had formed opinions related to the case prior to trial. Flowers claims that the venire was skewed in favor of the prosecution because a higher percentage of potential jurors who were familiar with Flowers and his family were struck from the venire compared to venire members who were familiar with the victims and their families. He claims that, because potential jurors who were familiar with the Flowers family were more likely to state that their relationships with the family would affect their ability to serve as fair and impartial jurors, ultimately, a higher percentage of jurors who were familiar with the victims and their families was empaneled.

¶154. Jurors who state that their relationship with a defendant or a victim would affect their ability to be impartial properly are struck for cause. *See **Manning***, 735 So. 2d at 340 (¶ 31) ("doubts as to one's ability to follow the law and vote for the death penalty when appropriate

is a sufficient race-neutral reason"); ***Stevens***, 806 So. 2d at 1062 (¶ 138) (removal of juror is justified where the trial court is "is left with the impression that a prospective juror would be unable to faithfully and impartially apply the law") (quoting ***Wainwright v. Witt***, 469 U.S. 416, 426 (1985)); ***Davis v. State***, 660 So. 2d 1228, 1244 (Miss. 1995) (same). However, when jurors indicate that they can be impartial, they do not have to be struck based on relationships alone. "The linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen." ***Hughes v. State***, 983 So. 2d 270, 284 (¶ 63) (Miss. 2008) (quoting ***Howell***, 860 So. 2d at 720 (¶ 37)). Thus, if jurors indicated that they could not be fair and impartial, they properly were struck. The claim is without merit.

¶155. Flowers's claim that the trial court erred by denying several of his challenges for cause fails. The potential jurors that Flowers challenged for cause were not selected to serve as jurors, and Flowers did not exercise all of his peremptory challenges. "Denial of challenge for cause is not error where it is not shown that the defense has exhausted peremptory challenges and is thus forced to accept the juror. This threshold test is applicable in a capital murder case." ***Berry v. State***, 575 So. 2d 1, 9 (Miss. 1990) (citing ***Billiot v. State***, 454 So. 2d 445, 457 (Miss. 1984); ***Rush v. State***, 278 So. 2d 456, 458 (Miss. 1973)).

¶156. Lastly, Flowers suggests that the trial court should have quashed the entire venire or provided for a "cooling-off period" until a fair and impartial jury could be empaneled, and he claims that the trial court's failure to do so was error. Flowers's suggested remedies are not viable. Flowers's claim that a pervasive bias existed throughout the community conflicts with his suggestion that another venire should have been empaneled. If the bias was in fact

93

pervasive, another venire from the same community likely would contain the same bias. Flowers's suggested "cooling-off period" is even more troublesome, as Flowers himself would be left in limbo awaiting another trial. In *Hughes v. State*, we held that the trial court did not err in denying the defendant's motion to quash the venire based on the crime being well known within the community. *Hughes*, 983 So. 2d at 284 (¶ 64). Because the jurors indicated that their knowledge of the case would not affect their ability to be fair and impartial, the trial court did not abuse its discretion in denying the motion to quash. *Id.* Again, "[t]he linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen." *Id.* at 284 (¶ 63) (quoting *Howell*, 860 So. 2d at 720 (¶ 37)).

¶157. A more appropriate remedy would be to expand the size of the venire. *See Toyota Motor Corp. v. McLaurin*, 642 So. 2d 351, 358 (Miss. 1994); *Mhoon v. State*, 464 So. 2d 77, 82 (Miss. 1985), *superseded by statute on other grounds*. However, the size of the venire was appropriately large, as 600 people were called for voir dire. Thus, it would seem that the trial court called a large enough venire to avoid problems. Trial courts have broad discretion in conducting voir dire. *See Howell*, 860 So. 2d at 726 (¶ 67). "A jury selection procedure which gives the defendant 'a fair opportunity to ask questions of individual jurors which may enable the defendant to determine his right to challenge that juror' is proper." *Id.* at 726-27 (¶ 69) (quoting *McLemore v. State*, 669 So. 2d 19, 25 (Miss. 1996)). We cannot say that the trial court abused its discretion in conducting voir dire. For the foregoing reasons, Flowers's claims that he was denied the right to a fair trial because the jury was biased are without merit.

### VIII. Whether the trial court erred in refusing Flowers's requested culpability-phase instructions.

¶158. Flowers claims that the trial court erred in refusing three of his culpability-phase instructions – D-7, D-8, and D-9. "Jury instructions are within the sound discretion of the trial court." *Gillett*, 56 So. 3d at 496 (¶ 67) (quoting *Rubenstein*, 941 So. 2d at 787 (¶ 239)).

> This Court does not single out any instruction or take instructions out of context; rather, the instructions are to be read together as a whole. *Thomas v. State*, 818 So. 2d 335, 349 (Miss. 2002). A defendant is entitled to have jury instructions which present his theory of the case. *Id.* This entitlement is limited, however, in that the court is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Id.*

*Gillett*, 56 So. 3d at 496 (¶ 67) (quoting *Walker v. State*, 913 So. 2d 198, 234 (¶ 132) (Miss. 2005)).

¶159. Flowers claims that the trial court erred in refusing instruction D-6 because he was entitled to an instruction on the burden of proof. That instruction read as follows:

> Each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

The trial court refused the instruction, finding that it was repetitive of instruction S-1, which stated that the State must prove all of the elements of the crimes beyond a reasonable doubt. Because the instructions are repetitive, the trial court did not err in denying D-6. *See Montana v. State*, 822 So. 2d 954, 961 (¶ 26) (Miss. 2002) ("A trial judge is under no obligation to grant redundant instructions."). The issue is without merit.

95

¶160. Instructions D-7 and D-8 were circumstantial-evidence instructions. They provided:

D-7: The Court instructs the jury that [if] the prosecution has used circumstantial evidence to show that Curtis Flowers committed the charged crimes, then the evidence must be so strong as to rule out any other reasonable explanation except that of guilt. Circumstantial evidence is anything other than direct evidence, such as, to give one example, testimony of someone who witnessed an event. In other words, you may not return a verdict of guilty if you could reasonably interpret the facts in a way that would show Mr. Flowers to be not guilty.

D-8: The Court instructs the jury that if there is any fact or circumstance in this case susceptible of two interpretations, one favorable and the other unfavorable to Curtis Flowers, and when the jury has considered such fact or circumstance with all the other evidence, if there is a doubt as to the correct interpretation, then you must resolve such doubt in favor of Curtis Flowers and interpret that fact or circumstance in favor of Mr. Flowers.

In support of his argument that the trial court erred in refusing the instructions, Flowers attacks the credibility of Odell Hallmon, the jailhouse informant. Flowers recognizes that Mississippi caselaw allows trial courts to refuse circumstantial-evidence instructions in cases in which direct evidence of the crime is presented, which includes testimony from a jailhouse informant. *See* *Ladner*, 584 So. 2d at 750 (case is not circumstantial even if the only direct evidence is a "jailhouse confession").

¶161. Flowers, however, relies on the Court's opinion in *McNeal v. State*, 551 So. 2d 151 (Miss. 1989), for the proposition that jailhouse informant testimony should not serve as a basis for refusing a circumstantial-evidence instruction when the informant's credibility is questionable. In *McNeal*, the jailhouse informant testified in exchange for a reduced sentence. *Id.* at 158. The Court questioned the refusal of the instruction in *McNeal*, but the case was reversed and remanded on other grounds, so the Court did not go so far as to find

96

that a circumstantial-evidence instruction should have been given.  *Id.* at 158-59 ("It is doubtful that such testimony should be considered as direct evidence which would prevent the granting of a circumstantial evidence instruction; however, we do not decide that question here, nor is it necessary, because we find merit and reverse under [another] assignment of error.").

¶162.  The Court has clarified the jailhouse informant/circumstantial evidence issue in subsequent cases.  In *Ladner*, the Court held that it was not error to refuse such an instruction in the case of a jailhouse informant:

> A circumstantial evidence instruction must be given only when the prosecution can produce neither an eyewitness nor a confession/statement by the defendant.  The "confession" which constitutes direct evidence of a crime is not limited to a confession to a law enforcement officer but also includes an admission made to a person other than a law enforcement officer.  In *Holiday v. State*, 455 So. 2d 750, 752-53 (Miss. 1984), a witness testified that he had overheard the defendant say to another person that he had killed his wife.  This Court held that the circumstantial evidence instruction was not required.  *See Foster v. State*, 508 So. 2d 1111, 1115 (Miss. 1987) (Court held that without "jailhouse confession" the case would have been entirely circumstantial).

*Ladner*, 584 So. 2d at 750 (other citations omitted).  The Court then stated that, because *McNeal* was decided on other grounds, it did not support the defendant's proposition that a circumstantial-evidence instruction should have been given.  *Id.* at 750 n.1.  We reaffirmed the *Ladner* holding in *Moore v. State*:

> As [the defendant] points out, prior to *Ladner*, this Court expressed doubt as to whether a jailhouse informant's testimony "should be considered as direct evidence which would prevent the granting of a circumstantial evidence instruction."  *McNeal*, 551 So. 2d at 159.  While *McNeal* declined to answer that question, *Ladner* settled the matter, holding that when the type of testimony given by [the informant] in the case sub judice is present, circumstantial evidence instructions are not necessary.

97

*Moore*, 787 So. 2d at 1288 (¶ 18). Following the Court's holdings in *Ladner* and *Moore*, the trial court in today's case found that Hallmon's testimony provided direct evidence of the crimes and denied instruction D-7 and D-8. We recognize that Hallmon's credibility is questionable. However, Hallmon was cross-examined extensively at trial, and the trial court instructed the jury "that the law looks with suspicion and distrust on the testimony of a jailhouse informant, and requires the jury to weigh the same with great care and suspicion." The jury was instructed adequately regarding Hallmon's testimony, and the trial court did not err by refusing the circumstantial-evidence instructions under *Moore* and *Ladner*. The issue is without merit.

## IX. Whether the trial court erred in refusing Flowers's penalty-phase instructions and in granting the State's aggravating-circumstances instruction.

¶163. Flowers claims the trial court erred in denying several of his penalty phase jury instructions – D-4, D-12, D-33, D-34, D-38, and D-39. He also asserts that the trial court erred by allowing the State's aggravating-circumstances instruction. Again, jury instructions are within the sound discretion of the trial court, and the trial court properly refuses instructions that are incorrect statements of the law, are covered fairly in other instructions, or do not have a foundation in the evidence. *Gillett*, 56 So. 3d at 496 (¶ 67).

### A. Instruction D-4

¶164. Flowers contends that the trial court erred in refusing instruction D-4, which was a "presumption of life" instruction. The proffered instruction read:

> You are to begin your deliberations with the presumption that there are no
> aggravating circumstances that would warrant a sentence of death, and the

98

presumption that the appropriate punishment in this case would be life imprisonment. These presumptions remain with Mr. Flowers throughout the sentencing hearing and can only be overcome if the prosecution convinces each one of you, beyond a reasonable doubt, that the death penalty is the only appropriate punishment.

The Court consistently has refused to find error when a trial court denies presumption-of-life instructions. *See **Gillett***, 56 So. 3d at 514 (¶ 135); ***Brown v. State***, 890 So. 2d 901, 920 (¶ 72) (Miss. 2004) ("We have repeatedly said that we reject the 'proposition that a defendant should go into the sentencing phase with a presumption that life is the appropriate punishment.'") (quoting ***Watts v. State***, 733 So. 2d 214, 241 (¶ 81) (Miss. 1999)). As such, the trial court did not err in refusing the presumption-of-life instruction.

## B. Instructions D-12 and D-33

¶165. Flowers claims that the trial court erred by refusing to grant two instructions related to aggravating circumstances and circumstantial evidence. The instructions provided:

> D-12: The Court instructs the jury that if the State has relied on circumstantial evidence to establish an aggravating circumstance, then the evidence for the State must be so strong as to establish the aggravating circumstance not only beyond a reasonable doubt, but must exclude every other reasonable hypothesis other than establishment of the aggravating circumstance.

> D-33: During the penalty phase, I instruct you that if there is a fact or circumstance in this case which is susceptible of two interpretations, one favorable and the other unfavorable to Mr. Flowers and if, after considering all the other facts and circumstances, there is a reasonable doubt regarding the correct interpretation, then you must resolve such doubt in favor of Mr. Flowers and place upon such fact or circumstance the interpretation most favorable to Mr. Flowers.

Flowers claims that whether a criminal defendant is entitled to a circumstantial-evidence instruction during the penalty phase is a matter of first impression. Flowers is incorrect. We

have held that a trial court did not abuse its discretion in refusing to grant circumstantial-evidence instructions at the penalty phase. *Fulgham*, 46 So. 3d at 340 (¶ 80); *King v. State*, 960 So. 2d 413, 446-47 (¶ 70) (Miss. 2007). In support of its finding, the *King* Court wrote that the jury's finding that the defendant actually committed the murder during the guilt-or-innocence phase "indicate[d] its rejection of any other reasonable hypothesis of [the defendant's] participation in the crime." *King*, 960 So. 2d at 446 (¶ 70). Instructions D-12 and D-33 are almost identical to the instruction at issue in *Fulgham*. The trial court did not err in refusing the instructions.

### C. Instruction D-34

¶166. Instruction D-34 provided: "The Court instructs the jury that if you cannot, within a reasonable time, agree as to punishment, the court will dismiss you and impose a sentence of imprisonment for life without the benefit of parole." Flowers claims that the trial court should have granted the instruction because the jury did not receive guidance on what would happen if the jurors could not agree unanimously on a punishment. Flowers contends that the alleged error is evident by a note sent from the jury during the penalty phase. The note stated: "If we cannot agree unanimously, who will make the ultimate decision?" The trial court responded to the note by stating: "That is not an issue the jury should be concerned about."

¶167. The Court has reviewed almost identical instructions in previous cases and found that the trial court did not err in refusing the proffered instructions. In *Gillett*, we held that the trial court did not err in refusing an instruction that stated: "If you cannot, within a reasonable

time, agree as to punishment, I will dismiss you and impose a sentence of life without the benefit of parole. If you cannot agree, know that any of you may inform the bailiff of this." *Gillett*, 56 So. 3d at 515 (¶ 138). Because the jury was instructed on the three possible penalty phase outcomes – death, life imprisonment without parole, or inability to agree unanimously on a punishment – the Court held that the jury was properly instructed on the possibility of not reaching a unanimous decision. *Id.* at 516 (¶ 139). In another capital murder case, the Court held that the trial court did not err in refusing the following instruction: "The court instructs the jury that if you do not agree upon punishment the court will sentence the defendant to life imprisonment without possibility of parole or early release." *Edwards v. State*, 737 So. 2d 275, 316 (¶ 142) (Miss. 1999). The *Edwards* Court held that the jury was adequately instructed that it could "return to the courtroom and report that it was unable to agree unanimously on punishment." *Id.* at 316 (¶ 143).

¶168. Similar to *Gillett* and *Edwards*, the trial court in today's case instructed the jury that it could reach three possible outcomes in the penalty phase: death, life without parole, or being unable to agree unanimously on a punishment. Accordingly, the trial court did not err in refusing instruction D-34.

### D. Instructions D-38 and D-39

¶169. Flowers claims that the trial court erred by refusing instructions on the jury's ability to consider mercy. Proposed instruction D-38 read:

> A mitigating factor is anything that in fairness and mercy may reduce blame or that may justify a sentence less than death. Even if a factor does not justify or excuse the crime it may still be a mitigating factor. It is for each of you to decide if a factor is mitigating.

101

Mercy alone can be a mitigating factor you can consider in deciding not to impose the death penalty and to impose a sentence of life without parole.

Instruction D-38 is clearly a mercy instruction, and the Court has recognized that such instructions are not required and "may be given at the discretion of the trial court." **Foster**, 639 So. 2d at 1300. Flowers's counsel recognized during the sentencing instruction hearing that D-38 was a mercy instruction. The trial court did not err in refusing the instruction.

¶170. Instruction D-39 provided: "The death penalty is never required. You may always find that Mr. Flowers should be sentenced to life in prison or life in prison without the possibility of parole." Although Flowers describes D-39 as a "mercy instruction," upon close examination, the instruction simply seems to instruct the jury on its ability to impose a sentence of life in prison rather than the death penalty. At the sentencing instruction hearing, the trial court refused the instruction because it was repetitive of the omnibus sentencing instruction given by the trial court. As part of the omnibus instruction, the jury was instructed:"In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you *may* impose the death sentence." (Emphasis added.) Thus, the jury was given the option to sentence Flowers to life without parole or to impose the death penalty if it found that the aggravating circumstances outweighed the mitigating circumstances. Although the life without parole option was stated more clearly in D-39 than in the omnibus instruction, it cannot be said that the jury was not given the instruction. The trial court did not err in refusing instruction D-39.

### E. Aggravating Circumstances

¶171. The court instructed the jury on three aggravating circumstances: (1) "the Defendant

knowingly created a great risk of death to many persons"; (2) "the capital offense was committed while the Defendant was engaged in the commission of the crime of armed robbery for pecuniary gain"; and (3) "the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." *See* Miss. Code Ann. § 99-19-101(5) (Rev. 2015). Flowers claims that the trial court erred in issuing the instruction.

### 1. Great Risk of Death to Many Persons

¶172. Flowers asserts that the trial court erred by allowing the jury to consider the aggravating factor of "great risk of death to many persons." The Court has held that the "great risk" aggravator is appropriate when there are multiple victims of a single crime. *See Flowers II*, 842 So. 2d at 560 (¶ 91) (quoting *Flowers I*, 773 So. 2d at 325 (¶ 53) (citing *McGilberry v. State*, 741 So. 2d 894, 925 (¶¶ 130-36) (Miss. 1999))). *See also Jackson v. State*, 672 So. 2d 468, 490 (Miss. 1996) (when "multiple victims have been stabbed in the same or a nearby room, courts in other jurisdictions generally have found that there was sufficient evidence to warrant the 'great risk to many persons' aggravating circumstance") (collecting cases). Flowers acknowledges the Court's prior holdings, but he asks the Court to rule differently here.

¶173. To give the instruction, the defendant must have created a great risk of death to someone other than his intended victim. *Porter v. State*, 732 So. 2d 899, 906 (¶ 31) (Miss. 1999). In *Porter*, the Court held that the evidence did not support the "great risk" aggravator because the defendant had killed only one person, whom he had been hired to kill, and he

103

fled the scene after shooting that person, even though other people were inside the house at the time. *Id.* In *Corrothers v. State*, the Court held that the "great risk" aggravator was proper because the "evidence showed that Corrothers entered the home intending to attack Taylor, and in doing so, he shot Frank and Tonya and held a gun on Josh." *Corrothers*, 148 So. 3d at 320 (¶ 118).

¶174. Flowers asserts that the evidence does not indicate that the person who killed the four victims had any intention to harm anyone other than the victims he was robbing. The State's theory was that Flowers intended to kill Bertha Tardy because she fired him and withheld his pay and, in the process of doing so, he shot and killed the others. Flowers knew Carmen Rigby from working at the store, but there is no evidence that he knew Robert Johnson or Derrick Stewart, as the day of the murders was their first day to work at the store. Based on the State's theory of the case, which was presented to the jury, we hold that there was sufficient evidence on which the jury could have found that Flowers caused a great risk of death to people other than his intended victim, Bertha Tardy. Further, because Flowers shot four victims in the same room, the evidence was sufficient to warrant the instruction. *Jackson*, 672 So. 2d at 490

¶175. Flowers also claims that "to allow the same conduct that is an essential element of the underlying crime to also aggravate that crime for sentencing purposes" violates the Eighth Amendment. Flowers does not cite any authority for this proposition, nor does he explain how the aggravator violates the Eighth Amendment. The State understands Flowers's argument to be that use of the aggravator violates double jeopardy. We have held

specifically that the "great risk" aggravator does not violate double jeopardy. *See Corrothers*, 148 So. 3d at 320 (¶¶ 117-19) (quoting *Flowers II*, 842 So. 2d at 561-62 (¶ 94) (quoting *Wilcher v. State*, 697 So. 2d 1087, 1105 (Miss. 1997))). The Court also has held that "doubling" – the use of an element of the underlying crime as an aggravating circumstance – does not violate the Constitution. *See Corrothers*, 148 So. 3d at 320 (¶ 116); *Gillett*, 56 So. 3d at 510 (¶ 118); *Ross I*, 954 So. 2d at 1014 (¶ 120). Accordingly, the issue is without merit.

### 2. Armed Robbery for Pecuniary Gain

¶176. Flowers claims that the trial court erred by instructing the jury to consider the aggravating factor of armed robbery for pecuniary gain because the instruction essentially combined two aggravating factors. The instruction given to the jury stated, in part: "Consider only the following elements of aggravation in determining whether the death penalty should be imposed: . . . The capital offense was committed while the Defendant was engaged in the commission of the crime of armed robbery for pecuniary gain." Mississippi Code Section 99-19-101(5) lists ten aggravating factors the jury may consider during the penalty phase of capital punishment cases. One factor listed is the capital offense occurring while in the commission of any robbery. Miss. Code Ann. § 99-19-101(5)(d) (Rev. 2015). A separate factor is commission of the capital offense for pecuniary gain. Miss. Code Ann. § 99-19-101(5)(f) (Rev. 2015).

¶177. Flowers recognizes that the Court previously has found similar aggravating-circumstances instructions permissible, but he encourages the Court to reconsider its

reasoning. In ***Howell v. State***, the Court held that it was not error for the following aggravating-circumstance instruction to be given to the jury: "The capital offense was committed for pecuniary gain during the course of an armed robbery." ***Howell***, 860 So. 2d at 756 (¶ 186). The Court noted that the jury is not permitted to "doubly weigh" aggravating circumstances; thus, listing armed robbery and pecuniary gain as *separate* aggravating circumstances could be unconstitutional in some factual circumstances. *Id.* at 756 (¶ 188) (quoting ***Turner v. State***, 732 So. 2d 937, 954-55 (¶¶ 71-72) (Miss. 1999)). When pecuniary gain and armed robbery are used within the *same* factor, however, the concern of the jury "doubly weighing" the aggravating factors is not present. As such, the issue is without merit.

### 3. Avoiding Lawful Arrest or Effecting an Escape from Custody

¶178. Flowers claims that the trial court erred by instructing the jury that it could consider that the capital offense occurred for the purpose of avoiding or preventing arrest as an aggravating factor, because the evidence presented at trial was insufficient to support the instruction. Flowers also claims that the definition of avoiding arrest is unconstitutional because it is overly broad. Whether the avoiding arrest aggravator is constitutional has been addressed several times, and we consistently have held that it is not overly broad. ***Brawner v. State***, 947 So. 2d 254, 266 (¶ 36) (Miss. 2006) (collecting cases).

¶179. The factor is appropriate where "the accused purposefully killed the victim of the underlying felony to avoid or prevent arrest for that felony." *Id.* at 266 (¶ 37). Further,

> [i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or to "cover their tracks" so as to avoid apprehension and eventual arrest by

106

authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

*Id.* (quoting *Wiley v. State*, 750 So. 2d 1193, 1206 (¶ 46) (Miss. 1999)). In *Wiley*, the defendant shot and killed a witness to a robbery and injured another witness. *Wiley*, 750 So. 2d at 1206 (¶ 47). The Court found that, because the defendant knew the victims and attempted to dispose of evidence linking him to the robbery, there was sufficient evidence to support the aggravating factor. *Id.* at 1206 (¶ 48). Like the defendant in *Wiley*, Flowers knew the murder victims. Further, the murder weapon was never found, nor were the Fila Grant Hill tennis shoes. However, a Fila Grant Hill shoebox was found at Flowers's girlfriend's house, and Flowers had been seen wearing Fila Grant Hill shoes. Cash was found hidden in Flowers's headboard, and Flowers gave conflicting statements to police regarding his whereabouts on the morning of the murders. In *Wiley*, the Court held that the defendant's "efforts to dispose of and/or conceal the evidence of his crime [were] sufficient to support the avoiding arrest instruction." *Id.* at 1206 (¶ 48). In the instant case, it could be "reasonably inferred" that Flowers attempted to conceal his identity, disposed of evidence, or tried to "cover his tracks." The evidence is sufficient to support the avoiding-arrest instruction.

### X. Whether Flowers's multiple trials violated the Double Jeopardy Clause and the Due Process Clause of the Fourteenth Amendment.

¶180. Flowers claims that his six trials for the Tardy Furniture murders violate his due process rights and the Double Jeopardy Clause. Flowers's first and second trials resulted in convictions and death sentences that subsequently were overturned by the Court for various

107

instances of prosecutorial misconduct. *Flowers I*, 773 So. 2d 309; *Flowers II*, 842 So. 2d 531. At his third trial, Flowers again was convicted and sentenced to death, but the Court reversed and remanded for a new trial for a *Batson* violation. *Flowers III*, 947 So. 2d 910. At Flowers's fourth and fifth trials, the juries was unable to reach unanimous decisions, and the trials resulted in mistrials. Prior to today's case, Flowers moved to have the case dismissed as a violation of his due process rights and the Double Jeopardy Clause; the trial court denied the motion. Claims of double jeopardy are reviewed de novo. *Rowland v. State*, 98 So. 3d 1032, 1037 (¶ 9) (Miss. 2012) (quoting *Foreman v. State*, 51 So. 3d 957, 960 (¶ 8) (Miss. 2011)).

¶181. The Double Jeopardy Clause of the Mississippi Constitution reads: "No person's life or liberty shall be twice placed in jeopardy for the same offense; but there must be an actual acquittal or conviction on the merits to bar another prosecution." Miss. Const. art. 3, § 22. Likewise, the Fifth Amendment to the United States Constitution provides that never "shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Double Jeopardy Clause does not bar reprosecution when a conviction has been set aside on appeal. *Green v. United States*, 355 U.S. 184, 189 (1957). Also, jeopardy does not attach when a criminal case ends by the jury failing to reach a unanimous verdict. *Id.* at 188. *See also* *Richardson v. United States*, 468 U.S. 317, 323-24 (1984); *Keerl v. Montana*, 213 U.S. 135, 137-38 (1909). "Double jeopardy consists of three separate constitutional protections: (1) protection against a second prosecution for the same offense after acquittal, (2) protection against a second prosecution for the same offense after

conviction, and (3) protection against multiple punishments for the same offense." ***Powell v. State***, 806 So. 2d 1069, 1074 (¶ 8) (Miss. 2001) (citing ***North Carolina v. Pearce***, 395 U.S. 711, 717 (1969)). Flowers has not been acquitted, his convictions have not been upheld on appeal, and he has not received multiple punishments. Therefore, the Double Jeopardy Clause has not been implicated.

¶182. Flowers also claims that continued trials, despite the reversals in his first three direct appeals on the bases of prosecutorial misconduct, violate his due process rights. We have not addressed whether multiple trials result in a due process violation, but other courts have held that multiple retrials do not violate a defendant's due process rights when implications of double jeopardy are not at issue. *See* ***People v. Sierb***, 581 N.W.2d 219, 223-25 (Mich. 1998);[7] ***United States v. Jones***, 122 F. 3d 1058 (2d Cir. 1997). *See also* ***United States v. Faulkenberry***, 461 Fed. App'x 496, 503 (6th Cir. 2012); ***United States v. Andrews***, 2 F. Supp. 3d 847, 853 (N.D. W. Va. 2014); ***Wallin v. Sinclair***, 2013 WL 2338259 (W.D. Wash. 2013); ***Whiteside v. Warden, S. Ohio Corr. Facility***, 2011 WL 5551598 (S.D. Ohio 2011). Further, the United States Supreme Court has held that the Due Process Clause does not provide greater protection against double jeopardy than the Double Jeopardy Clause itself. ***Sattazahn v. Pennsylvania***, 537 U.S. 101, 116 (2003). The Court wrote:

---

[7] In ***People v. Sierb***, the Michigan Supreme Court recognized that a rule prohibiting retrial on the basis of a due process violation would lead to problems with arbitrary application: "[I]f recognized, guidelines for responsible decision making in applying the new remedy would be scarce and open-ended. If three trials are too many under substantive due process, why are not two? It could follow that either any retrial after a mistrial is barred as a violation of substantive due process, or that the theory as applied would result in arbitrary assertion of judicial authority." ***Sierb***, 581 N.W.2d at 224.

At bottom, petitioner's due-process claim is nothing more than his double-jeopardy claim in different clothing. As we have said: "The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order." *Medina v. California*, 505 U.S. 437, 443, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992). We decline petitioner's invitation to hold that the Due Process Clause provides greater double-jeopardy protection than does the Double Jeopardy Clause.

*Id.* *See also* *United States v. Neto*, 659 F.3d 194, 201 (1st Cir. 2011) (the Due Process Clause of the Fifth Amendment does not supplement the protections provided by the Double Jeopardy Clause). Flowers's due process claim is an attempt to supplement the protections of the Double Jeopardy Clause. Because the double jeopardy protections have not been violated, Flowers cannot assert a due process claim on the same grounds. The issue is without merit.

XI. **Whether the convictions and death sentences were obtained in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and their counterparts in the Mississippi Constitution.**

¶183. Flowers presents several contentions of error related to his indictments, the admissibility of victim-impact testimony, and the constitutionality of the death penalty. Flowers claims that the trial court should have precluded the State from seeking the death penalty because of the alleged lack of evidence. Because there was sufficient evidence to support a conviction, the issue is without merit. *See* Issue IV *supra*. Flowers also asserts that his right to a speedy trial was violated for the Carmen Rigby and Robert Golden convictions, but he provides no support for that contention. As such, the issue is without merit. *See*

*Byrom v. State*, 863 So. 2d 836, 853 (¶ 35) (Miss. 2003) ("failure to cite relevant authority

110

obviates the appellate court's obligation to review such issues").

### A. Whether it was constitutional to try Flowers for all four murders in the same trial despite there being four, single-count indictments.

¶184. Flowers claims that it was error for him to be tried for all four murders at a single trial when there were four, single-count indictments rather than a multicount indictment. He further claims that the trial court erred in not entering an order consolidating the four cases or obtaining a statement waiving the multicount indictment. Flowers concedes that he did not object at trial to proceeding under the four, single-count indictments, but he claims that the issue is one of plain error.

¶185. At his first trial, Flowers filed a motion to consolidate the four murder indictments into one trial, but the trial court denied the motion. *Flowers I*, 773 So. 2d at 318 (¶ 26). During Flowers's third trial, the trial court announced that the parties had agreed to consolidate the four cases. *See Flowers III*, 947 So. 2d at 916 (¶ 5). Flowers's fourth, fifth, and sixth trials were for all four murders.

¶186. In his brief, Flowers claims that Mississippi Code Section 99-7-2 requires that he should have been charged under a multicount indictment and/or that the trial court should have entered an order consolidating the matters. Section 99-7-2 does not include either of the alleged requirements; rather, it includes permissive language allowing – but not requiring – the trial court to proceed under a multicount indictment. Section 99-7-2 reads in its entirely:

> (1) Two (2) or more offenses which are triable in the same court *may* be charged in the same indictment with a separate count for each offense if: (a) the offenses are based on the same act or transaction; or (b) the offenses are

based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan.

(2) Where two (2) or more offenses are properly charged in separate counts of a single indictment, all such charges *may* be tried in a single proceeding.

(3) When a defendant is convicted of two (2) or more offenses charged in separate counts of an indictment, the court shall impose separate sentences for each such conviction.

(4) The jury or the court, in cases in which the jury is waived, shall return a separate verdict for each count of an indictment drawn under subsection (1) of this section.

(5) Nothing contained in this section shall be construed to prohibit the court from exercising its statutory authority to suspend either the imposition or execution of any sentence or sentences imposed hereunder, nor to prohibit the court from exercising its discretion to impose such sentences to run either concurrently with or consecutively to each other or any other sentence or sentences previously imposed upon the defendant.

Miss. Code Ann. § 99-7-2 (Rev. 2014) (emphasis added). In 2002, the Court of Appeals addressed whether a defendant is entitled to a multicount indictment. *Brooks v. State*, 832 So. 2d 607, 610-11 (Miss. Ct. App. 2002). In *Brooks*, the defendant was charged with two counts of sale of cocaine in separate indictments and claimed on appeal that he should have been charged under a multicount indictment. *Id.* at 608, 610 (¶¶ 1, 13). The court held that single-count indictments were permissible:

[The defendant] argues the cocaine sales were part of a common scheme; therefore, he should have been charged in a multi-count indictment. [The defendant] is incorrect. Separate indictments are the usual practice in Mississippi, while multi-count indictments are exceptional. Mississippi Code Annotated § 99-7-2-(1) (Rev. 2000) provides the three exceptional situations in which a multi-count indictment *may* be brought: "(1) the offenses are based on the same act or transaction; or (2) the offenses are based on two (2) or more acts or transactions connected together; or (3) the offenses are based on two (2) or more acts or transactions constituting parts of a common scheme or

112

plan." *Id.* A basic tenet of statutory construction is that the word "shall" is a mandatory directive, and the word "may" is discretionary in nature. *American Sand and Gravel Co. v. Tatum*, 620 So. 2d 557, 563 (Miss. 1993); *Planters Bank & Trust Co. v. Sklar*, 555 So. 2d 1024, 1027 (Miss. 1990). In this case, the State could have brought a multi-count indictment but was not required to do so.

*Id.* at 610 (¶ 13). Flowers provides no other authority for his proposition that a multi-count indictment was required.

¶187. Flowers also claims that the trial court erred by not entering an order consolidating the matters and/or obtaining a waiver from Flowers "to be tried on only a single count indictment." In support of his argument, Flowers cites *State v. Berryhill*, 703 So. 2d 250 (Miss. 1997), and *Woods v. State*, 200 Miss. 527, 27 So. 2d 895, 896-97 (1946). Neither case supports Flowers's contention. *Berryhill* stands for the proposition that "capital murder indictments that are predicated upon the underlying felony of burglary must assert with specificity the felony that comprises the burglary." *Berryhill*, 703 So. 2d at 258. And, although the Court in *Woods* found that the trial court erred by allowing the State to consolidate for trial three separate crimes – exhibiting a deadly weapon, carrying a concealed weapon, and assault and battery with fists – the case is distinguishable from Flowers's case. *Woods*, 27 So. 2d at 897. In *Woods*, the Court noted that the three crimes contained different elements and the different elements led to a possibility of prejudice for the defense:

> the accused had to be prepared to meet evidence of three distinct crimes, where much of the evidence as to one was not competent as to the others. Certainly the accused was confounded in his defense and evidence was introduced before the jury which would not have been competent upon separate trials.

*Id.* The concern present in *Woods* – that the defendant would have to defend three distinct

113

crimes – is not present in today's case. Flowers was charged with four counts of capital murder with the underlying felony of armed robbery. Because proceeding under single-count indictments is permitted, the issue is without merit.

### B. Whether the trial court erred by refusing Flowers's motion to quash the indictment for failure to allege an aggravating circumstance and/or the *mens rea* requirement.

¶188. Flowers claims that his indictments were constitutionally insufficient because they failed to list the aggravating factors and/or the *mens rea* requirement. As mentioned above, Flowers was charged with the murders in four single-count indictments. Aside from the victims' names, each indictment contained identical language. The indictments read, in part:

> CURTIS GIOVANNI FLOWERS late of Montgomery County, Mississippi, on or about the 16th day of July, 1996, in the county and state aforesaid, and within the jurisdiction of this Court, alone or while acting in concert with another or others, did unlawfully, wilfully, feloniously, and either with or without the deliberate design to effect death, kill and murder [the victim], a human being, by shooting her with a pistol, while engaged in the commission of the felony crime of armed robbery in violation of Miss. Code Ann. Section 97-3-79 and Section 97-3-19(2)(e) [as amended] against the peace and dignity of the State of Mississippi.

¶189. Flowers claims that the indictments were insufficient under the United States Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000), and *Ring v. Arizona*, 536 U.S. 584, 605-06 (2002). We addressed the same argument in *Pitchford* and said that we have held repeatedly that "these cases have no application to Mississippi's capital murder sentencing scheme." *Pitchford*, 45 So. 3d at 258 (¶ 184). The indictment in *Pitchford* was almost identical to Flowers's indictments. *See id.* at 257-58 (¶ 183). The *Pitchford* Court provided the following regarding the Court's refusal to apply *Apprendi* and *Ring* to the issue:

114

This Court repeatedly has rejected this type of argument. We have held that *Apprendi* and *Ring* address issues wholly distinct from the present one, and in fact do not address indictments at all. The purpose of an indictment is to furnish the defendant with notice and a reasonable description of the charges against him so that he may prepare his defense. An indictment is required only to have a clear and concise statement of the elements of the crime with which the defendant is charged.

Under Mississippi law, the underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged. In addition, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment.

When [the defendant] was charged with capital murder, he was put on notice that the death penalty might result, what aggravating factors might be used, and the mens rea standard that was required.

*Pitchford*, 45 So. 3d at 258 (¶ 184) (quoting *Goff v. State*, 14 So. 3d 625, 665 (¶¶ 174-77) (Miss. 2009) (citations omitted)).  Because Flowers's indictments provided him with "notice and a reasonable description of the charges against him so that he may prepare his defense," the issue is without merit.

### C. Whether the trial court erred by not declaring Mississippi Code Section 97-3-19(2)(e) unconstitutional and/or by not precluding the prosecution from relying on Mississippi Code Section 99-19-101(5)(d) as an aggravating circumstance.

¶190. Flowers claims that Mississippi Code Section 97-3-19(2)(e) is unconstitutional because it allows for an "arbitrary and capricious" application of the death penalty, since cases of deliberate design and depraved heart murder are not death penalty eligible when felony murder is death penalty eligible.  He further contends that the application of Mississippi Code Section 99-19-101(5)(d) as an aggravating factor is unconstitutional

because the underlying felony – armed robbery – made the case eligible for the death penalty. Therefore, Flowers claims that the underlying felony cannot also be used as an aggravating circumstance. We have discussed both of the issues in past opinions.

¶191. In *Batiste*, the defendant claimed that Mississippi's death-penalty scheme was unconstitutional "because it [did] not allow the death penalty in cases of simple murder, no matter how premeditated or atrocious." *Batiste*, 121 So. 3d at 872 (¶ 181). We held that Batiste was not entitled to relief because "the death penalty in Mississippi does not violate the U.S. Constitution." *Id.* (quoting *Gillett*, 56 So. 3d at 525 (¶ 168)). We also have addressed whether the underlying felony may be considered an aggravating circumstance, and we have held that use of the underlying felony as the aggravating circumstance is appropriate. *See Manning*, 735 So. 2d at 350-51 (¶ 67). Further, the use of an underlying felony as an aggravating circumstance has been upheld by the United States Supreme Court. *See Lowenfield v. Phelps*, 484 U.S. 231, 241-46 (1988). For the above reasons, the issue is without merit.

> **D.    Whether the trial court erred in permitting victim-impact testimony.**

¶192. During the penalty phase, four witnesses provided victim-impact testimony – Roxanne Ballard, Bertha Tardy's daughter; Brian Rigby, Carmen Rigby's son; Kathy Permenter, Derrick Stewart's mother; and Willie Golden, Robert Golden's brother. Flowers contends that the trial court erred in permitting victim-impact testimony during the penalty phase because the testimony did not relate to the statutory aggravating factors. Flowers also claims that the admission of victim-impact testimony violated the Eighth Amendment.

116

¶193. Recently, in *Batiste*, we held that victim-impact testimony did not violate the Eighth Amendment:

> Victim impact statements are those which describe the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinions of the crimes and the defendant. *Edwards v. State*, 737 So. 2d 275, 291 (Miss. 1999). The United States Supreme Court has held that there is no *per se* bar to victim-impact testimony. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609, 115 L. Ed. 2d 720 (Miss. 1991). This testimony is admissible at the sentencing phase, but not in the culpability phase. *Havard v. State*, 928 So. 2d 771, 792 (Miss. 2006). We will allow relevant victim-impact testimony in narrow circumstances as is constitutionally permissible. *Id.* When the evidence is proper, necessary to a development in the case and the true characteristics of the victim, and could not incite the jury, the testimony is admissible. *Id.* (quoting *Jenkins v. State*, 607 So. 2d 1171, 1183 (Miss. 1992)) . . . . We decline to disregard the United States Supreme Court's pronouncement in *Payne*, and will continue to adhere to the standard enunciated above.

*Batiste*, 121 So. 3d at 864 (¶ 147). On several occasions, we have permitted victim-impact testimony that described the impact of the victim's death on his or her family. *See Keller v. State*, 138 So. 3d 817, 865 (¶ 131) (Miss. 2014); *Batiste*, 121 So. 3d at 864 (¶ 148); *Havard v. State*, 928 So. 2d 771, 792 (¶ 37) (Miss. 2006); *Branch v. State*, 882 So. 2d 36, 68 (¶¶ 96-97) (Miss. 2004). In *Havard*, the Court found that it was not error to admit the testimony of the victim's grandmother, who stated, "[j]ustice means [the victim's] life was taken, and there is only one way that we can find justice . . . . A life for a life." *Havard*, 928 So. 2d at 792 (¶ 36). The Court noted, however, that the "vast majority" of the witness's testimony "went straight to the relationships between her family members, including [the victim], and the impact losing [the victim] had on them, all part of permissible testimony under our case law." *Id.* at 792 (¶ 37).

117

¶194. Flowers cites **Berry v. State** for the proposition that victim-impact testimony must be relevant to a statutory aggravating circumstance, and that case does provide that victim-impact testimony is admissible "if it is necessary to develop the case, and if it is relevant to any of the aggravating circumstances." **Berry**, 703 So. 2d at 275-76. However, we rejected the same argument in **Keller v. State**. In **Keller**, the defendant cited **Berry** and argued that victim-impact testimony was not permissible when "it did not relate to any of the aggravating factors." **Keller**, 138 So. 3d at 865 (¶ 129). The testimony in **Keller** described "the emotional effect of the crime on the victim's son and his opinion of the crime." **Id.** at 865 (¶ 131). Despite the statement in **Berry**, we held that the testimony was "permissible under the Court's precedent on victim-impact statements." **Id.**

¶195. In today's case, the victim-impact testimony was consistent with the testimony presented in **Keller** and **Havard**. At the sentencing phase, Roxanne Ballard testified about her relationship with her mother and the effect her mother's death had on her life. Likewise, Brian Rigby, Kathy Permenter, and Willie Golden testified about the impact their family members' deaths had on them and their families. The above-described type of victim-impact testimony is permissible, and the issue is without merit.

### XII. Whether the death sentence in the instant matter is constitutionally and statutorily disproportionate.

¶196. Mississippi Code Section 99-19-105(3) requires the Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Miss. Code Ann. § 99-19-105(3) (Rev. 2015). The Court consistently has "upheld the death penalty in cases involving capital

murders committed during the commission of a robbery." ***Batiste***, 121 So. 3d at 873 (¶183) (citing ***Gillett***, 56 So. 3d at 524; ***Fulgham***, 46 So. 3d at 323; ***Goff***, 14 So. 3d at 650; ***Chamberlin v. State***, 989 So. 2d 320, 345 (Miss. 2008); ***Doss v. State***, 709 So. 2d 369, 401 (Miss. 1997); ***Chase v. State***, 645 So. 2d 829, 836-37 (Miss. 1994)). Further, the Court has upheld the imposition of the death penalty in cases involving multiple victims. *See Manning*, 765 So. 2d at 522 (¶ 17). As such, the issue is without merit.

### XIII. Whether the Court should set aside its prior order denying Flowers's motion for remand and leave to file supplemental motion for new trial.

¶197. In May 2012, Flowers filed a motion for remand and leave to file supplemental motion for new trial on the basis that the State failed to disclose information relating to the credibility of one of its witnesses, Patricia Hallmon Sullivan Odom. Approximately four months prior to the start of Flowers's sixth trial, a federal grand jury indicted Odom for tax fraud. Odom's trial was in September 2010 – three months after Flowers's trial. Flowers contends that the State should have disclosed Odom's indictment. Flowers's motion was based on the United States Supreme Court's holding in ***Brady v. Maryland***, 373 U.S. 83, 87 (1963), "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In response to Flowers's motion, the State claimed that the issue should not be presented to the Court through motion or direct appeal because the issue was not presented to the trial court. The State also submitted District Attorney Doug Evans's affidavit, which provided that he was not aware of Odom's indictment until after Flowers's trial. The Court denied Flowers's motion.

119

Because the issue was not presented to the trial court, it is not proper on appeal.

## XIV. Whether the cumulative effect of the errors mandates reversal of the verdict and/or the sentence of death entered pursuant to it.

¶198. Flowers claims that, even if the Court has doubts about the harm of any one error in isolation, the cumulative effect of the errors warrants reversal. Certainly, the Court often has applied the cumulative-error doctrine in capital cases where, "although no error, standing alone, requires reversal, the aggregate effect of various errors may create such an atmosphere of bias, passion[,] and prejudice that they effectively deny the defendant a fundamentally fair trial." *Goff*, 14 So. 3d at 672 (¶ 210) (citation omitted). That is not the case here. We have thoroughly reviewed the briefs, arguments, record, and trial transcript, and we have determined that each issue raised by Flowers is without merit. Therefore, as there are no individual errors, there is no cumulative error.

### Conclusion

¶199. Each issue raised by Flowers is without merit. Flowers's four convictions for capital murder and sentences to death were properly decided by the jury, and we affirm.

¶200. **AFFIRMED.**

**RANDOLPH, P.J., MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED B Y KITCHENS, P.J., AND ISHEE, J. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.; WALLER, C.J., JOINS IN PART.**

**WALLER, CHIEF JUSTICE, DISSENTING:**

¶201. Because the prosecution's mischaracterizations of the evidence during closing arguments affected Flowers's fundamental right to a fair trial, I respectfully dissent.

¶202. Prosecutors are afforded the right to argue facts that are in evidence. ***Henton v. State***, 752 So. 2d 406, 409 (¶ 11) (Miss. 1999). "However, arguing statements of fact that are not in evidence or necessarily inferable from it which are prejudicial to the defendant is error." ***Dancer v. State***, 721 So. 2d 583, 589 (¶ 31) (Miss. 1998). As discussed by Justice King, the prosecution in this case mischaracterized evidence during closing arguments. Two of those misstatements–the timing of Sam Jones's arrival at Tardy's and Flowers's motive–the prosecution similarly used in ***Flowers II***, where we found reversible error. ***Flowers v. State***, 842 So. 2d 531, 555 (¶ 71) (Miss. 2003) (***Flowers II***).

¶203. While it is true that fourteen prosecutorial misstatements were alleged in ***Flowers II*** as opposed to only four misstatements in the case *sub judice*, this Court uses heightened scrutiny when the death sentence is imposed. ***Cox v. State***, 183 So. 3d 36, 44 (¶ 17) (Miss. 2015). "This higher level of scrutiny requires that all doubts be resolved in favor of the accused because 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" ***Bennett v. State***, 933 So. 2d 930, 939 (¶ 17) (Miss. 2006) (citations omitted). Applying heightened scrutiny, I find plain error in the prosecution's mischaracterizations, particularly given our admonishments in ***Flowers II***. Therefore, I would reverse the judgment in this case and remand for a new trial.

**KITCHENS, P.J., AND ISHEE, J., JOIN THIS OPINION.**

**KING, JUSTICE, DISSENTING:**

¶204. In two previous direct appeals, this Court has reversed Flowers's conviction and death sentence as a result of prosecutorial misconduct. In ***Flowers v. State***, 842 So. 2d 531 (Miss.

2003) (***Flowers II***), the prosecution's argument of facts not in evidence resulted in reversal. Finding that a ***Batson***[8] violation had occurred, this Court reversed and remanded ***Flowers v. State***, 947 So. 2d 910 (Miss. 2007) (***Flowers III***), for a new trial. Despite the same errors occurring in the trial that is the subject of this appeal, the Majority, in a stark departure from this Court's previous ***Flowers*** opinions, found that Flowers's conviction and death sentence should be affirmed. The United States Supreme Court then granted Flowers's petition for a writ of certiorari, vacated our judgment, and remanded the case (a "GVR") to this Court for further consideration. The United States Supreme Court finds that a GVR is potentially appropriate

> [w]here intervening developments, or recent developments that we have reason to believe the court below did not fully consider, reveal a *reasonable probability* that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome of the litigation[.]

***Lawrence on Behalf of Lawrence v. Chater***, 516 U.S. 163, 167, 116 S. Ct. 604, 133 L. Ed. 2d 545 (1996) (emphasis added). To put it simply, the United States Supreme Court issued a GVR in this case because a majority of its members believed that a reasonable probability exists that this Court got it wrong on the first try. Yet, this Court ignores that strong implication and makes the same erroneous decision on remand. Because the errors in this case, particularly the denial of Flowers's ***Batson*** claims highlighted by the United States Supreme Court, resulted in Flowers being denied his right to a fair trial, I dissent.

I.      **Prosecution's Argument of Facts Not in Evidence**

---

[8] ***Batson v. Kentucky***, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

¶205. Three instances of the prosecution arguing facts not in evidence appear in today's case: (1) the prosecution misstated the time Sam Jones discovered the victims' bodies at Tardy's; (2) the prosecution stated an unsupported basis for Flowers's alleged motive; and (3) the prosecution incorrectly described Porky Collins's reaction to the photo arrays. In *Flowers II*, 842 So. 2d at 550, the prosecution's misstatement of facts during closing argument was one basis, *inter alia*, for this Court's reversal. In that appeal, Flowers cited approximately fourteen alleged misstatements. *Id.* at 555. This Court found that the following misstatements by the prosecutor resulted in an unfair trial: (1) that defense witnesses tried to coerce the State's witnesses to lie; (2) that Sam Jones received a call at 9:30 a.m. from Bertha Tardy asking him to come to the store; and (3) that Flowers "was mad" about losing his job and having his pay docked. *Id.* at 555-56.

¶206. The statements that resulted in this Court reversing Flowers's conviction and death sentence in *Flowers II* are notably similar to the statements raised in today's case. While this repetition of prosecutorial misconduct is alarming, the Majority's approval of the same is even more startling. Courts have long recognized – and reasonably feared – that misconduct during closing argument may become commonplace in our trial courts. Despite regular admonishments, such misconduct still occurs:

> That despite our consistent warnings to the Government we should still be called upon to admonish against such conduct is reprehensible per se because it constitutes a disregard for our directives. But additionally it is particularly pernicious because it results in an unnecessary waste of judicial resources, both at the trial and appellate level, by diversion and attention to review of what now should be understood to be totally unacceptable conduct by those who lay claim to representing the Government . . . .

*U.S. v. Maccini*, 721 F.2d 840, 846 (1st Cir. 1983). The Majority in today's case, by endorsing the prosecutor's misstatements – the same misstatements which warranted reversal in *Flowers II* – takes Mississippi one step closer to having misrepresentation of the facts presented at trial commonplace in our trial courts.

### A.    Sam Jones's Testimony Regarding His Arrival at Tardy's

¶207. Sam Jones died prior to Flowers's 2010 trial, and his testimony from Flowers's 2007 trial was read into evidence. Flowers claims that the State misrepresented Jones's testimony regarding the timeline of events the morning of the murders. Jones testified as follows:

> A.    Well, [Bertha Tardy] called me and asked me – I had promised her I would come down and help them load out a truck and go on a delivery. And she called me to ask me about was I coming down there. And I told her that I was. And then about, that was about 15 minutes after 9:00, I think, when she called, somewhere along in there.
>
> Q.    About what time did you get to the store that morning, Mr. Jones?
>
> . . . .
>
> A.    I got to the store; it was before – it was right at, between 9:15 and 9:30.
>
> Q.    Okay.
>
> A.    I will put it like that. It wasn't 9:30.
>
> Q.    Okay. You got to the store between 9:15 or right around that time?
>
> A.    Yes.

Although Jones testified that he arrived at Tardy's between 9:15 and 9:30 a.m., the State attempted to question Jones later about the timeline and misstated that he arrived closer to 10:00 a.m.:

Q. Okay. And I think – I might have misled you a little bit. It was, when you got to the store, that was going to be closer on up to 10 o'clock, wasn't it?

Flowers's Counsel: Object to leading, Your Honor.

Court: Overruled.

Jones never responded to this question.

¶208. In its closing argument, the State discussed the timeline for the morning of the murders and apparently put the timeline on some type of marker board. During the timeline discussion, the prosecution stated: "Mr. Sam Jones came into the store slightly after 10:00 on the morning of the 16th and discovered the bodies." Flowers did not object to this statement at closing argument.

¶209. In *Flowers II*, 842 So. 2d at 511, this Court addressed whether this same issue was procedurally barred by lack of contemporaneous objection. This Court applied plain error to the issue, and found that the prosecution's misstatements warranted reversal. *Id.* "The plain error doctrine requires that there be an error and that the error must have resulted in a manifest miscarriage of justice." *Williams v. State*, 794 So. 2d 181, 187 (Miss. 2001) (citing *Gray v. State*, 549 So. 2d 1316, 1321 (Miss. 1989)), *overruled on other grounds by Foster v. State*, 148 So. 3d 1012 (Miss. 2014).

¶210. In *Flowers II*, 842 So. 2d at 555, the prosecution stated that Sam Jones had testified that Bertha Tardy had called him at 9:30 a.m. Reviewing this statement, this Court stated:

> After a thorough examination of the record, it is clear from Jones's testimony that he testified he arrived at Tardy's at 9:30. He never once stated he was called at 9:30 on the morning of July 16, but he did testify he arrived at the store around 9:30. On direct examination, the State never questioned Jones

125

about a specific time. He only stated he received a call from Mrs. Tardy on the morning of July 16. On cross-examination, Jones was asked what time he arrived at Tardy's, and he answered it was around 9:30.

*Id.* at 556. This Court then found that "[t]he cumulative effect of the State's repeated instances of arguing facts not in evidence was to deny Flowers his right to a fair trial." *Id.*

¶211. Flowers claims that the statement in today's case prejudiced him by essentially skewing the timeline in the State's favor. Porky Collins and Clemmie Flemming both testified that they saw Flowers near Tardy's around 10:00 a.m. Flowers claims that if Jones's testimony had been accurately described – that he arrived at the store between 9:15 and 9:30 – the question of what Flowers was doing so close to the scene of a murder thirty to forty-five minutes after the murders could have occurred would have been raised in the jurors' minds.

¶212. There is no doubt that the prosecutor's statement is not supported by Sam Jones's testimony and that there is no direct evidence supporting the contention that Jones arrived at Tardy's at 10:00 a.m. The prosecution's statement is not based on facts and prejudiced Flowers by deliberately painting an incorrect picture for the jury of the events surrounding the discovery of the murders – this same picture was painted in *Flowers II*.

### B. Flowers's Motive

¶213. The second misstatement Flowers cites relates to his alleged motive to commit the murders. Similar to Sam Jones's testimony and the timeline described above, misstatements related to Flowers's motive were another basis for this Court's reversal in *Flowers II*, 842 So. 2d at 556. In *Flowers II*, 842 So. 2d at 555-56, this Court found that the prosecution's

126

statement that Flowers "was mad" as a result of losing his employment with Tardy's was a misstatement of the facts:

> [T]he prosecutor argued to the jury that [Robert] Campbell had testified that Flowers was mad because Mrs. Tardy had terminated his employment and was holding money out of his paycheck to cover the damaged batteries. Defense counsel objected on the basis that the prosecutor was mischaracterizing Campbell's testimony, and when the prosecutor responded that he was quoting verbatim from his notes, the trial court overruled the defense objection. . . . After a thorough examination of Campbell's testimony, it is clear Campbell never testified Flowers was upset at Mrs. Tardy. The State never questioned Campbell about Flowers's feelings toward Tardy or about any money. On redirect, Campbell was asked if Flowers ever mentioned anything was wrong with Mrs. Tardy, and Campbell stated Flowers never mentioned anything to him.

*Id.*

¶214. In today's appeal, Flowers claims that the following statement by the prosecutor was not based on facts in evidence:

> The investigators learned pretty quickly when they asked who in the world could have had some reason, some motive, some anything to attack four people like this.
>
> **Have you had anybody that's had beef with the store? Just one.** Well, that doesn't mean he did this though, does it? No. But you check that out. You look at him. And in the course of deciding what, if anything, Curtis Flowers had to do with this crime.

Flowers claims that no evidence was presented at trial supporting the contention that he was angry as a result of his termination. In response, the State argues that the following supports the contention that Flowers "had beef" with Tardy's:

1. Flowers losing his job days prior to the murders.

2. Bertha Tardy deducting the cost of damaged inventory from Flowers's paycheck.

127

3. Police Chief John Johnson's testimony that the Tardy family considered Flowers a threat:

> Q. Okay. How did Curtis Flowers become a suspect by then, by 6:30?
>
> A. I knew that the Tardy family had considered Curtis a threat and that they were concerned about their safety dealing with him.

4. Investigator Jack Matthew's testimony about employees who had been fired from Tardy's:

> Q. You asked who else had worked there the last couple of years and those kind of things?
>
> A. Well, we asked if there was anybody that they'd had any problem with or anybody that had been fired from there, and that was the – Curtis was the only one.

5. Doyle Simpson's testimony that Flowers had "problems" with Tardy's:

> Q. Okay. Did you know anything about Curtis having any problems with Tardy Furniture.
>
> A. I had heard about it.

¶215. This evidence cited by the State supports the contention that Tardy's employees were concerned about Flowers. But the feelings and perceptions of Tardy's employees must be distinguished from Flowers's perception. The statements cited by the State do not establish that Flowers had ill will toward Tardy's employees. Further, Doyle Simpson's testimony is too vague to support a statement that Flowers "had beef" with the store. "Problems" could easily refer to the firing itself or the damaged inventory. The State's contention that Flowers "had beef" with Tardy's is unsupported by the facts. As this Court recognized in ***Flowers***

***II***, this factually unsupported statement resulted in Flowers having an unfair trial.

### C. Porky Collins's Response to Photo Arrays

¶216. Next, Flowers claims that the prosecutor misrepresented Porky Collins's response to the first photo array – the array that contained a photograph of Doyle Simpson. Flowers claims that this misrepresentation was particularly prejudicial because part of his defense was based on the alternative theory that Doyle Simpson was the perpetrator. Collins saw two African-American men arguing outside Tardy's the morning of the murders. When Collins testified, he stated that he did not remember if he identified Simpson as one of the men standing outside Tardy's. The notes taken during the photo arrays state that Collins had the following reaction to the array containing Simpson's photo:

> #1 and #3 resembles, but hairline was further back
> #6 pointed to Simpson, said hairline like this, may have appeared a little darker.
> "But it looks like him."
> "Face was also same shape, round like this."
> "Unable to be positive."

Investigator Wayne Miller testified that Collins did point out Simpson during the photo array:

> Q. All right. So he did actually point out Mr. Simpson here as somebody who was – looks like the person he'd seen; is that a fair characterization?
>
> A. Right.

¶217. The State presented the following closing argument related to Collins's identifications:

> When Porky found out that some people had been murdered in front of Tardy's, he told James Taylor Williams. He said I saw something I think y'all ought to know about. He said I think I can identify that guy if I see him again.

129

Now, here's the interesting thing about Mr. Porky Collins. Porky didn't know Curtis. Never claims to have ever seen him before. Didn't know him. Didn't know those other people, as far as them having seen him. Porky says I can identify him.

I'm going to refer to this some more in a minute but I just want you to – you've seen these. We had them passed to y'all. Here are two line-ups. These line-ups were shown to Porky at the same setting. First was this one that has Doyle Simpson's picture on it. Because later on when they did this line-up, they already knew that the gun came out of Doyle's car. And so they gave this thing to Porky first and said is the guy that you saw in front of Tardy's in this group.

Now, if he was going to make a misidentification, ladies and gentlemen, that would have been the perfect time for him to pick one of these guys and say yeah, there he is right there. But you know what? Porky did not misidentify anybody. **He said the guy ain't there.** They took another six photographs and said look at this second set. He said that's him right there. You heard Mr. Miller talk about Porky, said he was positive. He made a positive identification.

Now, why is Porky's i.d. – Porky doesn't know him. Porky wasn't able to say yeah, I know him. When he saw the photograph of Curtis Flowers, he pointed him out. So you have got two different kinds of identifications and they agree. You've got identification by all these witnesses who knew him, Porky, who didn't know him, and they both agree. And he was offered – Porky was offered a prime chance to mess up. The perfect chance to make a mistake. He almost – it didn't develop out that way it, but it was almost like a trick.

**You know, see if he is in there. No, he is not.** Is he in the second group? Yeah. That's him right there. So that's a pretty strong identification, isn't it?

¶218. While the State correctly characterized Collins's identification of Flowers in the second photo array, the State deliberately failed to recognize Collins's statement that Simpson's photograph in the first array "looks like" a man he saw outside of Tardy's and that he was "unable to be positive." The State's argument that Collins stated "the guy ain't there" was not an accurate representation of Collins's identification. Because Flowers's defense

130

was based, in part, on the argument that Doyle Simpson was a likely suspect for the murders, the State's misstatement regarding Collins's identification of Simpson prejudiced Flowers.

¶219.  As in *Flowers II*, the prosecution's repeated argument of facts not in evidence in today's case prejudiced Flowers and denied him his right to a fair trial.  Under this Court's heightened review of death penalty cases, these misstatements – standing alone – should be enough to warrant reversal.  *See Fulgham v. State*, 46 So. 3d 315, 322 (Miss. 2010) ("What may be harmless error in a case with less at stake becomes reversible error when the penalty is death.").  This Court's prior admonishment of essentially the same statements in *Flowers II* bolsters a finding of reversal.  *See U.S. v. Drummond*, 481 F. 2d 62, 62 (2d Cir. 1973) ("Because of the repeated misbehavior of this prosecutor in this and prior cases, we feel compelled to reverse the decision of the trial court on the sole ground of prosecutorial misconduct.").

## II.    Jury Selection Process

¶220.  Flowers claims that the State violated the Equal Protection Clause of the Fourteenth Amendment when it struck five African-American jurors after utilizing disparate questioning and citing pretextual reasons.  "The Constitution forbids striking even a single prospective juror for a discriminatory purpose."  *Foster v. Chatman*, __ U.S. __, 136 S. Ct. 1737, 1747, 195 L. Ed. 2d 1 (2016) (internal quotations omitted).  Because a review of the record in today's case reveals that a *Batson* violation did occur, I dissent.

¶221.  "It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases

131

to deny to persons of those classes the full protection which others enjoy." ***Strauder v. West Virginia***, 100 U.S. 303, 309, 25 L. Ed. 664 (1880), *abrogated on other grounds by **Taylor v. Louisiana***, 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). Racial prejudice in the prosecution's jury selection results in "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." ***J.E.B. v. Alabama ex rel T.B.***, 511 U.S. 127, 128, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). Thus, for years, courts have held that racial discrimination by the State during the jury selection process violated the Equal Protection Clause. ***Miller-El v. Dretke***, 545 U.S. 231, 162 L. Ed. 2d 196, 125 S. Ct. 2317 (2005) (quoting ***Georgia v. McCollum***, 505 U.S. 42, 44, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992)).

¶222. In an effort to remedy the prejudices existing in jury selections, the United States Supreme Court has, over the years, developed various standards for establishing purposeful discrimination. In ***Swain v. Alabama***, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), *overruled by **Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the Court attempted to regulate purposeful discrimination through presuming the legitimacy of prosecutors' strikes except in the case of longstanding patterns of discrimination – when in case after case no African Americans served on juries, then "giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purposes of the peremptory challenge [were] being perverted."

¶223. ***Swain***'s approach did little to remedy the problem of purposeful discrimination in jury selection. Thus, in ***Batson***, the United States Supreme Court "held that a defendant could make out a prima facie case of discriminatory jury selection by 'the totality of the relevant

facts' about a prosecutor's conduct during the defendant's own trial." *Miller-El*, 545 U.S. at 239 (quoting *Batson*, 476 U.S. at 94). The State must then come forward with race neutral bases for the peremptory strikes. *Batson*, 476 U.S. at 97. "The trial court then has the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98.

¶224. *Batson*, however, is not without flaws. Thus, in *Miller-El*, the United States Supreme Court refocused on all of the relevant circumstances of the case, rather than just the proffered race-neutral bases provided by the State:

> Although the move from *Swain* to *Batson* left a defendant free to challenge the prosecution without having to cast *Swain*'s wide net, the net was not entirely consigned to history, for *Batson*'s individualized focus came with a weakness of its own owing to its very emphasis on the particular reasons a prosecutor might give. If any facially neutral reason sufficed to answer a *Batson* challenge, then *Batson* would not amount to much more than *Swain*. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand. Hence *Batson*'s explanation that a defendant may rely on "all relevant circumstances" to raise an inference of purposeful discrimination.

*Miller-El*, 545 U.S. at 239-40 (citing *Batson*, 476 U.S. at 96-97).

¶225. Thus, in finding that a *Batson* violation occurred in today's case, I consider all of the relevant circumstances in Flowers's case.

### A. History of Flowers's Case

¶226. In *Flowers III*, 947 So. 2d at 935, this Court found as "strong a prima facie case of racial discrimination as we have ever seen in the context of a *Batson* challenge." In *Flowers III*, the State exercised all twelve of its peremptory strikes on African Americans and all three of its strikes of alternate jurors on African Americans. After reviewing the individual

133

strikes in the case, this Court found that the State engaged in purposeful discrimination during jury selection. *Id.* at 939. Thus, the Court reversed and remanded for a new trial on this basis. *Id.* The same prosecutor who this Court found had engaged in purposeful discrimination in *Flowers III* prosecuted the trial before this Court on appeal today. On its own, this fact is not dispositive of a finding of racial discrimination. This history, however, cannot be ignored and is part of the relevant circumstances that must be considered in this case.

¶227. In *Miller-El*, 545 U.S. at 253, the United States Supreme Court considered the "widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time [the defendant's] jury was selected." If the history of discrimination by a district attorney's office is a permissible consideration under *Batson*, surely the history of the *same prosecutor in the retrial of the same case* is a legitimate consideration. To fail to consider this history is to rebuff *Batson*'s direction that "all relevant circumstances" must be considered. *Batson*, 476 U.S. at 96-97; *Miller-El*, 545 U.S. at 239-40.

### B. Disparate Treatment – The Numbers

¶228. Like the history of today's case, a review of the statistics relating to the prosecutor's use of peremptory strikes is not, standing alone, dispositive of the *Batson* inquiry. These numbers, however, reveal a clear pattern of disparate treatment between white and African-American venire members. In today's case, a special venire of 600 citizens was drawn. The original venire consisted of forty-two percent African Americans. After the jury qualification

and initial for-cause challenges, the venire consisted of twenty-eight percent African Americans. Ultimately, one African American served as a juror and one African American served as an alternate juror. Despite the initial venire consisting of forty-two percent African Americans, the jury that convicted and sentenced Flowers consisted of eight percent African Americans.

¶229. An analysis of the number and type of questions asked by the prosecutor further reveals a pattern of disparate treatment. During individual voir dire, the prosecutor asked white jurors an average of approximately three questions. African-American jurors, however, were asked approximately ten questions each by the prosecutor.

¶230. Further, in what appears to be mere lip service to the voir dire process, when questioning most white jurors during individual voir dire, the prosecutor essentially repeated questions that the trial court had just asked. The trial court asked each juror standard death-penalty-qualification questions. The prosecutor would then – in substance – ask the same questions and then hand the juror off to be questioned by the defense. The prosecutor asked only nine percent of white jurors something beyond these duplicated questions.

¶231. In a stark contrast, the prosecution asked sixty-three percent of African Americans questions outside the standard death-penalty-qualification questions. As an example, fifty-five percent of African-American jurors who had some kind of connection to the Flowers family (through work, the community, or family) were asked questions by the prosecutor about this connection. Although five white jurors had similar connections to the Flowers family (through work and the community), the prosecutor failed to ask any questions about

these connections.

¶232.  As noted in *Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003), statistical analysis can raise a question as to whether race influenced the jury selection process.  The numbers described above are too disparate to be explained away or categorized as mere happenstance.

### C.      Individual Jurors

¶233.  The pattern of disparate treatment is further revealed when comparing the treatment of individual jurors.  *See Flowers III*, 947 So. 2d at 921 (citing *Manning*, 765 So. 2d at 519) (A side-by-side comparison of jurors is helpful to determine whether purposeful discrimination existed.).  Explanations by the prosecution are difficult to credit where the State accepted white jurors with the same traits it used to strike black jurors.  *Foster*, 136 S. Ct. at 1750.

### 1.      Carolyn Wright

¶234.  The State exercised one of its peremptory strikes on Carolyn Wright for the following reasons: (1) she knew several of the defense witnesses; (2) she was sued by Tardy's for an overdue account; and (3) she used to work with Flowers's father, Archie Flowers, Sr.  During the ***Batson*** hearing, Flowers rebutted the State's bases for its peremptory strike first by noting that Pamela Chesteen, Harold Waller, and Bobby Lester all had a significant number of acquaintances involved in the case.  Flowers responded to the fact that Tardy's had sued Wright by noting that the State had not questioned white jurors regarding their accounts at Tardy's.  Finally, Flowers rebutted the basis relating to Wright's working relationship with

136

Flowers's family by comparing Wright to Chesteen, who was a bank teller at a bank where the members of the Flowers family were customers.

¶235. Finding that the State's reasons for striking Wright were race-neutral, the trial court specifically noted that all jurors were asked by the court during group voir dire if they had accounts with Tardy's and whether they had been sued by Tardy's. The court found that this basis was race neutral because none of the white venire members reported that they had been sued by Tardy's. The trial court found that Wright's working relationship with Archie Flowers was distinguishable from the professional relationship Chesteen had with the Flowers family. Specifically, the court stated that the Winona Walmart was a "relatively small" Walmart and seemed to imply that Wright had a close relationship with Archie Flowers because of the small size of the store. The trial court also stated that no white jurors had reported working at Walmart with Archie Flowers. The trial court summed up its finding by stating:

> If the only reason the State offered was that she knows some of these defense witnesses, then there might be something there. But the fact is knowing these defense witnesses that you're intending to call, plus the fact that Tardy's had to sue her, plus the fact that she worked with Archie, in my mind, creates race-neutral reasons for striking her.

Each of the State's reasons for the peremptory strike is analyzed below.

*Wright's Relationships with Persons Involved in the Case*

¶236. In sum, Carolyn Wright had some type of connection to thirty-four people involved in Flowers's case. Flowers compares Wright to Chesteen, who knew thirty-one people involved in Flowers's case; Waller, who knew eighteen people involved in the case; and

137

Lester, who knew twenty-seven people involved in the case.

¶237. Similar to Wright, Chesteen, Waller, and Lester all had a significant number of relationships with witnesses and persons involved with the case. One indicium of pretext this Court considers is "the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge." *Flowers III*, 947 So. 2d at 917 (quoting *Manning*, 765 So. 2d at 519). Indeed, "'[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination.'" *Foster*, 136 S. Ct. at 1754 (quoting *Miller-El*, 545 U.S. at 241). As such, this basis is suspect.

¶238. Flowers also claims that the State mischaracterized Wright's relationships with Flowers's family. Specifically, Flowers points out that the State claimed that Wright knew Flowers's sister, Sherita Baskin. Wright, however, never indicated that she knew Baskin. The State does not address this in its brief. This one statement could have simply been a slip of the tongue. However, "lack of support in the record for the reason given for a peremptory strike has been identified as an indicator of pretext." *Flowers III*, 947 So. 2d at 924 (citing *Manning*, 765 So. 2d at 519). *Foster* emphasized this notion, noting that the prosecutor's "misrepresentations of the record" constituted evidence that a strike was motivated in substantial part by discriminatory intent. *Foster*, 136 S. Ct. at 1754.

*Wright's Litigation with Tardy's*

¶239. Flowers claims that the State mischaracterized Wright's litigation with Tardy's by claiming that her wages had been garnished as a result of the litigation. Nothing in the record

138

supports the contention that Wright's wages were garnished. The only statements Wright made regarding the actual litigation were that she was sued, but that "it was paid off." Wright also stated that her involvement with the litigation would not affect her if she were selected as a juror. During the **Batson** hearing, the State produced a copy of the judgment in Wright's case, and Flowers's counsel asked if a garnishment order was attached. The trial court did not directly respond to this question, but instead stated that "it's an abstract of justice court where she was sued." Because there is no evidence that Wright's wages were garnished, the State did mischaracterize its basis for the peremptory strike. Further, unlike the misstatement discussed above relating to Wright's acquaintance with Sherita Baskin, the statement that Wright had her wages garnished seems to go directly to reasoning for the State's strike – that Wright would have some sort of ill will toward Tardy's as a result of her wages being garnished. It is easy to imagine that litigation which ends in friendly terms – for example, a settlement – might result in the parties having different feelings toward one another as opposed to a suit which results in garnished wages. As such, the State's unsupported characterization of the lawsuit is problematic. *See  Flowers III*, 947 So. 2d at 924 (citing *Manning*, 765 So. 2d at 519); *Foster*, 136 S. Ct. at 1754.

*Wright's Working Relationship with Archie Flowers, Sr.*

¶240. Wright worked with Flowers's father, Archie Flowers, Sr., at Walmart; and on its face, this basis seems to be race-neutral. *See Manning*, 735 So. 2d at 340 (This Court "has condoned a peremptory challenge against a juror who was acquainted with the defendant's family."). However, a review of the record reveals that this basis may have been pretextual.

139

Although the State cited Wright's working relationship with Archie Flowers as a basis for its strike, the State made no effort during voir dire to question Wright about the working relationship beyond a general question as to whether the relationship would affect her ability to serve as a juror. One could easily assume that the two worked in different departments and during different shifts. Further, Wright stated during group voir dire that she was unaware of whether Archie Flowers still worked at Walmart or if he had retired. This supports an inference that Wright and Flowers did not have a close working relationship. The lack of questioning related to this basis is suspect. *See **Miller-El***, 125 S. Ct. at 2328 (failing to conduct meaningful voir dire on subject with which State is allegedly concerned suggests that "explanation is a sham and a pretext for discrimination").

¶241. The questionable nature of the State's reason is compounded by its failure to strike Pamela Chesteen. Chesteen worked at a local bank in Winona and stated that she knew Archie Flowers, Sr., Lola Flowers, and Flowers's sisters from her work at the bank. Although the coworker relationship and bank-employee/customer relationship are not exactly comparable, the concern relating to the influence such relationships would have on a juror are the same – a concern that the coworker or employee would be influenced toward a family member of another coworker or a customer. The disparate treatment of Wright and Chesteen, along with the failure to conduct meaningful voir dire regarding Wright's working relationship with Archie, Sr., suggests this basis for the State's peremptory strike was pretext. *See **Flowers III***, 947 So. 2d at 924 ("Failure to voir dire as to the characteristic cited for the strike is also an indicator of pretext.").

140

¶242. When the State's bases and the record in today's case are viewed *in toto*, evidence of disparate treatment and pretext exists. *See **id.*** at 937 ("Though a reason proffered by the State is facially neutral, trial judges should not blindly accept any and every reason put forth by the State, especially where, as here, the State continues to exercise challenge after challenge only upon members of a particular race.").

### 2. Dianne Copper

¶243. The State provided the following reasons for striking Dianne Copper: (1) she worked with Archie Flowers and Cora Flowers, Flowers's sister; (2) she knew several members of the Flowers family; (3) she stated that she "leaned towards" Flowers's side of the case; and (4) she knew several defense witnesses. For the most part, the State focused on Copper's statement that she would lean toward Flowers as a result of her relationships with the Flowers family.

¶244. Flowers rebutted the State's reasons by again noting that several white jurors with multiple connections to persons involved in the case had not been challenged by the State. Flowers also argued that the State did not attempt to rehabilitate Copper when she stated that she would lean toward Flowers's side of the case. The trial court accepted the State's reasons as race neutral, finding that Copper's relationships with persons connected to the case were distinguishable from those of the white jurors not challenged by the State. The trial court also found that Copper was distinguishable from other jurors because she stated that she would tend to favor Flowers's side of the case and had worked with Flowers's father and sister.

¶245. Similar to his argument relating to Carolyn Wright, Flowers claims that the State's strike of Copper was pretextual because white jurors who knew several defense witnesses were not struck. Further, Flowers claims that the State mischaracterized Copper's statements relating to whether she "leaned towards" Flowers in the case as a result of her relationship with the Flowers's family.

¶246. Copper knew thirty-one people involved in the case. Copper also testified about her relationship with the Flowers family and witnesses during voir dire:

> Q. Now, I noticed that you told us the other day that you lived on Harper Street at one time?
>
> A. Yes, sir.
>
> Q. That y'all [Copper and the Flowers family] lived on the same street.
>
> A. Not on the same street. Because they – they live on Cade Street, and I lived on Harper Street.
>
> Q. Don't they live on the corner of Cade and Harper?
>
> A. Well, I guess. I'm not – I – you know, my street is Harper and then its – as it go around – that's where I assume it was Cade Street. I'm not positive.
>
> Q. Okay. And you've stated that you worked with the defendant's sister at Shoe World?
>
> A. That's correct.
>
> Q. And which sister was that?
>
> A. Cora.
>
> Q. How long did y'all work together?

A.    Probably a year or two.

Q.    Okay.  You worked with the defendant's father?

A.    Yes, sir.

Q.    How long did you work with him?

A.    Estimating, probably – possibly about the same, one to two years.

Q.    Okay.  And I want to make sure my notes are right, because we can all write down things wrong.  You stated that you knew his father Archie Flowers.

A.    Yes, sir.

Q.    You know his brother, Archie, Jr.?

A.    Yes, sir.  I know his brother.

Q.    You know his mother Lola?

A.    Yes, sir, I do.

Q.    You know witnesses in this case, Hazel Jones?

A.    Yes, sir, I know her.

Q.    You know Kittery Jones, a witness in this case?

A.    Yes, sir, I know him.

Q.    And you know Danny Joe Lott, a witness in this case?

A.    Yes, sir.

Q.    And I think it was yesterday and my notes show that you said that the fact that you know all of these people could affect you and you think it could make you lean toward him because of your connection to all of these people.  Is that correct?

143

A.    It – it's possible.

Q.    Okay. That would be something that would be entering into your mind if you were on the jury, wouldn't it?

A.    Yes, sir.

Q.    And it would make it to where you couldn't come in here and, just with an open mind, decide the case, would it?

A.    Correct.

¶247. Flowers's counsel attempted to rehabilitate Copper:

Q.    . . . What I'm trying to find out is just as you could put aside all the information you heard before about this case, could you not also put aside the fact – if you got picked as a juror, put aside the fact that you have met Mr. Flowers, that you know some other people in these cases and be fair to the Tardys, the Stewarts, the Goldens, and Rigbys, and make whatever decision or vote that you're going to make based on the evidence and the evidence only. Could you do that?

A.    I feel like I could. But, you know, it –

Q.    Is what you're saying –

A.    Of course, it would make me, you know, feel uncomfortable. But if I had to do it, you know, I got to do what I got to do.

Q.    Okay. So you're saying that – thank you. You're saying that you'll be uncomfortable. You'd prefer not to – I get the impression you're saying that you'd rather not be a juror. But if you got picked to be one, you would take the responsibility seriously, and you would follow the law and the rules that the Court give[s] you, and you would put aside anything that you are required to put aside and make your evidence and make your vote based on just the evidence you hear in the courtroom. Is that fair to say?

A.    Yes, sir. That's correct.

¶248. As mentioned above, one indicium of pretext is "the presence of unchallenged jurors

144

of the opposite race who share the characteristic given as the basis for the challenge." ***Id.*** at 917 (quoting ***Manning***, 765 So. 2d at 519). As such, the State's basis that Copper knew several witnesses in the case is suspect. While the other bases the State provided appear to be race neutral – namely, Copper's relationship with Flowers's family and the possibility that it could cause her to "lean toward" Flowers, the unchallenged jurors with a shared characteristic must still be considered.

### 3. Flancie Jones

¶249. The State provided the following reasons for striking Jones: (1) she is related to Flowers; (2) she was late for jury selection on two separate occasions; and (3) she provided inconsistent statements on her view of the death penalty by lying on her juror questionnaire in an attempt to avoid serving as a juror. After reviewing the record, the State's bases for striking Jones appear to be race-neutral.

### 4. Tashia Cunningham

¶250. The State cited Cunningham's working relationship with Flowers's sister and her wavering statements on the death penalty as bases for its peremptory strike. During the ***Batson*** hearing, Flowers's counsel rebutted the State's reasons by pointing out that Cunningham stated that she could set aside her relationship with Flowers's sister and be a neutral juror. Defense counsel also compared Cunningham to Chesteen, the juror who knew several of Flowers's family members from working at a local bank. Finally, Flowers's counsel compared Cunningham's alleged wavering views on the death penalty to views of white jurors. The trial court found that both of the State's reasons were race-neutral:

145

And Ms. Cunningham's all-over-the-map response to the death penalty, plus her situation about working so closely with Mr. Flowers's sister, in my mind, the State has shown race-neutral reasons for that strike.

*Cunningham's Working Relationship with Flowers's Sister*

¶251. During voir dire, Cunningham stated that she and Sherita Baskin, Flowers's sister, did not have a close relationship; Cunningham described it as a "working relationship." According to Cunningham, she and Baskin would "sometime" see each other, but would not see each other at work every day. Cunningham also stated that she worked at the end of the assembly line, and Baskin worked at the front of the line. The two women worked the same shift for two or three years.

¶252. Apparently, the State called Cunningham's employer, ADP, to confirm her testimony relating to her working relationship with Baskin. During individual voir dire, the State asked Cunningham further questions about the relationship:

Q:   And you work with the Defendant's sister, Sherita Baskin?

A:   Yes.

Q:   Now, the other day, I think you said that you do not work close to her?

A:   No, I do not.

Q:   Would you think about that for a minute?

A:   I do not.

Q:   Are you sure that you do not work side by side with her?

A:   No, I do not.

Q:   And you're saying that under oath?

A:     Yes, sir.

¶253. In response to Cunningham's statements, the State called an ADP quality control clerk, Crystal Carpenter, to give testimony. Carpenter testified that Cunningham and Baskin both worked on the "raw 2 line" and that the women worked side-by-side – "nine or ten inches" apart from one another. Twenty-five to thirty-five persons worked on this particular assembly line. Carpenter also testified that the women would occasionally not work side-by-side if another employee was absent from work and a spot in another location needed to be filled, but that the women typically worked next to one another. Carpenter observed the women working every day and based her testimony on her personal observations. Flowers's counsel asked Carpenter if there was documentation supporting the location of Cunningham and Basking on the assembly line, and Carpenter stated that she could provide documentation supporting her testimony. Apparently, Carpenter did not provide the documentation.

¶254. At first glance, the conflicting testimony of Cunningham and Carpenter tends to provide a race-neutral basis for the State's challenge. *See Manning*, 735 So. 2d at 340. When considering the voir dire process as a whole, however, the State's investigation of Cunningham is suspect. As discussed above, the State accepted Pamela Chesteen as a juror even though she stated that several members of the Flowers family were customers at the bank where she worked. There is no evidence in the record that the State further investigated the relationship between Chesteen and the Flowers family, and the State did not voir dire Chesteen on this subject. The absence of voir dire and investigation for Chesteen compared to the thorough investigation for Cunningham is problematic and tends to evidence disparate

147

treatment. *See **Miller-El***, 125 S. Ct. at 2328 (failing to conduct meaningful voir dire on subject with which State is allegedly concerned suggests that "explanation is a sham and a pretext for discrimination"); *see also **Flowers III***, 947 So. 2d at 924 ("Failure to voir dire as to the characteristic cited for the strike is also an indicator of pretext.").

*Cunningham's Wavering Views on the Death Penalty*

¶255. The State cited Cunningham's wavering views on the death penalty as another basis for its challenge. On her juror questionnaire, although she stated that she had "no opinion" on the death penalty, Cunningham stated that she would not consider the death penalty under any circumstances. During voir dire by the trial court, Cunningham initially stated that she could not consider the death penalty as a punishment, but she then stated that she "might" consider it:

Q:     . . . [w]hat's your view on even considering the death penalty?

A:     I would not.

. . .

Q:     Are – are you saying you would not consider it?

A:     No, sir.

Q:     Even if the law allowed it and the facts justified it, you just could not even consider it?

A:     No, sir.

. . .

Q:     So – but again, just tell me again what your feelings are on the death penalty.

148

A:     I don't believe in the death penalty.

Q:     And would there be a possible – could you consider it?

A:     I don't think so.

Q:     You don't think so?

A:     I don't think so.

Q:     But there's – in your own mind, you might could – are you saying you could possibly?

A:     I don't think so.

Q:     See, I'm not asking you to make a – you know, you haven't heard anything.  And all we want to know is whether you could consider that as a possibility – that as a sentencing possibility, because you and your fellow jurors will decide the sentence, but I just want to know if you could even consider that as a possible sentence?

A:     I might.  I might.  I don't know.  I might.

Q:     So you might be able to consider that?

A:     (Nodding head).[9]

Then during voir dire by the State, Cunningham returned to her initial position of not being able to consider the death penalty:

Q:     All right.  As far as the death penalty – and I want to make sure I understand what you're saying – if the law authorized the death penalty in this case and you found that the facts of the case that came from the stand justified it, could you, in fact, vote for the death penalty?

A:     I don't think so.
. . .

_____

[9] The record does not indicate whether Cunningham was nodding in the affirmative or the negative.

149

Q: Could you consider the death penalty yourself if the facts justified it and the law allowed it?

A: I don't think so.

Q: You don't think so.

A: That I could.

When questioned by defense counsel, Cunningham then stated that she could consider both punishments:

Q: . . . And what you're required to do is just consider both, then decide which way you want to vote. Do you understand now?

A: Yes, sir.

Q: And that's your decision. And with that being the case, can you consider both options, then vote your conscience?

A: Yes.

¶256. This Court has recognized that a juror's views on the death penalty may provide a race-neutral basis for a peremptory challenge. *See **Batiste v. State***, 121 So. 3d 808, 848 (Miss. 2013); ***Flowers III***, 947 So. 2d at 920-21. In ***Flowers III***, this Court found that the striking of an African American who had "virtually indistinguishable" views on the death penalty as compared to white jurors who were not struck raised an inference of discrimination, although, standing alone, it did not warrant the finding of a ***Batson*** violation. *Flowers III*, 947 So. 2d at 921. In today's case, there are no white jurors who survived for-cause challenges whose views on the death penalty were comparable to Cunningham's. As such, it cannot be said that this basis was pretext.

¶257. This race-neutral basis, however, does not erase the prosecutor's highly suspect

150

investigation of Cunningham's working relationship with Flowers's sister. ***Batson***, 476 U.S. at 96-97; ***Miller-El***, 545 U.S. at 239-40. No evidence in the record provides a basis for the in-depth investigation. Likewise, nothing in the record evidences that a similar investigation was performed for all other jurors. With this suspect record, the prosecution's unusual investigation of Cunningham must be seen for what it is worth – a questionable search for a race neutral basis, indicating that striking Cunningham was "motivated in substantial part by discriminatory intent." *See **Foster***, 136 S. Ct. at 1754 (internal quotations omitted).

### 5. Edith Burnside

¶258. The State provided the following reasons in support of its peremptory strike of Burnside: (1) she knew Flowers and members of his family; (2) she was sued by Tardy's Furniture; and (3) she provided inconsistent statements regarding her views on the death penalty.

*Burnside's Litigation with Tardy's*

¶259. During voir dire, the trial court asked the entire venire if anyone had been sued by Tardy's, and Burnside responded that she had been sued by the store. Later, Burnside explained that she was able to pay off the amount that she owed the store and that the litigation stemmed from a misunderstanding about her account after the murders occurred. During the ***Batson*** hearing, the State represented that Burnside had a garnishment issued against her. The prosecutor stated: "She also was sued by Tardy Furniture, and a garnishment was issued against her. She tried to deny that and said that she just settled with them when she came back but she was, in fact, sued by them." The State's description of the

151

litigation and Burnside's testimony regarding the same is not completely supported by the record. In response to the trial court's first inquiry during group voir dire, Burnside stated: "I had an account there, but I was not sued by Ms. Bertha. It was later on when it was took over by Mr. Frank and Roxanne." Burnside then confirmed that she was sued by Tardy's.

¶260. Then, during individual voir dire, Burnside further explained the suit:

A:     . . . . Let me explain that. I worked for Ms. Bertha. She hired me to work for Mr. Tardy before she was married to him the first time. I was caring for Ms. Lena Tardy. That's how I met Ms. Bertha. So when me and my husband was going through a divorce, she let me have some furniture. And she said she was going to note it on the book. Sometimes, I cleaned up for her and I paid for it and we just have, like, a little understanding about it. Okay. When she got killed, it was still on the book. And then her son-in-law – when I came back from Nevada, then that's when I had to pay for it. I don't remember when it was.

Q:     So there was a dispute between you and her son-in-law?

A:     No. It wasn't a dispute. He just –

Q:     Well, did you agree that you owed it?

A:     Yes. We had no falling out about it. I had the funds, and I agreed I owed it. When I went to Nevada, I guess it was just a space where I owed him. When I came back here and went to work, I paid him for it. We never had a misunderstanding about it.

Q:     If it wasn't no misunderstanding, why did it have to go to court?

A:     I'm not quite sure about that. I remember them bringing the papers after I come back here to go to work. Maybe he found out I was back or what. But then I went down to the store – that's when they had moved the store over to where the other building was – and I talked to him about when I paid it. We never had a falling out about it.

Q:     But you did have to be sued over it?

152

A:    Yes. I can't remember the –

Q:    And there was a judgment against you?

A:    Yes. But it was no falling-out about it.

Q:    Is there anything about that, that would cause you any difficulty in that case?

A:    No. Because he is a distributor for something for one of our salesman at Super Value where I work, and he come in every Thursday, and the lady make an order so I see him like on a weekly basis. But, you know, sometimes, I speak if it's – because she see him like over in her office, so no, it's nothing about that would make me have no –.

¶261. Similar to the State's characterization of Wright's litigation with Tardy's discussed above, the State's representation that Burnside's wages were garnished and that Burnside "denied" this is unsupported by the record in today's case. This incorrect description of the litigation between Burnside and Tardy's is suspect. *See* **Flowers III**, 947 So. 2d at 924 (citing **Manning**, 765 So. 2d at 519) ("Lack of support in the record for the reason given for a peremptory strike has been identified as an indicator of pretext."); **Foster**, 136 S. Ct. at 1754 (misrepresentations of the record are evidence of discriminatory intent).

*Burnside's Relationships with Flowers and His Family*

¶262. The State also cited Burnside's relationships with Flowers and his family as a basis for its challenge. Burnside stated during voir dire that she used to live close to the Flowers family. Flowers and his sister, Prisilla, used to visit Burnside's home. Further, Flowers was friends with Burnside's sons and used to play football with them. Burnside stated that these relationships would not affect her ability to serve as a juror.

¶263. No white venire members had comparable – or even close to comparable –

153

relationships with Flowers and his family. This Court has recognized that a juror's relationships with the defendant's family may provide a race-neutral reason for a peremptory challenge. *See* **Manning**, 735 So. 2d at 340. And although Burnside stated that her connections to the Flowers family would not affect her when serving as a juror, this basis – standing alone – seems to not be pretext. As mentioned above, however, this race neutral basis does not negate the questionable characterization of Burnside's litigation with Tardy's. **Batson**, 476 U.S. at 96-97; **Miller-El**, 545 U.S. at 239-40.

*Burnside's Statements Regarding the Death Penalty and Her Ability to Judge Others*

¶264. The State's final reasons for striking Burnside were her statements relating to whether she could judge another person and impose the death penalty. Burnside testified as follows during individual voir dire:

> Q: . . . . And so I want to know if the facts justified it and the law allowed it, could you consider the death penalty as a sentencing possibility?
>
> A: That I don't think I could do. I don't know if I could do that. . . . I don't – I don't know if I could consider it, sending anybody to death. I don't know if I could do that.
>
> Q: And can you explain further your views on that?
>
> A: I've just never been put in that predicament. I've always just don't know if I could do that. It's just the best way I can explain it. I just don't think I could do that.
>
> Q: Again, let me explain. You're not committing to do it or not to do it. You're just – we just need to know if that's something that would be in your mind where you could think about it and you could consider the possibility of it.
>
> A: I could think about it and consider it. That's all I could say.

154

Q:     And would you consider the imposition of the death penalty, if you were on the jury and it got to the second phase?

A:     If I was on there, yeah, I guess I'd have to.

Q:     So if the facts justified it and the law allowed it, you would consider it?

A:     Yes.

Q:     Also, if he did not receive that death sentence – if he was convicted and the jury did not impose the death sentence, . . . [he] would receive the sentence of life without parole.  So is that a sentencing option that you could consider, also?

A:     Yes, I could consider that.

Q:     And so you would consider and have an open mind as to both sentencing options then; is that correct?

A:     Yes, sir.

Although Burnside eventually stated that she would consider both sentencing options, she

later stated in voir dire that her reservations about judging another person would affect her

ability to serve as a juror:

Q:     When I was asking the questions the other day about jurors that could judge other people, you stated at that time that you could not judge anyone.  Why did you state that?

A:     Well, because I – you know, I prefer not to judge anyone.  But then when they come back and say could I be fair.  My thing is I prefer not to judge anyone.  But no, I will be fair.

Q:     All right. Who will you be fair to?

A:     I will be fair to whoever evidence is presented.  I will be fair.  Because I would want somebody to be fair to me or my children or my family.  That the only way I can explain it.

. . .

155

Q: So you have changed your mind, and you say now that you could judge someone; is that correct?

A: Well, basically, I haven't changed my mind. I just prefer not to be in a predicament where I have to judge somebody.

Q: So you still have a problem with judging someone?

A: I still have a problem with that.

Q: Would that problem be such that you would think about it if you were picked on a jury?

A: Well, I'd have to say yes.

Q: It would? So that might affect your judgment in the case; is that right?

A: It could, possibly, yes, sir.

Flowers's counsel then rehabilitated Burnside:

Q: Ms. Burnside, if you got picked on the jury, you would be fair to both sides, wouldn't you?

A: Yes, sir.

Q: And despite the fact that you don't like to judge, if you got picked you would, in fact, judge and be fair to both sides; is that correct?

A: Yes, sir, that is correct.

¶265. While a juror's views on the death penalty and hesitation about serving as a juror are race neutral reasons for peremptory challenges, the State rehabilitated Burnside and she ultimately stated that she could consider either punishment and could be fair to either side. *See Batiste*, 121 So. 3d at 848; *Hughes*, 90 So. 3d at 626; *Flowers III*, 947 So. 2d at 920-21. As such, this basis is somewhat suspect.

### D. Jury Selection Conclusion

156

¶266. While the Court has focused on the interests of Flowers in having a jury not tainted by racial bias, it has ignored the right of prospective jurors not to be subjected to racial bias. Beyond question, the right to a jury selection process free from the taint of racial discrimination belongs both to the parties and to the prospective jurors. *See Powers v. Ohio*, 499 U.S. 400, 416, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (Courts are "under an affirmative duty to enforce the . . . policies embodied in [the] prohibition" on the discrimination in the selection of jurors.). When the trial court and this Court, in robotic fashion, merely say that the prosecution gave facially race-neutral reasons, which were not rebutted by the defense, both completely disregard the constitutional right of prospective jurors to be free from a racially discriminatory selection process.

¶267. No attorneys are present in the courtroom to protect the constitutional rights of perspective jurors. Thus, of necessity, that responsibility must be undertaken by the trial courts. The honest exercise of that responsibility demands that the trial court look beyond the mere recitation of the words "race neutral." In this case, the trial court completely ignored and failed in that responsibility.

### III. *Batson* Conclusion

¶268. As noted previously, this case has been twice reversed by this Court for some of the same issues presented to the Court today. In the retrial of a case under these circumstances, where the same issues are confronted, the trial court is obligated to look beyond the surface. The United States Supreme Court's decision in *Foster* affirms this principle. The trial court failed in that obligation.

157

¶269. Because of that failure, I cannot conclude that Flowers received a fair trial, nor can I conclude that prospective jurors were not subjected to impermissible discrimination. For these reasons, I would reverse and remand for a new trial.

## IV.    Additional Errors

¶270. While the United State Supreme Court focused its remand on the ***Batson*** violation, and while I find the ***Batson*** violation dispositive, I continue to believe that other errors occurred at trial that also warrant reversal. Those errors were memorialized in Presiding Justice Dickinson's dissent in the original appeal on this matter. ***Flowers v. State***, 158 So. 3d 1009, 1076-83 (Miss. 2014) (Dickinson, P.J., dissenting). The circuit judge erred by refusing to allow the accused to defend the charges by calling a qualified expert to provide perfectly admissible expert opinions, and by instructing the jury on an aggravating factor for which the State provided no evidence. I reiterate those errors here, with credit to then-Justice Dickinson. *See **id.*** (Dickinson, P.J., dissenting).

### A.    Dr. Neuschatz should have been allowed to testify.

¶271. The trial judge categorically prohibited Flowers's expert, Dr. Jeffrey Neuschatz, from providing expert testimony on eyewitness identification. It was not that the trial judge disagreed with the evidence in Dr. Neuschatz's expert affidavit—he ignored it. The trial judge felt that any helpful information that could have been provided by the expert could just as easily have been developed through cross-examination. But the information the expert would have provided could never be developed on cross examination, because the witnesses would not know they had made misidentifications.

158

¶272. This Court reviews a trial court's ruling on the admissibility of evidence under a deferential abuse of discretion standard. *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003) (internal citations omitted). Under Rule 702, an expert's testimony must satisfy a two-part test. *Id.* at 35. "First, the witness must be qualified by virtue of his or her knowledge, skill, experience[,] or education. Second, the witness's scientific, technical[,] or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue." *Id.*

¶273. The trial judge is to act as a gatekeeper and may look to "a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony." *Id.* at 36 (internal citations omitted). The five factors referenced in *Daubert*[10] look at whether: (1) the theory or technique can be and has been tested; (2) the theory has been subjected to peer review and publication; (3) there is a high known or potential rate of error; (4) there are standards controlling the technique's operation; and (5) the theory or technique enjoys general acceptance within a relevant scientific community. *Id.* (internal citations omitted). The presence or absence of any one of these factors is not dispositive.

¶274. The issue of allowing experts to testify about the reliability of eyewitness identification is not new. A majority of state jurisdictions allow eyewitness identification experts to testify, provided they are properly qualified and their opinions satisfy reliability concerns, such as those set forth in *Daubert*. For instance, the Tennessee Supreme Court—evaluating factors similar to those mentioned in *Daubert*—reversed its prior position

---

[10]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

seven years ago and now allows properly qualified eyewitness experts to testify, finding that such testimony can be helpful in the jury's evaluation of an eyewitness's identification. *State v. Copeland*, 226 S.W. 3d 287, 302-304 (Tenn. 2007). And the vast majority of states and the District of Columbia either give trial courts discretion to allow eyewitness identification expert testimony, or require the admission of such testimony.[11]

---

[11] *See **Ex Parte Williams***, 594 So. 2d 1225, 1227(Ala. 1992) ("It is clear from these cases that there is presently a trend in the law to allow expert testimony on the subject of human memory."); ***Skamarocius v. State***, 731 P.2d 63, 66-67 (Alaska 1987); ***State v. Chapple***, 660 P.2d 1208, 1219 (Ariz. 1983), *overruled on different grounds by **State v. Benson***, 307 P.3d 19 (Ariz. 2013); ***Jones v. State***, 862 S.W.2d 242, 244-45 (Ark. 1993); ***People v. Jones***, 70 P.3d 359, 388 (Cal. 2003) ("Exclusion of the expert testimony is justified only if there is other evidence that substantially corroborates the eyewitnesses identification and gives it independent reliability."); ***People v. Campbell***, 847 P.2d 228, 233 (Colo. App. 1992); ***State v. Guilbert***, 49 A.3d 705, 731-32 (Conn. 2012); ***Hager v. U.S.***, 856 A.2d 1143, 1147 (D.C. 2004); ***McMullen v. State***, 714 So. 2d 368, 371 (Fla. 1998); ***Johnson v. State***, 526 S.E.2d 549, 552 (Ga. 2000); ***People v. Enis***, 564 N.E.2d 1155, 1165 (Ill. 1990); ***Cook v. State***, 734 N.E.2d 563, 570 (Ind. 2000); ***State v. Schutz***, 579 N.W.2d 317, 319 (Iowa 1998) ("[T]he admissibility of expert testimony relating to the accuracy of eye witness identification rests within the sound discretion of the trial court."); ***State v. Carr***, 331 P.3d 544, 690 (Kan. 2014), *overruled on other grounds by **Kansas v. Carr***, __ U.S. __, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016); ***Commonwealth v. Christie***, 98 S.W.3d 485, 488 (Ky. 2002) (noting that the vast majority of jurisdictions have left the admission of eyewitness expert identification testimony to the discretion of trial courts); ***State v. Rich***, 549 A.2d 742, 743 (Me. 1988); ***Bomas v. State***, 987 A.2d 98, 114-115 (Md. 2010); ***Commonwealth v. Santoli***, 680 N.E.2d 1116, 1120 (Mass. 1997); ***State v. Barlow***, 541 N.W.2d 309, 313 (Minn. 1995); ***State v. DuBray***, 77 P.3d 247, 255 (Mont. 2003) ("It shall be an abuse of discretion for a district court to disallow expert testimony on eyewitness testimony when no substantial corroborating evidence exists."); ***White v. State***, 926 P.2d 291, 292 (Nev. 1996); ***State v. Henderson***, 27 A.3d 872, 916-17 (N.J. 2011); ***People v. LeGrand***, 867 N.E.2d 374, 379 (N.Y. 2007); ***State v. Fontaine***, 382 N.W.2d 374, 378 (N.D. 1986); ***State v. Buell***, 489 N.E.2d 795, 803 (Ohio 1986); ***Bristol v. State***, 764 P.2d 887, 890 (Okla. Crim. App. 1988); ***State v. Lawson***, 291 P.3d 673, 697 (Or. 2012); ***Commonwealth v. Walker***, 92 A.3d 766, 791 (Pa. 2014) ("[I]n light of the magnitude of scientific understanding of eyewitness identification and marked developments in case law during the last 30 years, it is no longer advisable to ban the use of expert testimony to aid a jury in understanding eyewitness identification."); ***State v. Sabetta***, 680 A.2d 927, 933 (R.I. 1996);

¶275. In this case, the trial judge first found that the trier of fact did not need Dr. Neuschatz's testimony. He stated: "Given the extensive cross-examination of Mr. Collins and because all other witnesses knew Mr. Flowers on sight, I do not believe an expert on witnesses identification would assist the jury in the least bit in this case." This conclusion was demonstrably incorrect. The trial judge provided no analysis of how cross-examination of the witnesses could develop the opinions provided by Dr. Neuschatz, or how the witnesses themselves could provide expert testimony. The eyewitnesses certainly could provide the facts, such as distance, lighting, length of time, etc. But Dr. Neuschatz was not presented to testify to the facts alone. His role was to begin with the facts provided by the eyewitnesses, and then provide expert testimony as to the difficulties and reliability associated with identification. The eyewitnesses themselves certainly could not provide the testimony expected from Dr. Neuschatz.

¶276. Nor could cross-examination provide an adequate substitute for Dr. Neuschatz's testimony. A skillful attorney may utilize cross-examination to expose contradictions in a witness's testimony. But no attorney—of even the greatest skill—can cross-examine a witness in such a way as to expose that the witness did not see what the witness actually believes he saw. And that is exactly the purpose of expert eyewitness identification testimony. Dr. Neuschatz—if allowed to testify—would have explained scientific principles

*State v. Whaley*, 406 S.E.2d 369, 372 (S.C. 1991); *State v. Hill*, 463 N.W.2d 674, 676 (S.D. 1990); *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996); *State v. Clopten*, 223 P.3d 1103, 1112 (Utah 2009); *State v. Percy*, 595 A.2d 248, 253 (Vt. 1990); *State v. Cheatam*, 81 P.3d 830, 842 (Wash. 2003); *State v. Utter*, No. 13-0479, 2014 WL 1673025, at *3 (W. Va. Apr. 25, 2014); *State v. Shomberg*, 709 N.W.2d 370, 377 (Wis. 2006); *Engberg v. Meyer*, 820 P.2d 70, 79-80 (Wyo. 1991).

affecting the accuracy of a witness's perception of what he saw.

¶277. The trial judge's entire *Daubert* analysis was as follows:

> Further, though, I think aside from the fact that I do not think this would assist the trier of fact, I do not think all the *Daubert* principles have been shown to the Court to apply to this testimony. The defense has not offered to this Court this idea that the theories the defense would testify to or the area of expertise proffered are generally accepted. I do not know whether the testimony has a potential or known high rate of error. I do not have anything about that. I do not know anything about the principles and methods used to come to conclusions. And basically, the witness did not apply the principles and methods to the facts of this case. He made broad generalizations in the document that was submitted, but he did not specifically apply those principles and methods to the facts of this case. So for all these reasons, I do not think that this witness testimony would be appropriate, and I am going to deny the testimony of this witness.

The following is a detailed analysis of each sentence of the trial judge's *Daubert* analysis, and it demonstrates that the trial judge abused his discretion in refusing to allow Dr. Neuschatz to testify as an expert.

> *"I do not think all the **Daubert** principles have been shown to the Court to apply to this testimony."*

¶278. This statement suggests the trial court erroneously believed the defendant had a burden to show that "all the *Daubert* factors" applied. Clearly, this is not the case.

> *"The defense has not offered to this Court this idea that the theories the defense would testify to or the area of expertise proffered are generally accepted."*

¶279. This conclusion was incorrect. Dr. Neuschatz cited thirty-three studies in his affidavit, each of which indicated general acceptance in the field of psychology. The State offered no

evidence in rebuttal of Dr. Neuschatz's affidavit on this point.[12]

¶280. The majority's only reason for agreeing with the trial judge on this point is that Dr. Neuschatz did not attach each article to his affidavit. But under our Rules of Evidence, experts are not required to attach the basis of their opinions to their affidavits. Instead, they are allowed to rely on studies that they do not provide to the court, unless requested by the court. Rule 705 provides

> The expert may testify in terms of opinion or inferences and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Miss. R. Evid. 705.

¶281. In this case, neither the trial judge nor the State requested production of the underlying data or the articles upon which Dr. Neuschatz relied. It was clear error for the trial judge to reject Dr. Neuschatz's affidavit merely because the articles were not attached. And the majority compounds the error by requiring the expert in this case to do something other

---

[12] Dr. Neuschatz cited studies by: (1) Neisser 1967; (2) Loftus 1979; (3) Loftus & Loftus 1990; (4) Schacter 1995; (5) Ellis, Davis & Shepard 1977; (6) Maclin, Maclin & Malpass 2001; (7) Shapiro & Penrod 1986; (8) Memon, Hope & Bull 2003; (9) Culter & Penrod 1988; (10) Culter, Penrod & Martens 1987 (study a); (11) Culter, Penrod & Martens 1987 (study b); (12) Culter 1986; (13) O'Rourke 1987; (14) Culter 2006; (15) Tulving 1983; (16) Hunt & Ellis 1974; (17) Read, Tollestrup, Hammersley, McFadden & Christensen 1990; (18) Ross, Ceci, Dunning & Toglia 1994; (19) Meissner & Brigham 2001; (20) Gibson 1969; (21) Wells & Bradfield 1998; (22) Neuschatz 2005; (23) Hafstad, Memon & Logie 2004; (24) Wells, Small, Penrod, Malpass, Fulero & Brimacombe 1998; (25) Haw & Fisher 2004; (26) Garrioch & Brimacombe 2001; (27) Neuschatz & Gutler (in progress); (28) Douglas, Smith, & Frasier-Hill 2005; (29) Malpass & Devine 1981; (30) Stebaly 1997; (31) Loftus 1993; (32) Johnson 1993; and (33) Pezdek 2007.

experts are not required to do,[13] and something this very Court's rules specifically do not require.

¶282. In **Watts v. Radiator Specialty Company**, this Court considered whether an expert's opinions were actually supported by the case-studies he cited. **Watts v. Radiator Specialty Co.**, 990 So. 2d 143, 146-48 (Miss. 2008). The expert in that case did not provide the studies to the court. **Id.** at 147 n.7. Though this Court found that the trial court properly excluded the expert's testimony because the studies did not support his conclusion, the Court never questioned his failure to provide those studies. **Id.**

> "I do not know whether the testimony has a potential or known high rate of error. I do not have anything about that."

¶283. Again, on this point, the trial judge was incorrect. In his affidavit, Dr. Neuschatz discussed extensive testing that produced precise error rates. For instance, in discussing the factor of exposure time, Dr. Neuschatz stated:

> Exposure duration had a significant impact on identification accuracy. Ninety-five percent of the young adults and 85% of the older adults made correct identifications from the robber-present photo arrays when the robber was exposed for 45 seconds, but only 29% of the young adults and 35% of the older adults made correct identifications when the robber was exposed for 12 seconds.

¶284. In discussing the appearance change disguise factor, he stated: "The average performance levels across the six studies, which involved over 1,300 eyewitness identifications, was 57% correct when uncovered and versus 44% when a hat was worn."

---

[13] It is difficult to imagine the Majority rejecting out-of-hand the opinions of the State's pathologist as to the cause and manner of death, simply because the record does not include all of the underlying studies and data that contributed to that opinion.

¶285. In discussing cross-race identification, Dr. Neuschatz stated:

The reliability of the ORB [own-race bias] was examined by Meissner and Brigham (2001) who meta-analyzed the results of 31 separate studies involving 91 separate experimental tests of own versus same-race identifications. The studies included over 5,000 participants. Across all studies, eyewitnesses were 1.4 times more likely to correctly identify members of their own race than members of other races, and they were 1.56 times more likely to falsely identify members of other races than members of their own race.

¶286. These and other studies cited in the affidavit speak not only to error rates but also to the reliability of Dr. Neuschatz's opinions.

*"I do not know anything about the principles and methods used to come to conclusions."*

¶287. Here again, the trial judge was incorrect. The studies cited above, and the balance of Dr. Neuschatz's affidavit are replete with descriptions of the methods and principles used in the numerous studies.

¶288. Dr. Neuschatz's affidavit contained detailed information about studies on: (1) how memory works; (2) effect of exposure time on reliability of memory; (3) effect of appearance changes and disguises on identification; (4) the phenomenon of unconscious transference where one situation is confused with another; (5) problems with cross-racial identifications; (6) problems with post identification feedback; and (7) problems with suggestive line-up procedures.

*"And basically, the witness did not apply the principles and methods to the facts of this case. He made broad generalizations in the document that was submitted, but he did not specifically apply those principles and methods to the facts of this case."*

¶289. Again, the trial judge was incorrect. Dr. Neuschatz indeed applied the principles and

methods in his field of expertise to the facts in the Flowers case. For instance, he analyzed in detail the effect of the police's line-up identification. Also, he addressed issues involving Porky Collins's identification, including problems with cross-racial identifications.

*Refusing to allow Dr. Neuschatz to testify was not harmless error.*

¶290. Dr. Neuschatz's testimony would have provided the jury a fair basis upon which to judge the accuracy of Collins's identification. I also cannot accept the majority's conclusion that "Collins's identification was far from the only evidence of guilt in the instant case, and it cannot be label 'critical.'"

¶291. It is true that the State had other witnesses, but none provided the powerful eyewitness testimony that Collins provided. He is the only witness who placed Flowers at the scene of the murders shortly before they were committed. None of the witnesses was more critical to the State's case, and none was more important for the defense to attack.

¶292. The State offered *nothing* in rebuttal of Dr. Neuschatz's opinions: no experts, articles, studies, or evidence of any kind that tended to refute his opinions and methodology. Accordingly, Dr. Neuschatz should have been allowed to testify in this case.

**B.    The trial judge should have denied the State's requested instruction on the commission of a capital crime to avoid arrest aggravator.**

¶293. When Flowers's case proceeded to the sentencing phase, the trial judge instructed the jury to consider three potential aggravating factors:

1.    The Defendant knowingly created a great risk of death to many persons.

2.    The capital offense was committed while the Defendant was engaged in the commission of the crime of armed robbery for pecuniary gain.

166

3.  The capital offense was committed for the purpose of avoiding or preventing lawful arrest or effecting an escape from custody.

The jury found each aggravating factor and sentenced Flowers to death. Because the trial judge erred when he instructed the jury to consider the third aggravating factor, I would reverse Flowers's death sentence and remand for resentencing even if this Court affirmed his conviction.

¶294. It is elementary that the State bears the burden to prove the defendant's guilt of a charged offense beyond a reasonable doubt. *Henley v. State*, 136 So. 3d 413, 415-16 (Miss. 2014). Likewise, our law places upon the State the burden in a capital murder sentencing proceeding to prove the existence of **each aggravating factor beyond a reasonable doubt**. *Holland v. State*, 587 So. 2d 848, 874 (Miss. 1991) (citing *Nixon v. State*, 533 So. 2d 1078, 1099 (Miss. 1987), *overruled on other grounds by Wharton v. State*, 734 So. 2d 985, 991 (Miss. 1998)); *see also Keller v. State*, 138 So. 3d 817, 867-68 (Miss. 2014). Only when the State satisfies its burden may the jury weigh a particular aggravating factor in favor of a death sentence. *Keller*, 138 So. 3d at 867-68.

¶295. The Majority relies on this Court's repeated statement that an instruction should be granted on this aggravating factor if the jury may draw an inference from the evidence that avoiding arrest was "a substantial reason for the killing." *Id.* at 868 (quoting *Gillett v. State*, 56 So. 3d 469, 505-06 (Miss. 2010) (quoting *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983))); *see also Wiley v. State*, 750 So. 2d 1193, 1206 (Miss. 1999); *Woodward v. State*, 726 So. 2d 524, 540 (Miss. 1997); *Foster v. State*, 687 So. 2d 1124, 1140 (Miss. 1996); *Taylor v. State*, 672 So. 2d 1246, 1275 (Miss. 1996); *Walker v. State*, 671 So. 2d 581,

611 (Miss. 1995); *Carr v. State*, 655 So. 2d 824, 853-54 (Miss. 1995); *Chase v. State*, 645 So. 2d 829, 858 (Miss. 1994); *Hansen v. State*, 592 So. 2d 114, 153 (Miss. 1991); *Lanier v. State*, 533 So. 2d 473, 490 (Miss. 1988). But that standard—stated in that way with nothing more—cannot be the law. Saying jurors may draw an inference is not enough, unless the inference is so strong that, standing alone, the inference is sufficient for a finding beyond a reasonable doubt. The inference in this case clearly does not fall into that category.

¶296. The Majority says a reasonable juror could infer that Flowers killed one of the victims to prevent identification and avoid arrest. While a reasonable juror might very well find that to be a possibility, it would be no more than a guess. And no reasonable juror could make that finding beyond a reasonable doubt. Judges should submit issues to juries through instructions *only* when a reasonable juror could find the beyond a reasonable doubt burden of proof satisfied on that issue. *Henley*, 136 So. 3d at 415-16 (quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985) (citing *May v. State*, 460 So. 2d 778, 781 (Miss. 1984)) (a directed verdict should be granted if no reasonable juror could find the defendant guilty beyond a reasonable doubt)); *Harper v. State*, 478 So. 2d 1017, 1021 (Miss. 1985) (a lesser offense instruction should be granted unless no reasonable juror could find that the defendant committed the lesser offense).

¶297. Stated another way, jurors certainly are free to draw reasonable inferences from the facts. But a juror's ability to draw a reasonable inference is not the same as a reasonable juror's ability to find that fact beyond a reasonable doubt. For instance, one may draw a reasonable inference that a person who usually goes to lunch from 12:00 to 1:00 p.m. is at

lunch on a particular day at 12:30 p.m. But that does not mean one may reach that conclusion beyond a reasonable doubt.

¶298. So a trial judge should grant a State's request to instruct the jury on this aggravating factor only where the State has presented evidence from which a reasonable juror could find beyond a reasonable doubt that "a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities." *Keller*, 138 So. 3d at 867-68 (quoting *Gillett*, 56 So. 3d at 505-06 (quoting *Leatherwood*, 435 So. 2d at 651)). And any case that categorically establishes inferences as sufficient to satisfy the beyond-a-reasonable-doubt standard should be overruled.

¶299. The State presented insufficient evidence to meet its burden. The most that may be said in this case is that the jury could speculate that Flowers committed one of the murders to avoid arrest. There was no evidence that he did. In fact, the State argued in the guilt phase that Flowers committed the murders for different purposes: revenge and anger over being fired as well as to effectuate the robbery. From its opening statement, the State's theory of the case was that Flowers possessed a motive to commit the murders because he had been fired by Tardy's. This motive—a revenge killing—is at odds with a conclusion that he killed out of a necessity to avoid arrest. No evidence was presented that Flowers expressed an intent to kill to avoid arrest.

¶300. The Majority finds that this aggravating factor instruction is supported by two facts: Flowers knew his victims and Flowers disposed of evidence after the killings. The second

169

can be disposed of easily because it bears no logical connection to the question at hand. Regardless of the reason someone commits murder, that person usually has an incentive to dispose of the evidence. Said differently, if Flowers killed his victims out of pure anger, he would have an incentive to cover up the killing by disposing of evidence. The same could be said if Flowers killed because the victims resisted the robbery. Showing that Flowers disposed of evidence after the killing makes it no more reasonable to conclude that he killed to avoid arrest.

¶301. Likewise, the Majority's reliance on the fact that Flowers knew his victims is misplaced. First, by the Majority's own statement, this rationale applies to one victim. The majority states:

> The State's theory was that Flowers intended to kill Bertha Tardy because she fired him and withheld his pay and, in the process of doing so, he shot and killed the others. Flowers knew Carmen Rigby from working at the store, but there is no evidence that he knew Robert Johnson or Derrick Stewart, as the day of the murders was their first day to work at the store.

This statement acknowledges that Flowers killed Tardy—not to avoid arrest—but for revenge. The Majority admits that Flowers did not know Johnson or Stewart. So at best, the Majority's reliance on this evidence relates to Rigby alone. But even there it cannot provide sufficient evidence to grant the instruction. It is simply inaccurate to say that a reasonable juror could conclude beyond a reasonable doubt that Flowers killed Rigby to avoid arrest, simply because they had worked together.

¶302. True, this Court has supported an instruction on this aggravating factor in the past based solely on the fact that the victim knew the defendant and could identify him. *Wiley*,

170

750 So. 2d at 1206. But if we are to enforce the burden of proof required of the State, this was error. Allowing a jury to consider an aggravating factor based on nothing more than pure speculation cannot reach the level of proof beyond a reasonable doubt. Because the State presented insufficient evidence from which a reasonable juror could find this aggravating factor beyond a reasonable doubt, I would reverse Flowers's sentence of death and remand for a new sentencing hearing.

**KITCHENS, P.J., JOINS THIS OPINION. WALLER, C.J., JOINS IN PART WITH OPINION.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Timothy Nelson Evans v. State*, 226 So. 3d 1 (Miss. 2017).

*James Cobb Hutto III v. State*, 2014-DP-00177-SCT, 2017 WL 2001157 (Miss. May 11, 2017).

*David Cox v. State*, 183 So. 3d 36 (Miss. 2015).

*David Dickerson v. State*, 175 So. 3d 8 (Miss. 2015).

*Timothy Robert Ronk v. State*, 172 So. 3d 1112 (Miss. 2015).

*Curtis Giovanni Flowers v. State*, 158 So. 3d 1009 (Miss. 2014). *following remand.

*Caleb Corrothers v. State*, 148 So. 3d 278 (Miss. 2014), *leave to seek PCR granted in part and denied in part* (Feb. 2, 2017), *rehearing denied* (May 11, 2017).

*Jason Lee Keller v. State*, 138 So. 3d 817 (Miss. 2014), *leave to seek PCR granted in part and denied in part* (May 25, 2017).

*Leslie Galloway III v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So 3d 808 (Miss. 2013), *granted leave to seek PCR* (Jan. 21, 2016).

*Roger Lee Gillett v. State,* 56 So. 3d 469 (Miss. 2010).

*Moffett v. State*, 49 So. 3d 1073 (Miss. 2010).

*Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

*Goff v. State*, 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State*, 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State*, 933 So. 2d 930 (Miss. 2006).

*Havard v. State*, 928 So. 2d 771 (Miss. 2006).

*Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

*Hodges v. State*, 912 So. 2d 730 (Miss. 2005).

*Walker v. State*, 913 So. 2d 198 (Miss. 2005).

*Le v. State*, 913 So. 2d 913 (Miss. 2005), *granted leave to seek second PCR,* 2013-DR-00327-SCT (Feb. 23, 2016).

*Brown v. State*, 890 So. 2d 901 (Miss. 2004).

*Powers v. State*, 883 So. 2d 20 (Miss. 2004)

*Branch v. State*, 882 So. 2d 36 (Miss. 2004).

*Scott v. State*, 878 So. 2d 933 (Miss. 2004).

*Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State*, 875 So. 2d 140 (Miss. 2004).

*Byrom v. State*, 863 So. 2d 836 (Miss. 2003).

*Howell v. State*, 860 So. 2d 704 (Miss. 2003).

*Howard v. State*, 853 So. 2d 781 (Miss. 2003).

*Walker v. State*, 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State*, 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State*, 806 So. 2d 241 (Miss. 2002).

*Knox v. State*, 805 So. 2d 527 (Miss. 2002).

*Simmons v. State*, 805 So. 2d 452 (Miss. 2002).

*Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State*, 792 So. 2d 192 (Miss. 2001).

*Puckett v. State*, 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State*, 787 So. 2d 639 (Miss. 2001).

*Jordan v. State*, 786 So. 2d 987 (Miss. 2001).

*Manning v. State*, 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State*, 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State*, 741 So. 2d 894 (Miss. 1999).

*Puckett v. State*, 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State*, 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State*, 735 So. 2d 238 (Miss. 1999).

*Turner v. State*, 732 So. 2d 937 (Miss. 1999).

*Smith v. State*, 729 So. 2d 1191 (Miss. 1998).

*Burns v. State*, 729 So. 2d 203 (Miss. 1998).

*Jordan v. State*, 728 So. 2d 1088 (Miss. 1998).

*Gray v. State*, 728 So. 2d 36 (Miss. 1998).

*Manning v. State*, 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

***Bell v. State***, 725 So. 2d 836 (Miss. 1998), *post-conviction relief granted in part and denied in part*, 725 So. 2d 836 (Miss. 2011).

***Evans v. State***, 725 So. 2d 613 (Miss. 1997).

***Brewer v. State***, 725 So. 2d 106 (Miss. 1998).

***Crawford v. State***, 716 So. 2d 1028 (Miss. 1998).

***Doss v. State***, 709 So. 2d 369 (Miss. 1996).

***Underwood v. State***, 708 So. 2d 18 (Miss. 1998).

***Holland v. State***, 705 So. 2d 307 (Miss. 1997).

***Wells v. State***, 698 So. 2d 497 (Miss. 1997).

***Wilcher v. State***, 697 So. 2d 1087 (Miss. 1997).

***Wiley v. State***, 691 So. 2d 959 (Miss. 1997).

***Brown v. State***, 690 So. 2d 276 (Miss. 1996).

***Simon v. State***, 688 So. 2d 791 (Miss.1997).

***Jackson v. State***, 684 So. 2d 1213 (Miss. 1996).

***Williams v. State***, 684 So. 2d 1179 (Miss. 1996).

***Davis v. State***, 684 So. 2d 643 (Miss. 1996).

***Taylor v. State***, 682 So. 2d. 359 (Miss. 1996).

***Brown v. State***, 682 So. 2d 340 (Miss. 1996).

***Blue v. State***, 674 So. 2d 1184 (Miss. 1996).

***Holly v. State***, 671 So. 2d 32 (Miss. 1996).

***Walker v. State***, 671 So. 2d 581 (Miss. 1995).

***Russell v. State***, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding; *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding; *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987); ***Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding; ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Sherwood Brown v. State*, 2017-DR-00206=SCT (Oct. 26, 2017) (order).

*Erik Wayne Hollie v. State*, 174 So. 3d 824 (Miss.  2015).

*Manning v. State*, 158 So. 3d 302 (Miss. 2015) (reversing denial of post-conviction relief).

*Byrom v. State*, 2014-DR-00230-SCT (April 3, 2014) (order).

*Ross v. State*, 954 So. 2d 968 (Miss. 2007).

*Flowers v. State*, 947 So. 2d 910 (Miss. 2006).

*Flowers v. State*,  842 So. 2d 531 (Miss. 2003).

*Randall v. State*, 806 So. 2d 185 (Miss. 2002).

*Flowers v. State*, 773 So. 2d 309 (Miss. 2000).

*Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

*Smith v. State*, 733 So. 2d 793 (Miss. 1999).

*Porter v. State*, 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State*, 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State*, 701 So. 2d 274 (Miss. 1997).

*Lester v. State*, 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED
AS TO PUNISHMENT AND REMANDED
FOR RESENTENCING TO LIFE IMPRISONMENT**

*Bell v. State*, 160 So. 3d 188 (Miss. 2016).

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

**DEATH CASES REVERSED AS TO**
**PUNISHMENT AND REMANDED FOR A NEW TRIAL**
<u>**ON SENTENCING PHASE ONLY**</u>

*Fulgham v. State*, 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State*, 941 So. 2d 735 (Miss. 2006).

*King v. State*,  784 So. 2d 884 (Miss. 2001).

*Walker v. State*, 740 So. 2d 873 (Miss. 1999).

*Watts v. State*, 733 So. 2d 214 (Miss. 1999).

*West v. State*, 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State*, 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding; *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding; *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd,* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986); *cert. denied, **Wiley v. Mississippi***, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State***, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed.

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

(Revised October 30, 2017.)